RECEIVED CLERK
FILED
2001 JUL 25 P 7 09
U.S. DISTRICT COURT
DISTRICT OF UTAH

Mark L. Shurtleff USB # 4666
UTAH ATTORNEY GENERAL
Raymond A. Hintze USB #1501
Chief Civil Deputy Attorney General
J. Mark Ward USB # 4436
Assistant Attorney General
236 State Capitol Building
Salt Lake City, Utah 84114
Telephone 801-538-1191
Facsimile 801-538-1121

Thomas R. Lee USB # 5991
1395 E. Canberra Dr.
Lindon, Utah 84042
Telephone 801-378-0024
Facsimile 801-378-5893

Gene C. Schaerr
Michael S. Lee USB #8108
Jay T. Jorgensen USB #8216
SIDLEY & AUSTIN BROWN & WOOD
1722 Eye St., NW
Washington, DC 20006
Telephone 202-736-8000
Facsimile 202-736-8711

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

STATE OF UTAH, et al.

Plaintiffs,

v.

DONALD L. EVANS, et al.

Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**SUPPLEMENTAL DECLARATION
OF LARA J. WOLFSON, Ph.D.**

Case No. 2:01–CV–292: G



I, Lara J. Wolfson, do hereby declare the following:

1.      I am currently employed as a Professor of Statistics at Brigham Young University in Provo, Utah.

2.      I hold a Ph.D. and an M.S. in Statistics, both of which were awarded by Carnegie Mellon University in Pittsburgh, Pennsylvania.  I also hold a Bachelor's degree in Mathematics from Simon Fraser University in Burnaby, British Columbia.

3.      I have authored over 30 scholarly publications in the field of statistics.

4.      I have also conducted numerous studies, and compiled statistical reports to accompany those studies, as a consultant.

5.      A significant portion of my work – both as a scholar and as a consultant – has been devoted to evaluating the statistical accuracy of national censuses.

6.      An additional portion of my work, both as a scholar and as a consultant, has been in the area of statistical techniques for accounting for missing data; in particular, in the use of statistical imputation methods.

7.      I am currently serving as the Past President of the Utah Chapter of the American Statistical Association.

8.      I have been retained as a consultant in this case to advise the Plaintiffs on the statistical implications of the way in which the Bureau conducted the 2000 decennial census.

9.      The conclusions I draw and opinions I express in this Declaration are supported by data and statistical analysis that other experts in my field would consider reliable.

10.     In preparing this Declaration, I have reviewed population data produced by the Census Bureau in connection with the 2000 census.  I have also reviewed the process by which the Census Bureau apportions congressional representation after conducting each decennial

census, as well as numerous documents detailing the methods used by the Census Bureau in conducting Census 2000, and the way in which previous decennial censuses have been conducted. I have additionally reviewed numerous scholarly articles on methods used in the decennial census, and contacted several of the authors of such articles.

11.     On March 14, 2001, plaintiffs first asked me to start an investigation to determine (a) whether the Bureau's use of a statistical estimation procedure or procedures may have affected Utah's representation in the House of Representatives; and (b) whether and to what extent the Bureau's use of such procedure(s) could correctly be characterized as a method of statistical sampling comparable to the sampling method held unlawful by the Supreme Court in *Dept. of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999).

12.     At that time, plaintiffs called my attention to a press release issued by the Utah Democratic Committee (attached hereto as Exhibit 1), which asserted that if "Non-Data Defined Persons" were removed from the apportionment population, Utah would receive a 4th congressional seat. The press release also implied that "Non-Data Defined Persons" were the product of a method of statistical estimation or sampling.

13.     In response to this press release and at the request of plaintiffs, I spent dozens of hours during March and early April examining thousands of pages of the Census Bureau's publicly released documents, making inquiries with the Census Monitoring Board—Presidential Members ("CMBP"), and eventually interviewing staff members of the House Subcommittee on the Census, in an attempt to determine whether the Bureau had used a statistical method of estimation that had affected the State of Utah's representation in Congress. Despite these extensive, ongoing efforts, I was unable to make this determination until April 9, 2001. Indeed, for the reasons explained below, the State of Utah could not reasonably have made this

3

determination any earlier, and it was only as the result of intensive investigation and inquiry that Plaintiffs were able to resolve this issue by April 9.

14.     Upon my initial review of the documents released publicly by the Census Bureau, I learned that the only data that were available were the general apportionment counts, consisting of the resident population of the United States ("Resident Population") and federal military and civilian personnel (and their dependents) serving overseas ("Overseas Population"). These data were transmitted by the Census Bureau to the President on December 28, 2000, and made available publicly on the Census Bureau's website shortly thereafter. *See* http://www.census.gov/population/cen2000/tab01.txt .

15.     Unfortunately, the Census Bureau's report of these data did not enable me to determine whether the Bureau had used a statistical method of estimation that had affected the State of Utah's representation in Congress. In fact, a footnote at the bottom of the above-noted webpage suggested that no such methods had been used:

> NOTE: As required by the January 1999 U.S. Supreme Court ruling (Department of Commerce v. House of Representatives, 525 U.S. 316, 119 S. Ct. 765 (1999)), **the apportionment population counts do not reflect the use of statistical sampling to correct for overcounting or undercounting**.

*Id.* (emphasis added).

16.     Despite this disclaimer, I continued to investigate whether the Census Bureau had used a method of statistical estimation that might have affected Utah's representation in Congress. For example, I searched the Census Bureau website with respect to the use of imputation and/or sampling in the 2000 census, but found only documents such as the one found at http://www.census.gov/dmd/www/sampfaq.htm, which is a document discussing the *proposed* use of sampling that was officially struck down by the Supreme Court ruling in *House of Representatives*.

4

17.     On or about March 16, 2000, I contacted Frances Bourne of the Census Monitoring Board, Presidential Members (CMBP) and Eugene P. Ericksen, a consultant to the CMBP and a professor at Temple University, by telephone to ask them whether they were aware of any data regarding the Census Bureau's use of any methods of statistical estimation—specifically, any data detailing for each state the number of "Non-Data Defined People" added to the apportionment count.  Bourne and Ericksen indicated that no such data was available to the public at that time.  In fact, when I pressed further as to whether the data existed, Ericksen indicated that he had been required to sign a Memorandum of Agreement with the Census Bureau that required that he maintain the confidentiality of this data.

18.     On March 20, I had another telephone conversation with Professor Ericksen in a further effort to determine whether the relevant data existed.  At that time, Ericksen indicated that even he did not have access to sufficiently detailed, state-by-state breakdowns of the "Non-Data Defined People[1]" to determine whether statistical estimation methods had affected Utah's (or any other state's) representation in Congress.

19.     On or about March 26, 2001, Plaintiffs' counsel informed me that they had contacted the House Subcommittee on the Census in an attempt to track down the relevant data (which still had not been released to the public).  As a result of these inquiries, plaintiffs acquired a document (attached hereto as Exhibit 2) providing various data under the headings "Data Defined," "Imputations," "Total Substitutions," "Substitutions of 3,4,5," and "Group Quarters." Unfortunately, staff members of the Subcommittee (such as Mr. Mike Miguel, senior data

---

[1] "Non-Data Defined" people, as used herein and in the press release, referred to persons for whom *any* information, including characteristics such as age, race, or sex, had been estimated.  In order to ascertain whether Utah's representation in Congress had been impacted by any use of statistical estimation technique, it was necessary to break that category down further into those who had been *counted* by means of statistical estimation, as opposed to those who merely had characteristics estimated by means of statistical estimation.  The data that Professor Ericksen had access to grouped these two categories together.

analyst of the House Subcommittee on the Census) were unable to explain what these headings meant or to indicate whether this document established that the State of Utah's representation in Congress had been affected by the use of a statistical method of estimation.

20.     After receiving this document, I reviewed extensive Census Bureau documentation in an attempt to decipher the above-noted headings.  None of the documents that I reviewed enabled me to establish conclusively the meaning of the headings.

21.     On April 5, 2001, I again contacted Professor Ericksen to as his opinion about the meaning of the headings and whether the document provided by the House Subcommittee indicated whether a statistical method of estimation had affected Utah's (or any other state's) representation in Congress.  Ericksen indicated that he was unable to determine which of the columns labeled "Imputations," "Total Substitutions," and "Substitutions of 3,4,5" referred to the number of people that who had been included in the apportionment population only through a process of statistical estimation.

22.     On April 9, 2001, I participated in a telephone conference call with Mr. Miguel. Mr. Miguel indicated that prior to that day, even he had not known the meaning of the data or the headings in Exhibit 2.  Mr. Miguel also confirmed that the relevant data (even in its present, indecipherable form) had not been made publicly available.  However, Mr. Miguel explained that he had obtained the relevant explanation of the data that very morning from a staff person at the Census Bureau, and he agreed to share the explanation with me and with counsel for Plaintiffs.

23.     Mr. Miguel's explanation of the data in Exhibit 2 confirmed for the first time that the Census Bureau's use of the statistical method of hot-deck imputation had caused the State of Utah to lose its fourth representative in the House of Representatives.

24.     Prior to April 9, 2001, neither I, nor the Plaintiffs, nor the Census Monitoring Board, Presidential Members, nor even the senior data analyst at the House Subcommittee could have determined whether hot-deck imputation had affected Utah's representation in Congress. Indeed, the relevant data still had not been publicly released by that date, and it was only as a result of intensive inquiries on my part and on the part of Plaintiffs' counsel that we were able to acquire and decipher the data.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of July, 2001.

Lara J. Wolfson, Ph.D.

7

## CERTIFICATE OF SERVICE

I, Becky Jorgensen, hereby certify that a true and correct copy of the foregoing document was served on July 25, 2001 via electronic mail, hand delivery and/or overnight delivery on each of the persons listed below:

Hon. Paul M. Warner
U.S. Attorney's Office, District of Utah
185 South State Street #400
Salt Lake City, UT  84111

Stuart E. Schiffer
Sandra M. Schraibman
Amy M. Allen
United States Department of Justice
PO Box 883
901 E Street, NW
Washington, DC  20044

Edwin M. Speas, Jr.
Tiare B. Smiley
James Peeler Smith
State of North Carolina
114 W. Edenton St.
PO Box 629
Raleigh, NC  26702

Jathan W. Janove
Janove Baar Associates, L.C.
9 Exchange Place Suite 900
Salt Lake City, UT  84111

Becky Jorgensen – Legal Secretary

8

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.