FILED

14 AUG 01 AM 11: 26

DIS... ... JTAH

DEPUTY CLERK

Roy Cooper
North Carolina Attorney General
Edwin M. Speas, Jr.
Chief Deputy Attorney General
Tiare B. Smiley
Special Deputy Attorney General
James Peeler Smith
Special Deputy Attorney General
Attorneys for Defendant-Intervenors,
*State of North Carolina, et al.*
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763

Jathan W. Janove
Utah Bar No. 3722
Local Counsel for Defendant-Intervenors,
*State of North Carolina, et al.*
Janove Baar Associates, L.C.
9 Exchange Place, Suite 900
Salt Lake City, UT 84111
Telephone: (801)530-0404 ext. 230
Facsimile: (810) 530-0428

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

STATE OF UTAH, *et al.,*
　　　Plaintiffs,

　　　v.

DONALD L. EVANS, *et al.,*
　　　Defendants,

　　　and

STATE OF NORTH CAROLINA, *et al.,*
　　　Defendant-Intervenors.

　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:
　　　:

**Case No.  2:01-CV-292G**

**NORTH CAROLINA
INTERVENORS' REPLY
MEMORANDUM**



# TABLE OF CONTENTS

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      PLAINTIFFS HAVE FAILED TO ESTABLISH THAT IMPUTATION
CONSTITUTES "SAMPLING" PROHIBITED BY THE CENSUS ACT . . . . . . . . . . 2

II.     THE CENSUS CLAUSE IS A POSITIVE GRANT OF POWER TO CONGRESS
TO DIRECT THE MANNER FOR MAKING THE "ACTUAL ENUMERATION"
OF THE PEOPLE AND ENABLES CONGRESS TO AUTHORIZE WHATEVER
MEANS IT DEEMS APPROPRIATE TO ACCOMPLISH A FULL AND
COMPLETE CENSUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    PLAINTIFFS' CLAIMS ARE BARRED BY LACHES . . . . . . . . . . . . . . . . . . . . . . 20

IV.    THE COURT LACKS JURISDICTION AND POWER TO REASSIGN
CONGRESSIONAL REPRESENTATIVES BETWEEN NORTH CAROLINA
AND UTAH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE

## SUMMARY OF ARGUMENT

The entire thrust of plaintiffs' summary judgment arguments is that Congress intended the statistical methodology of "imputation" to be included within the meaning of the phrase "the statistical method known as 'sampling'" as used in § 195 of the Census Act, and that the Framers of the Constitution intended the words "actual Enumeration" in the Census Clause to restrict the census of the people to a head count of each individual and to forbid the use of any other means which might become known after the time of creation of the Constitution. Plaintiffs' word games are without merit.

The Census Act prohibits the "use of the statistical method known as 'sampling'" in determining the population of the States for apportionment purposes. Plaintiffs' argument that by prohibiting the use of "sampling" Congress intended thereby to prohibit the use of "imputation" as well fails for at least four reasons: 1) the statute specifically prohibits "sampling", it does not refer to "imputation"; 2) "imputation" is a technical term with an understood meaning in the field of statistics; 3) the legislative history reveals that Congress was concerned only with "sampling" and with no other statistical methodology; and 4) the Census Bureau's historical treatment of "sampling" and "imputation" as different and unrelated procedures is entitled to great deference.

The debates of the Constitutional Convention demonstrate that the Framers's use of the words "actual Enumeration" in the Census Clause was intended as a grant of power to provide for a counting of the people by a census. In the Census Clause, the Framers confirmed in Congress the same degree of discretion to make laws for taking the census as is found in the "Necessary and Proper" Clause for other Article I powers. The Framers left such broad discretion in Congress so that the Legislative Branch of government would have the capacity to enact laws to deal with

1

unforeseeable exigencies of future times. The Census Clause permits Congress to authorize the use of "imputation" or other statistical methodologies that, in its discretion, would best achieve a full and accurate counting of the people.

In their brief in chief, North Carolina intervenors argue that plaintiffs' claims are barred by the doctrine of laches. Plaintiffs' response to the defense of laches is erroneous for several reasons. First, their argument that the defense is not applicable to the federal government or those who stand in its shoes is meritless because Utah plaintiffs are neither. Further, plaintiffs have offered no viable explanation or excuse for their unreasonable delay in bring the present action. Finally, North Carolina and her citizens will suffer irreparable harm to the election process if her ability to reapportion is hampered because of plaintiffs' dilatoriness in bringing this action.

Finally, this Court lacks the jurisdiction and power to reassign a Congressional Representative from North Carolina to Utah. The Constitution give Congress, and no other branch of government, the power to reapportion after the decennial census. Congress, acting pursuant to its Constitutional authority, has enacted legislation which resulted in the apportionment about which Utah now complains. This Court cannot grant the relief sought without violating that legislation or the separation-of-powers principle embodied in the Constitution.

## ARGUMENT

## I.   PLAINTIFFS HAVE FAILED TO ESTABLISH THAT IMPUTATION CONSTITUTES "SAMPLING" PROHIBITED BY THE CENSUS ACT.

The Census Act prohibits only "the use of the statistical method known as 'sampling'" in determining the population count used to apportion congressional seats among the States. *See* U.S.C. § 195 (2001). Imputation and sampling are two very different statistical methods with

2

separate and distinct origins, purposes and rationales.  Plaintiffs contrived and artificial arguments that these two methodologies comprise the same statistical science and are interchangeable concepts must be rejected for at least four reasons: 1) the express language of the statute does not refer to imputation; 2) the statute's use of the word "sampling" is technical in nature and must be interpreted in light of the relevant science or methodology; 3) the legislative history evinces no intent to deal with any statistical method other than sampling; and 4) the Census Bureau has consistently treated sampling and imputation as unrelated statistical procedures, each based on a separate science, and the agency's interpretation of the statute is entitled to great deference.

The sole question before the Court with respect to §195 of the Census Act is whether the phrase "the statistical method known as 'sampling'" encompasses the statistical method for coping with missing data known as "imputation."  The obvious answer to this question is "no."  It is a well established canon of statutory construction that "the starting point for interpreting a statute is the language of the statute itself.  Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."  *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).

> [T]he language of the statutes that Congress enacts provides "the most reliable evidence of its intent."  For that reason, we typically begin the task of statutory construction by focusing on the words that the drafters have chosen.  In interpreting the statute at issue, "we consider not only the bare meaning" of the critical word or phrase "but also its placement and purpose in the statutory scheme."

*Holloway v. United States*, 526 U.S. 1, 6 (1999) (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)).  In ascertaining the plain meaning of the language, however, the court "should not read with blinders on - - context matters."  *Smith v. Zachary*, 255 F.3d 446, 2001 U.S. App. 14339, at * 18

3

(7th Cir. 2001)(Williams, dissenting) *(*citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997)).

In this case, the bare words do not reference imputation; nor does the prohibitory language attempt to broadly encompass statistical methodologies generally.[1]   Instead, the bare words refer only to the statistical methodology *known* as sampling.  To answer the question "known by whom," it must be understood that the phrase appears in the context of census taking.  The simplest meaning of the statute's reference is to the statistical method known by the Census Bureau, and its demographers and statisticians, as sampling.[2]  The conventional understanding of sampling in the context of demographic and population survey applications is the statistical methodology of probability or random sampling, where every member of the target population has a known, non-zero probability or chance of selection. *See* Declaration of Howard Hogan (hereinafter "Hogan Decl.") ¶ 30. *See also* A.R. C01167-68 (Defendants' Interrogatory Answers in *Orr v. Baldrige,* No. IP-81-604-C. (S.D. Ind.)); Declaration of David W. Peterson (hereinafter "Peterson Decl.") ¶¶ 6-8. Plaintiffs' expert, Dr. Donald B. Rubin, has in the past *agreed* with this definition or understanding

---

[1]  Compare the language of H. R. 1469, tit. VIII(b)(1), at 65, when Congress attempted in 1997 to amend 13 U.S.C § 141(a) to provide that "[n]otwithstanding any other provision of law, no sampling or any other statistical procedure, including any statistical adjustment, may be used in any determination of population for purposes of the apportionment of Representatives in congress among the several States." This bill ultimately was vetoed by the President, and so never became law. *See* Federal Defendants' Consolidated Memorandum (hereinafter "Fed. Mem.") at 30 (Response to Plaintiffs' Statement of Material Facts ¶ 28).  Clearly Congress knows how to extend the ban on sampling to include imputation or any other statistical procedure.

[2]  The original version of § 195 was enacted in 1957 as the result of a request by the Secretary of Commerce who sought to obtain Congress' blessing on the Bureau's use of random sampling for the census "long form." *See* North Carolina Intervenors' Memorandum in Support of Motion to Dismiss and for Summary Judgment (hereinafter "North Carolina Mem.") at 32.

of sampling by the Census Bureau. *See* Fed. Mem., Exhibit G (Affidavit of Rubin in *Orr* ¶ 5). Because sampling has an understood and accepted meaning in the area of census or survey applications, it is a "technical term." And where Congress has used technical words or terms of art, they must be understood or interpreted by reference to the art or science to which they apply. *Corning Glass Works v. Brennan*, 417 U.S. 188, 201-02 (1974). *See also*, NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 47:29 at 358-59 (rev'd 2000) (footnotes omitted) ("In the absence of legislative intent to the contrary, or other overriding evidence of a different meaning, technical terms or terms of art used in a statute are presumed to have their technical meaning.").

The essence of plaintiffs' lengthy dissertations attempting to define sampling and imputation as identical statistical methodologies is their emphasis on the fact that both methodologies rely on inferences from what they describe as a "subset" of a population to draw conclusions about characteristics of population units not in the subset. *See, e.g.* Plaintiffs' Reply Memorandum (hereinafter "Pl. Reply") at 30-33. *See also*, Plaintiffs' Memorandum in Support of Motion for Summary Judgment (hereinafter "Pl. Mem."), Exhibits A & B (Declarations of Lara J. Wolfson ¶¶ 13-15 and Donald B. Rubin ¶¶ 45 46)(hereinafter "Wolfson Decl." and "Rubin Decl."). But it is not the fact that each science utilizes inferences that is significant. Statistical sampling involves the random selection of a subset or "sample" from a target population from which it is possible to then calculate some *average or proportion* that is characteristic of the entire population. Peterson Decl. ¶¶ 7, 8. By contrast, imputation assigns data values to individual members of the population rather than calculating overall population parameters based on an average or proportion. *Id.* ¶ 9. Dr. Peterson offers the example of measuring the heights of a randomly chosen group of students for

purposes of estimating the average height of students versus imputing the heights of individual students not included in the sample.[3]  *Id.* ¶ 8.

The important point here is that statistical sampling and imputation are separate and distinct statistical methodologies, each based on its own science and serving different purposes. Imputation deals with the data processing problem of missing, discrepant, or improperly processed data. It is a valid, well-known and widely used science. *See* Peterson Decl. ¶ 10; Hogan Decl. ¶¶ 8, 16, 23, 24, 31, 51. Plaintiff's own expert Dr. Rubin has written extensively on the method calling it "about the only practically possible method for handling nonresponse." Fed. Mem., Exhibit D (*Multiple Imputations in Sample Surveys*) at 2. *See also* Fed. Mem. at 64 n.39 (citing other Rubin literature on imputation). When occupancy or population data for a particular housing unit are incomplete, missing or conflicting, individual data components are imputed premised on local homogeneity essentially using similar housing units in close geographic proximity as a proxy. The homogeneity

---

[3]   Plaintiffs attempt to offer a similar example by asserting that "mathematically" the methodologies of random sampling and imputation are identical. *See* Pl. Reply at 42. In their example, an enumerated population of 360 is counted based on 90 of 100 households. Using the "random, aggregated sampling approach will estimate the total population is 400 by multiplying the total number of unenumerated units (10) by the average number of occupants (4), and then by adding that estimate (40) to the enumerated population (360)." *Id.* Plaintiffs' mathematical comparison, however, goes awry by misstating the imputation process. According to plaintiffs, if the nearest neighbor approach is used, "some of the 10 units might be estimated to have 3 occupants and others might be estimated to have 5 occupants, but the addition of the estimates for all 10 unenumerated units would (*on average*) yield the same result of 40, which would be added to the enumerated population to yield an estimate of the total population of 400." *Id.* (emphasis added). In fact, applying imputation methodologies to the 10 units for which data is missing or discrepant, some of the units might be deleted, some might be assigned a status of unoccupied or zero, and others might be assigned any number of occupants. Because specific data values are being imputed to each unit based on homogeneity principles, it is not possible to know the number of additional occupants that will be imputed to the "enumerated population" or the total population until imputation methods are applied. Only then is it possible to calculate the number of occupants imputed as a result of missing or discrepant data and there is no basis for assuming that number will be 40.

assumption that underlies the Census Bureau's imputation technique is well supported in practice, the academic literature, and in logic.[4]

Statistical sampling is an equally well-known but separate statistical science. *See, e.g.*, Peterson Decl. ¶¶ 6,7. Interestingly, sample surveys are subject to the same kinds of missing data problems as are full census surveys, and imputation techniques appropriate to the particular survey or census can be utilized to improve the accuracy of the data. *See e.g.* Hogan Decl., Exhibit E (2 BARRY L. FORD, *An Overview of Hot-Deck Procedures, in* INCOMPLETE DATA IN SAMPLE SURVEYS 185 (1983)). The application of imputation methodologies to data obtained through sampling techniques does not convert imputation into sampling. The Census Act prohibits the use of the statistical method known as sampling for purposes of apportionment, and plaintiffs are asking the Court to stretch that language to prohibit the entirely different statistical method known as imputation. "Stretching language in order to write a more effective [or prohibitive] statute than Congress devised is not an exercise [the Court] should indulge in." *Smith v. United States*, 508 U.S. 223, 247 n.4 (1993) (Scalia, J. dissenting).

Assuming *arguendo* that more than one reading of the literal text of the particular statutory phrase at issue here is possible, then one of the traditional tools for investigating Congress' intent is a review of a statute's legislative history. *See Chevron USA, Inc. v. Natural Resources Defense Council*. 467 U.S. 837, 859-63 (1984); *Timex V.I. v. United States*, 157 F.3d 879, 882 (Fed. Cir.

---

[4] Plaintiffs' contrived views of the homogeneity concept are well illustrated by their absurd suggestion that the Census Bureau's imputation techniques allow it to substitute characteristics of the residents of Fargo, North Dakota to determine the occupancy of unenumerated households in Pomona, California. Pl. Reply at 37. This is patently untrue and contrary to the homogeneity assumption actually used.

1998). The legislative history of § 195 when originally enacted in 1957, and when amended in 1976, is replete with references to the conventional understanding of statistical sampling as a random sample using some percentage of the total population from which to make projections about the total population. *See* North Carolina Mem. at 32-36. *See also* Fed. Mem. at 43-44. In response, plaintiffs can point to nothing in the legislative history that suggests that the prohibition in § 195 was meant to encompass imputation or even statistical methodologies generally. Instead, plaintiffs cite the U.S. House Representatives Report stating that § 195 permits utilization of something "less than complete enumeration" when efficient and accurate coverage may be effected through a sample survey. *See* Pl. Reply at 44 (citing H.R. Rep No. 85-1043, at 10 (1957)). Plaintiffs also cite to a statement by Representative Schroeder in discussions preceding the 1976 amendment to § 195 indicating that the statute "directs the Secretary of Commerce to use sampling methods rather than 100 percent questionnaires whenever possible." Pl. Reply at 44 (citing North Carolina Mem. at 36 (quoting 122 Cong. Rec. 27, 35171)). From these legislative snippets, plaintiffs ask the Court to glean a prohibition on "anything other than an actual enumeration by 100 percent questionnaires." Pl. Reply at 44-45. This is clearly an improper request to "redraft" the language Congress enacted because the language of § 195 fails to prohibit the use of anything other than 100 percent questionnaires. Instead it prohibits the statistical methodology known as sampling; but the language does not prohibit imputation. *See Smith v. Zachary*, 255 F.3d 446, 2001 U.S. App. 14339, at *18 (7th Cir. 2001) (Williams, dissenting) ("[W]e may not redraft language Congress enacted simply because the language may fail to achieve Congress's entire purpose as we perceive it.") Furthermore, plaintiffs have simply taken Representative Schroeder's remarks out of context since she was contrasting a

8

25 percent across-the-board survey with 100 questionnaires. *See* North Carolina Mem. at 36.[5] There is nothing in the legislative history supporting plaintiffs' desire to interpret "sampling" to include imputation or any other statistical methods.

Finally, the Census Bureau since 1960 consistently has applied imputation techniques for purposes of determining the apportionment and deems its use as part of the traditional census enumeration. In addition, the use of imputation has been regularly reported to Congress. *See* detailed discussion in Fed. Mem. at 43-46. *See also* Hogan Decl. ¶¶ 11, 63. In view of the extensive oversight provided by Congress to the Bureau's conduct of the census, the failure by Congress to amend § 195 to include a prohibition against imputation, or any other statistical procedure, speaks volumes. It is well established that

> the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction.

*CBS, Inc. v. Federal Communications Comm'n*, 453 U.S. 367, 382 (1981) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381 (1969) (footnotes omitted)); *Zemel v. Rusk*, 381 U.S. 1, 11, *reh'g denied*, 382 U.S. 873 (1965) (Congress' failure to repeal or reverse a statute in the face of an agency's repeated interpretation is "persuasive evidence that that interpretation is the one intended by Congress").[6] Moreover, as argued by the federal defendants, to the extent § 195 is

---

[5] Plaintiffs assert that Congress' exclusion of the word "random" in the phrase "the statistical method known as sampling" does not allow the Court to insert the term. *See* Pl. Reply at 35. This is beside the point since the statute fails to prohibit imputation specifically or more broadly to prohibit any other statistical method, and is limited to the statistical method *known* as sampling, which conventionally and technically refers to random or probability sampling.

[6] Plaintiffs' reliance on cases where there was an absence of widespread congressional awareness of an agency's construction of its enabling statute or where there existed only a few

susceptible to more than one meaning, the Census Bureau is entitled to substantial deference under *Chevron. See* Fed. Mem at 42. Indeed, considerable deference is required by the courts when considering the Census Bureau's decisions about the form and content of the census. As the Supreme Court has established, virtually unlimited discretion regarding the form, manner and content of the decennial census is vested in the Census Bureau by the Constitution and the Census Act. *See Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) ("text of the Constitution vests Congress with virtually unlimited discretion" and Congress has delegated its broad authority to the Secretary).

In light of the express language of § 195 and its legislative history, as well as the longstanding employment of well recognized imputation techniques by the Census Bureau, Congress never intended § 195 to encompass imputation.[7] Despite the plenary oversight of census planning and implementation by Congress, no action has been taken to prohibit the Census Bureau from

---

isolated statements in thousands of pages of legislative documents, *see* Pl. Reply at 46-47, is factually inapposite to the case at hand. Moreover, it is implausible to suggest that Congress was not aware after the 1980 census that Indiana lost a seat to Florida because of the Census Bureau's use of imputation or was unaware of the outcome of the ensuing litigation in *Orr . Baldridge. See* Pl. Mem., Exhibit A (Order (July 1, 1985)) at 4-7. Congress' extraordinarily active oversight of the Census Bureau's activities in the planning and taking of each decennial census is persuasive evidence that imputation has congressional approval.

[7] Plaintiffs' long discussion of *Department of Commerce v. House of Representatives*, 525 U.S. 316 (1998), *see* Pl. Reply at 39-43, does not advance their cause. As noted previously, *see* North Carolina Mem. at 39-41, the Supreme Court's opinion dealt with proposed sampling methodologies squarely with the conventional and technical understanding of the term "sampling." Nothing in the opinion extends the meaning of the prohibitory phrase to include statistical methods generally or imputation specifically. Justice Breyer specifically commented on the fact that because the statistical method of imputation had been utilized to some degree for the last 50 years, § 195 "could not have been intended as a prohibition so absolute as to stop the Census Bureau from imputing the existence of a living family behind the closed doors of an apparently occupied house, should that family refuse to answer the bell." *Id.* 525 U.S. at 355.

10

continuing to deal with the problem of missing and discrepant data using the statistical science known as imputation. Against this background, it is not possible to conclude that the "statistical method known as 'sampling'" refers to imputation methods.

## II. THE CENSUS CLAUSE IS A POSITIVE GRANT OF POWER TO CONGRESS TO DIRECT THE MANNER FOR MAKING THE "ACTUAL ENUMERATION" OF THE PEOPLE AND ENABLES CONGRESS TO AUTHORIZE WHATEVER MEANS IT DEEMS APPROPRIATE TO ACCOMPLISH A FULL AND COMPLETE CENSUS.

Article I, Section 2, Clause 3, of the Constitution empowers Congress to direct the taking of the decennial enumeration of the people. With respect to the issue before this Court, the Census Clause provides in pertinent part that "[t]he actual Enumeration shall be made . . . in such Manner as they [Congress] shall direct." Plaintiffs would have this Court focus with tunnel vision on the words "actual Enumeration" and blind itself to the context within which those words appear. Applying such an approach, the Clause is transformed from a positive grant of authority to a restriction on Congressional power never intended by the Framers.

To argue, as plaintiffs do, that the Constitution forbids Congress from authorizing the use of "imputation" or other statistical techniques to achieve a more complete and accurate "actual Enumeration" is to limit the "enumeration" techniques to those in place in 1787, when the Constitution was created, and to deny the use of improved means of achieving an "actual Enumeration" developed in modern times. The Census Clause itself refutes plaintiffs' position. The Clause is one of the more flexible and forward-looking provisions in the Constitution in that it is designed to be used every ten years in constitutional perpetuity. The Census Clause is an integral part of a Constitution that John Marshall said was "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs." *M'Culloch v. Maryland*, 17 U.S.

11

(4 Wheat.) 316, 415 (1819).  Marshall pointed to the Necessary and Proper Clause of Article I, Section 8 of the Constitution, as the authority by which Congress can take action to execute and enforce the powers of Government in ways the Framers could never have foreseen.  The Census Clause is certainly one of those governmental powers that from time to time may need adjustment in order to take advantage of newer scientific, technological or statistical methods of achieving a more accurate and complete "actual Enumeration."

In a real sense the Census Clause contains its own internal "necessary and proper" provision. The "actual Enumeration" words of that Clause do not stand alone.  They must be read as a part of an entire sentence, *i.e.*, "The actual Enumeration shall be made . . . in such Manner as [Congress] shall by law direct."  And to execute the "such Manner" requirement, Congress must of necessity determine what "Manner" it considers "necessary and proper" in light of the obvious problems of counting an ever-growing and constantly mobile population.  Plaintiffs at no point in their briefs discuss the context in which the words "actual Enumeration" appear.

It is not sufficient, as plaintiffs do here and Justice Scalia did in his concurring opinion in *Department of Commerce v. House of Representatives*, 525 U.S. 316, 346-347 (1998), to rely solely on the meaning of the word "enumerate," as defined by the dictionaries that were available to the Framers of the Constitution.  To limit the census "enumeration" to the dictionary process of counting or numbering each particular resident, separately and "number by number," has simply been outmoded by time and by the changes in the American population dynamics.  It has been demonstrated that some of the newer statistical techniques, reflecting a development in census-taking unknown to the Framers or to the dictionary-compilers of that era, produce a more accurate and complete count of the population than the 1787 concept of "actual Enumeration" could now produce.

12

Should Congress be deprived of the power to direct that the census be conducted, at least in part, by such newer enumerating techniques?  Should Congress be deprived of what Justice Story described in *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 327 (1816), as its intended power "to adopt its own means to effectuate legitimate objects [such as the census enumeration], and to mould and model the exercise of its powers, as its own wisdom and the public interests should require"?

In its constitutional sense "actual Enumeration" means a "counting" of the people.  How that counting is to be accomplished is left by the unambiguous language of the Clause to the discretion of Congress.  The Constitution does not tell Congress how it shall direct the "actual Enumeration" or "counting."  The Constitution merely prescribes that the Enumeration shall be done every ten years and that Congress by law shall direct how the Enumeration shall be done.  An enumeration or counting performed by employing statistical methodology is no less an enumeration than one done by counting noses or heads.

The North Carolina intervenors have demonstrated by reviewing the debates at the Constitutional Convention that the Framers never intended the words "actual Enumeration" as a limitation on the power of Congress to direct how the census is to be taken.  If the Framers intended to vest in the words "actual Enumeration" a prescription as to how the census would be performed, it is reasonable to assume that their debates would have revealed such an intent.  A thorough study of the debates reveals only that the Framers opted for a census or enumeration of the population as opposed to an estimation, because population estimates were not considered sufficiently reliable.  Instead of countering intervenors' argument with citations to the debates of the Framers of the American Constitution, plaintiffs resort to British debates, which took place several years after the

first census in our county, on the feasibility of a census *vis a vis* an estimation of the population of Great Britain. North Carolina intervenors have never contended that educated Americans in the late Eighteenth Century were somehow less conversant with the English language than their British counterparts and did not know or appreciate the distinction between an estimation and an enumeration or census. *See* Correspondence of Thomas Jefferson and George Washington, Pl. Reply, Exhibits P and Q. The Framers clearly rejected an estimation of the population of the States in favor of a census or enumeration after they proposed that the apportionment of the House of Representatives be based on population. But the Framers did not propose restricting the discretion of future Congresses with respect to how censuses should be conducted. Instead, they proposed in simple language that the "actual Enumeration" of the people "shall be made . . . in such Manner as [Congress] shall by Law direct."

The Framers understood the difference between a constitution and statutory code. *See* North Carolina Mem. at 54 regarding the notes of Edmond Randolph. Some thirty-two years after the adoption of the Constitution, Chief Justice John Marshall in *M'Culloch v. Maryland* elaborated on the principle stated by Randolph:

> A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of a prolixity of a legal code, and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves.

17 U.S. (4 Wheat.) at 407.

Justice Marshall's comments echoed those of Justice Storey in *Martin v. Hunter's Lessee,*

The constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution. It was foreseen that this would be a perilous and difficult, if not an impracticable, task. The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes of Providence. It could not be foreseen what new changes and modifications of power might be indispensable to effectuate the general objects of the charter; and restrictions and specifications, which, at the present, might seem salutary, might, in the end, prove the overthrow of the system itself. Hence its powers are expressed in general terms, leaving to the legislature, from time to time, to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers, as its own wisdom and the public interests should require.

14 U.S. (1 Wheat.) at 326-27.

Ironically, in the instant case the State of Utah has adopted exactly the same position with respect to the Census Clause as the State of Maryland did in *M'Culloch* concerning the Necessary and Proper Clause: that a clause, which is an apparent grant of power to Congress, should be read as a restriction on that power. "The counsel for the State of Maryland have urged various arguments, to prove that this clause, though in terms a grant of power, is not so in effect; but is really restrictive of the general right, which might otherwise be implied, of selecting means for executing the enumerated powers." *M'Culloch*, 17 U.S. (4 Wheat.) at 412. Maryland's argument was rejected by Chief Justice Marshall and the Supreme Court, and this Court should similarly reject its counterpart posited by Utah today.

Utah's argument further parallels Maryland's in *M'Culloch*. Chief Justice Marshall set out Maryland's chief contention and then refuted it succinctly:

But the argument on which most reliance is placed, is drawn from the peculiar language of this clause. Congress is not empowered by it to make all laws, which may have relation to the powers conferred on the government, but such only as may be "necessary and proper" for carrying them into execution. The word "necessary" is considered as controlling

15

the whole sentence, and as limiting the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory. That it excludes the choice of means, and leaves to Congress, in each case, that only which is most direct and simple.

*Id.* at 413. Maryland had maintained that the word "necessary" in the Necessary and Proper Clause restricted Congress' implied powers to means of "absolute physical necessity." *Id.* But Marshall, rejecting such a restrictive reading, wrote:

Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive should be understood in a more mitigated sense -- in that sense which common usage justifies. The word "necessary" is of this description. It has not a fixed character peculiar to itself.

*Id.* at 414.

The words "actual Enumeration" were inserted for the first time by the Committee of Style, which was responsible for assembling the final document but was not making substantive changes to matters resolved. *See* North Carolina Mem. at 55-56, and n.19. The Committee then must have considered the words "actual Enumeration" as synonymous with "census", which was the word employed by the Framers in their debates and resolutions. It might be noted that the statute, which authorized the first census of Great Britain, is entitled "An Act for taking an Account of the Population of Great Britain, and of the Increase or Diminution thereof." Pl. Reply, Exhibit M. The difference in wording indicates that one should look to the context of the words to determine the intent of drafters. Attempting to hang the meaning of a Constitutional grant of power on one word of a clause often leads to erroneous conclusions; and this is especially so in the present case.

16

Utah plaintiffs contend the words "actual Enumeration" can mean only a one-two-three nose count. Such a constricted reading runs counter to Chief Justice Marshall's views of constitutional construction:

> The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers, to insure, as far as human prudence could insure, their beneficial execution. This could not be done by confiding the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances. If we apply this principle of construction to any of the powers of the government, we shall find it so pernicious in its operation that we shall be compelled to discard it.

*Id.* at 415-16.

Finally, in *M'Culloch* Chief Justice Marshall enunciated the principles for reviewing the constitutionality of Congressional enactments. These principles are as valid today as when the great Chief Justice declared them:

> [T]he sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

17 U.S. (4 Wheat.) at 421.

17

The power to direct how the census shall be conducted is like the powers and duties imposed on Congress under Article I, Section 8, of the Constitution. Such powers are direct grants of authority without instructions about how Congress shall exercise the respective powers imposed on it. Instead, the Constitution simply empowers Congress in the exercise of its Constitutional responsibilities "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18.

Clearly, Congress has the Constitutional discretion to authorize the Census Bureau to use statistical methodologies, including imputation, in determining the population for apportionment purposes. As explained elsewhere in the briefs of defendants and intervenors, the process of imputation is a statistical procedure applied at the data processing stage to deal with the problem of inconsistent or missing data in order to provide for a more complete and accurate census. *See* Hogan Decl. ¶¶ 22,23.

In *House of Representatives*, Justice O'Connor recounts how Congress has by law expanded the manner by which the census shall be taken. 525 U.S. at 335-36. The First Congress enacted legislation which required the census takers to make "a just and perfect enumeration" of every person within their assigned division. Act of Mar. 1, 1790, § 1, 1 Stat. 101. The enumerator had to prepare a schedule, listing every person within the division by family name. *See id.,* at 101-102; *House of Representatives*, 525 U.S. at 335. In 1810, Congress amended the Census Act to expressly provide that "the said enumeration shall be made by an actual inquiry at every dwelling-house, or of the head of every family within each district, and not otherwise." Act of Mar. 26, 1810, § 1, 2 Stat. 565-566. The requirement that census takers personally visit each home was carried forward for succeeding

18

censuses. *House of Representatives*, 525 U.S. at 335. In 1850, Congress permitted the enumerators to obtain the required census information from "some member of each family, if any one can be found capable of giving the information, but if not, then of the agent of such family." Act of May 23, 1850, § 9, 9 Stat. 430; *House of Representatives*, 525 U.S. at 335 n.5. In the Act of Mar. 3, 1919, § 12, 40 Stat. 1296, Congress allowed the enumerators to obtain information from neighbors, if no household member could be found. *House of Representatives*, 525 U.S at 335 n.5. For the 1970 Census, the Bureau initiated the now familiar "mail-out/mail-back" enumerating procedure. *See* Hogan Decl., Exhibit B (*Decennial Census: Overview of Historical Census Issues* (May 1998)) at 24-25; *see also, Quon v. Stans*, 309 F. Supp. 604 ( N.D. Cal 1970) (use of this procedure is within the discretion of the Census Bureau); *West End Neighborhood Corp. v. Stans*, 312 F. Supp. 1066 (D.D.C. 1970) (same). In fact, Utah concedes that the Clause does not forbid conducting the "actual Enumeration" by mail or telephone. Pl. Reply at 56 n.13.

The historical record reveals that the "actual Enumeration" is not so restrictive as Utah plaintiffs contend. Congress has never required census enumerators to make a nose count of every person individually. Hogan Decl. ¶ 11 & Exhibit B at 24. From the beginning, enumerators obtained data for households from individuals who were presumed to possess the information, *i.e.* the heads of households. Later enumerators obtained data from neighbors. Finally, by 1970, much of the census was conducted by mail. Thus, the "actual Enumeration" has been accomplished from the first census by obtaining data from supposedly reliable sources, not by nose counting every individual. Imputation, as it has been used by the Bureau since 1960, is a statistical method which fills gaps in or corrects discrepancies, necessarily occurring in the data collection process. It is simply the final editing or clean-up process for producing the census's counting of the people.

19

The Census Clause permits Congress to authorize imputation and other statistical methodologies in accomplishing the "actual Enumeration." The Framers of the Constitution specifically provided in the Clause that Congress has the authority to direct the manner for taking the Census. The Framers, in their wisdom and with prescient foresight, gave Congress full power and authority to legislate such means as should be necessary and proper to accomplish the functions of the federal government. As Marshall and Storey understood, the Framers intended that the Constitution be sufficiently flexible to deal not only with exigencies at the time of the ratification of the Constitution, but also those which at that time were unforseen and unforeseeable. Such an unforseen exigency is the transformation of thirteen independent States into a nation with an extraordinarily diverse and mobile population, exceeding 280,000,000 people. To permit the use of imputation as one method of accomplishing the "actual Enumeration" of the people of this nation is without doubt within the discretion reposed in Congress by the Framers in the Constitution. Plaintiffs' argument to the contrary is without merit.

## III.   PLAINTIFFS' CLAIMS ARE BARRED BY LACHES

Plaintiffs assert that laches does not bar their claim on the grounds that 1) laches is inapplicable in suits aimed at protecting the public interest; 2) there was no unreasonable delay by plaintiffs in filing this action; and 3) there is no cognizable prejudice to North Carolina. None of these assertions has merit and the doctrine of laches should, under the circumstances of this case, be invoked to dismiss plaintiffs' claims.

Plaintiffs attempt to bootstrap from the well-established doctrine that the defense of laches may not be asserted against the federal government. This doctrine is based on concerns about the magnitude and importance of the rights when interests of the public are asserted, and public interests

20

not being compromised or forfeited by those who act as guardians of the public. *United States v. California*, 332 U.S. 19, 39-40, *reh'g denied*, 332 U.S. 787 (1947); *United States v. Summerlin*, 310 U.S. 414, 416 (1940). The bar to a laches defense also has been extended to plaintiffs that stand in the shoes of the federal government as private attorneys general enforcing federal statutes such as environmental protection laws. *See, e.g., Student Public Interest Research Group, Inc. v. P.D. Oil & Chemical Storage, Inc.*, 627 F. Supp. 1074, 1085 (D.N.J. 1986). Otherwise, the courts have expressed only a "reluctance" to apply the doctrine of laches when a plaintiff attempts to safeguard an important public interest. *Lake Michigan Federation v. United States Army Corp of Engineers*, 742 F. Supp 441, 448 (N.D. Ill. 1990).

In this case, however, the Utah plaintiffs are not the federal government and are not acting in the federal government's place as private attorneys general looking after the national public interest. The Utah plaintiffs are not looking out for the interests held in trust for all the people, but are solely looking out for the parochial interests of Utah. Moreover, because Congress has specifically provided for a streamlined and "virtually self-executing" reapportionment process after each decennial census, *Franklin v. Massachusetts*, 505 U.S. 788, 791-92 (1992), the doctrine of laches can and should be invoked when plaintiffs inexcusably delay in asserting their claim. Election and districting disputes are matters of great public interest. The courts have recognized that time is of the essence in election matters and have not hesitated to invoke the doctrine of laches when plaintiffs have delayed bringing their claims even a few months. *See* North Carolina Mem. at 26-27. The strict time-line between tabulating the census, reporting to the President, and the President's transmitting the apportionment calculation to Congress clearly proclaims that time is

of the essence for a challenge to the apportionment of Representatives. *See* 13 U.S.C. §§ 141(a) and (b); 2 U.S.C. §§ 2a(a) and (b).[8]

Plaintiffs still have failed to explain their inexcusable delay in asserting their claims challenging imputation. In *Utah v. Evans*, No. 2:01-CV-23B (D. Utah) (hereinafter "*Evans I*"), plaintiffs knew when they filed their complaint, or no later than January 30, 2001, when they filed their summary judgment memorandum, that the Census Bureau was utilizing the statistical method of imputation. *See* North Carolina Mem., Exhibit B (*Evans I* Order (April 17, 2001) at 4). On January 31, 2001, they filed a Freedom of Information Act (hereinafter "FOIA") request seeking information and data on overseas federal employees, but failed to request imputation information or data. They served discovery requests on the federal defendants on January 16, 2001, and received expedited production on February 9, 2001. Although the imputation data may not have been "publically available," between FOIA and the rules of civil procedure plaintiffs easily could have obtained the data from the federal defendants to determine imputation's effect on the apportionment, especially since only a small number of people (857) separated Utah from the 435th seat apportioned

---

[8] The need for finality to the apportionment calculations contrasts with the less rigid finality of the census population for other purposes. The Census Bureau conducts a Count Question Resolution program, *see* Census 2000 Count Question Resolution Program, 66 Fed. Reg. 6574 (2001) which provides a process for state, local and tribal governmental entities to challenge population and housing unit counts. A successful challenge can result in the issuance of new official Census 2000 housing and population counts and may be used by the governmental entities for future programs requiring official Census 2000 data. *See* Census 2000 Count Question Resolution Program, 66 Fed. Reg. 130, 35588 (2001). The process is not a mechanism for seeking revision of the apportionment numbers reported to the President. This appeal process will extend from June 30, 2001 through September 30, 2003. *Id.*

to North Carolina.[9]  The after-the-fact travails of plaintiffs' expert Dr. Laura Wolfson in obtaining

or understanding the imputation data, do not excuse the plaintiffs' delay.  Her supplemental

declaration, to the extent it is not inadmissable hearsay which cannot be considered by the court,

merely confirms that plaintiffs made a strategic choice not to pursue the issue of imputation along

with their overseas claim, leaving it instead as a second bite of the apple.[10]  The *Evans I* court

recognized the implausibility of plaintiffs' claimed lack of knowledge or ability to timely bring this

claim when it denied their tardy motion to amend the complaint in that case.  *See* North Carolina

Mem., Exhibit B.  Plaintiffs also cannot argue that the North Carolina intervenors contributed in any

way to the plaintiffs' delay in filing this action by objecting to plaintiffs' proposed briefing schedule.

By the time the Utah plaintiffs deigned to file their claim challenging imputation in a separate,

subsequent lawsuit, the bar of laches had already risen. When this action was filed, April 25, 2001,

---

[9]  Plaintiffs contend the Census Bureau failed to release the imputation data on January 1,
2001, as required by Pub. L. No. 105-119, Title II §209(j).  Assuming *arguendo* that this provision
applies to imputation data, plaintiffs never cited the statute and used it as a basis for seeking the data
while making FOIA and discovery demands on the federal defendants in their first lawsuit in
January.

[10]  The majority of the Supplemental Declaration of Lara J. Wolfson filed by plaintiffs in
support of their reply brief is inadmissible hearsay not based on personal knowledge.  Through Dr.
Wolfson, plaintiffs improperly attempt to introduce the thoughts, motives and understandings of
plaintiffs' lawyers and members of the Census Monitoring Board, Presidential Members.  It is
axiomatic that a declaration filed as evidence in a summary judgment proceeding "must present
evidence in substantially the same form as if the affiant were testifying in court."  *Evans v.
Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).  Federal Rule of Civil
Procedure 56(e), specifically requires that affidavits supporting or opposing a motion for summary
judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible
in evidence, and shall show affirmatively the affiant is competent to testify to the matters stated
therein." *See Scosche Indus. v. Visor Gear,* 121 F.3d 675, 681 (Fed. Cir. 1997).  In evaluating
evidence concerning a summary judgment, "a court *may not consider* affidavits that do not satisfy
the requirements of Fed. R. Civ. 56(e)." *El Deeb v. University of Minn.*, 60 F.3d 423, 429 (8th Cir.
1995) (emphasis added).

North Carolina had already received certification of its apportionment of thirteen Representatives, *see* Argument IV *infra*, and the redistricting data had been released for use in redrawing congressional districts. (The Census Bureau was required to have the redistricting data in the states' hands no later than April 1, 2001. *See* 13 U.S.C. § 141(c)).

Finally, the prejudice to North Carolina is not a lack of "savvy", *see* Pl. Reply at 86, in failing to develop alternative plans. As a legal matter, North Carolina may not submit alternative plans to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act. *See* 28 C.F.R. § 51.22. Nor can North Carolina wait until the courts finally resolve Utah plaintiffs' second challenge before submitting a plan for preclearance if the election process is to proceed beginning with candidate filing January 7, 2002. As a practical matter, it is exponentially more difficult to draw district lines for twelve or thirteen congressional districts than to draw lines for three or four districts, especially in a state like North Carolina where there are complex Voting Rights Act, equal protection, partisan, and incumbency issues to be resolved.

Utah plaintiffs deliberately delayed bringing their challenge to the Census Bureau's long-standing imputation practices to the prejudice of the North Carolina intervenors. Under the unusual circumstances of this case, their claims should be dismissed on the grounds of laches.

## IV.    THE COURT LACKS JURISDICTION AND POWER TO REASSIGN CONGRESSIONAL REPRESENTATIVES BETWEEN NORTH CAROLINA AND UTAH.

Utah seeks to have this Court take from North Carolina one of the thirteen Representatives allocated to it and to reassign that Representative to Utah. This the Court cannot do without infringing upon the duty and authority regarding apportionment given by the Constitution to Congress, nor without running afoul of the statutes governing apportionment of representatives.

24

The duty and authority of enumeration and apportionment is given by the Constitution to Congress. U.S. CONST. art. I, § 2, and amend. XIV, § 2. The United States Code provides that it is the responsibility of the President to transmit to the Congress, within one week of the opening of each fifth Congress, a statement "showing the whole number of persons in each State as ascertained under . . . [the] decennial census of the population, and the number of Representatives to which each State would be *entitled* under an apportionment of the then existing number of Representatives." 2 U.S.C. § 2a(a) (emphasis added). The concept of entitlement is reiterated in the next subsection and later sections of the United States Code:

> (b)   Each State shall be *entitled* . . . to the number of Representatives shown in the statement required by subsection (a) of this section, no State to receive less than one Member. It shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is *entitled* under this section.

2 U.S.C. § 2a(b) (emphasis added). *See also* 2 U.S.C. §§ 2b and 2c.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). *See also, Director, Office of Workers' Compensation Programs, DOL v. Greenwich Collieries*, 512 U.S. 267, 272 (1994). "In its usual sense, to entitle is to give a right or legal title to." BLACK'S LAW DICTIONARY 532 (6th ed. 1990). When the President provided his statement to Congress that North Carolina "would be entitled" to thirteen Representatives, that "action . . . create[d] an entitlement," a legal right, on the part of North Carolina "to a particular number of Representatives and ha[d] a direct effect on the reapportionment" of members of

Congress. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). This entitlement was formally attested to when the Clerk of the House of Representatives certified,

> Pursuant to the provisions of Title 2, United States Code, Section 2a (b), that the State of North Carolina *shall be entitled*, in the One Hundred Eighth Congress and in each Congress thereafter until a subsequent reapportionment shall take effect under applicable statutes, to thirteen representatives in the House of Representatives of the Congress of the United States.

Certificate of Entitlement dated January 16, 2001, transmitted by Jeff Trandahl, Clerk of the United States House of Representatives, to Michael F. Easley, Governor of North Carolina (emphasis added) (copy attached as Exhibit N).

Courts addressing various issues related to the apportionment of Representatives have consistently recognized that Congress makes a determination, which may not be amended by the courts, as to the number of Representatives allocated to each state. "[I]t is noteworthy that there are no instances in which the courts have attempted to revise the apportionment of Representatives by Congress." *Saunders v. Wilkins* 152 F.2d 235, 238 (4th Cir. 1945), *cert. denied*, 328 U.S. 870 (1946) (citing WILLOUGHBY, CONSTITUTION 626, 627 (2nd ed.)). Indeed, it is assumed that the number of Representatives allocated by Congress to a State may not be adjusted by the courts.

> It is equally true that the court is without power to reduce the number of Representatives fixed by Act of Congress or to decide in case the number of Representatives from Virginia should be reduced, what disposition should be made of the vacancies thus caused, or to what states they should be allotted in order to maintain the total ordained by Congress. It is clear that there can be no finality on any of these questions until Congress exercises the authority and performs the duty entrusted to it by the Constitution.

*Id. See also Franklin*, 505 U.S. at 800-03 (The court has no jurisdiction to enjoin the President in the performance of his statutory duty to calculate and send the final apportionment to Congress). *Cf. Department of Commerce v. Montana*, 503 U.S. 442, 464 (1992) ("Article I, § 8, cl. 18,

expressly authorizes Congress to enact legislation that 'shall be necessary and proper' to carry out its delegated responsibilities. Its apparently good-faith choice of a method of apportionment of Representatives among the several States 'according to their respective Numbers' commands far more deference than a state districting decision that is capable of being reviewed under a relatively rigid mathematical standard.")  While Utah argues that a judicial holding that one Representative should be taken from North Carolina and allocated to her would affect no other states in the instant case, such a decision would constitute usurpation by the courts of power allocated separately to Congress by the Constitution. This the courts do not have the power to do. While the courts can hold that a method of apportionment adopted by Congress does not meet constitutional requirements, *see Montana, supra,* the courts simply cannot abrogate to themselves the authority of actual apportionment.

The certificate issued by Congress is binding, just as a certificate of election is binding if the statute authorizing the issuance of the certificate so provides. *Attorney Gen. v. Drohan*, 169 Mass. 534, 48 N.E. 279 (1897); 26 Am. Jur. 2d § 401.  The United States Code could not be more clear - - the statement of the President, certified by the Clerk of the House of Representatives, *entitles* North Carolina to thirteen Representatives.  Absent any action by Congress to revoke its allocation, this Court lacks jurisdiction and authority to reapportion the Representatives in Congress between North Carolina and Utah.  The only remedy available to the plaintiffs through the court, assuming any merit can be found in plaintiffs' claims, would be declaratory and prospective only - - looking to the next decennial census and apportionment.

## CONCLUSION

For the reasons stated above and in defendant-intervenors' main brief, plaintiffs' motion for summary judgment should be denied and defendants' and defendant-intervenors' motions to dismiss or in the alternative for summary judgment should be allowed.

This the 13th day of August, 2001.

ROY COOPER
NORTH CAROLINA ATTORNEY GENERAL

EDWIN M. SPEAS, JR.
CHIEF DEPUTY ATTORNEY GENERAL

Tiare B. Smiley
Special Deputy Attorney General
N.C. State Bar # 7719

James Peeler Smith
Special Deputy Attorney General
N.C. State Bar # 5193

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6900

Attorneys for Defendant-Intervenors
*State of North Carolina, et al.*

28

# CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing **North Carolina Intervenors' Reply Memorandum** have been served by Federal Express, Priority Overnight delivery, next business day, addressed as follows:

Mark L. Shurtleff
Attorney General of Utah
Raymond A. Hintze
Chief Civil Deputy Attorney General
J. Mark Ward
Assistant Attorney General
236 State Capitol Building
Salt Lake City, Utah 84114
Telephone: (801) 538-1191

Gene C. Schaerr
Michael S. Lee
Jay T. Jorgensen
SIDLEY & AUSTIN
1722 Eye St. NW
Washington, DC 20006

Attorneys for *State of Utah, et al.*

Stuart E. Schiffer
Deputy Assistant Attorney General
Sandra M. Schraibman
Amy M. Allen
Carol Federighi
Attorneys, U. S. Department of Justice
Civil Division, Federal Programs Branch
901 E. St. NW Room 918 (20004)
P. O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-4523

Attorneys for *Donald L. Evans
and William G. Barron*

This the 13th day of August, 2001.

ROY COOPER
NORTH CAROLINA ATTORNEY GENERAL

Tiare B. Smiley
Special Deputy Attorney General

Exhibits/
Attachments
to this document
have **not** been
scanned.

Please see the
case file.