STUART E. SCHIFFER
Acting Assistant Attorney General
SANDRA M. SCHRAIBMAN
CAROL FEDERIGHI
AMY M. ALLEN
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, 901 E Street, N.W.
Washington, D.C. 20044
Telephone: (202) 514-4523
Facsimile: (202) 616-8202
Attorneys for Defendants

RECEIVED CLERK
**FILED**
2001 AUG 14  P 5: 50
U.S. DISTRICT COURT
DISTRICT OF UTAH

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH, et al., | ) Civil No. 2:01-CV-000292G |
| Plaintiffs, | ) |
| | ) DEFENDANTS' REPLY |
| v. | ) MEMORANDUM IN SUPPORT |
| | ) OF THEIR MOTION TO DISMISS |
| DONALD L. EVANS, United States | ) OR, IN THE ALTERNATIVE, |
| Secretary of Commerce, et al., | ) THEIR CROSS-MOTION FOR |
| | ) SUMMARY JUDGMENT |
| Defendants. | ) |
| | ) |



**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FURTHER RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 3

REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      THE CENSUS BUREAU'S USE OF IMPUTATION IS NOT PROHIBITED
        UNDER SECTION 195 OF THE CENSUS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.      Plaintiffs Still Fail To Establish That "Sampling" Includes Imputation . . . . . . . 16

        B.      The Secretary Has Consistently Interpreted Section 195 As Not
                Precluding Imputation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        C.      The Legislative History Is Consistent With The Secretary's Interpretation . . . . 27

        D.      Plaintiffs' Assertions That The Secretary's Interpretation Is Not
                Entitled To Deference Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . 30

II.     THE CENSUS BUREAU'S USE OF IMPUTATION IS CONSTITUTIONAL . . . . . . . 33

III.    THE CENSUS BUREAU'S USE OF IMPUTATION IN CENSUS 2000 IS
        NOT REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT . . . . . 46

IV.     THE CENSUS BUREAU'S USE OF IMPUTATION IN CENSUS 2000
        DOES NOT VIOLATE THE ADMINISTRATIVE PROCEDURE ACT . . . . . . . . . . 51

V.      THE DELAY IN BRINGING PLAINTIFFS' CLAIMS AND THE ALLEGED
        RESULTING PREJUDICE IS ATTRIBUTABLE SOLELY TO PLAINTIFFS'
        LACK OF DUE DILIGENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## TABLE OF AUTHORITIES

### CASES

Page(s)

Adler v. Wal-Mart Stores, Inc., 44 F.3d 664 (10th Cir. 1998) ........................................... 5

Almendarez-Torres v. United States, 523 U.S. 224 (1998) ................................................ 33

Baker v. Carr, 369 U.S. 186 (1962) .................................................................................... 37

Bain Peanut Co. v. Pinson, 282 U.S. 499 (1931) ............................................................... 34

Brown v. Gardner, 513 U.S. 115 (1994) ............................................................................. 30

Bush v. Gore, 531 U.S. 98 (2000) ....................................................................................... 34

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .................................................................... 5

Central Bank of Denver, N.A. v. First Interstate Bank of Denver,
    511 U.S. 164 (1994) .................................................................................................... 29

Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) ......................................................................................... 30, 31, 33

Christensen v. Harris County, 529 U.S. 576 (2000) ...................................................... 30, 32

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) ........................... 52

City of Detroit v. Franklin, 4 F.3d 1367 (6th Cir. 1993) .................................................... 31

Columbia Broadcasting System, Inc. v. Democratic National Comm.,
    412 U.S. 94 (1973) ...................................................................................................... 45

Cramer v. United States, 325 U.S. 1 (1945) ....................................................................... 39

Cuomo v. Baldrige, 674 F. Supp. 1089 (S.D.N.Y. 1987) ................................................... 31

Department of Commerce v. United States House of Representatives,
    525 U.S. 316 (1999) ............................................................................................. passim

Dillon v. Gloss, 256 U.S. 368 (1921) .................................................................................. 34

District of Columbia v. United States Department of Commerce,
    789 F. Supp. 1179 (D.D.C. 1992) ................................................................ 31

Federal Election Commission v. Democratic Senatorial Campaign Committee,
    454 U.S. 27 (1981) .......................................................................... 31, 33

Foust v. Lujan, 942 F.2d 712 (10th Cir. 1991) ........................................... 52

Franklin v. Massachusetts, 505 U.S. 788 (1992) ........................... 2, 43, 46, 47

Glavin v. Clinton, 19 F. Supp. 2d 543 (E.D. Va. 1998) ............................... 46

Grynberg v. Watt, 717 F.2d 1316 (10th Cir. 1983) ..................................... 53

Gullickson v. Southwest Airlines Pilots' Association, 87 F.3d 1176 (10th Cir. 1996) ............. 5, 6

Investment Co. Institute v. Camp, 401 U.S. 617 (1971) ............................... 30

Lorillard v. Pons, 434 U.S. 575 (1978) ..................................................... 29

Maier v. United States EPA, 114 F.3d 1032 (10th Cir. 1997) ........................ 52

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ........................... 6

Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,
    463 U.S. 29 (1983) ............................................................................ 52

National Labor Relations Board v. Bell Aerospace Co.,
    416 U.S. 267 (1974) .............................................................. 29, 31, 32, 33

Nichols v. Hurley, 921 F.2d 1101 (10th Cir. 1990) ...................................... 4

Nixon v. United States, 506 U.S. 224 (1993) ......................................... 34, 35

Northwest Pipeline Corp. v. Federal Energy Regulatory Commission,
    61 F.3d 1479 (10th Cir. 1995) ............................................................. 52

Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994) ............ 52

Orr v. Baldrige, No. IP 81-604-C, slip op. (S.D. Ind. July 1, 1985) .............. 17

Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633 (1990) ......... 29, 32

iii

Plato v. Roudebush, 397 F. Supp. 1295 (D. Md. 1975) ................................................ 37

Powell v. McCormack, 395 U.S. 486 (1969) ................................................ 35

Ray v. Blair, 343 U.S. 214 (1952) ................................................ 45

Rust v. Sullivan, 500 U.S. 173 (1991) ................................................ 33

Skidmore v. Swift & Co., 323 U.S. 134 (1944) ................................................ 32

South Carolina v. United States, 199 U.S. 437 (1905) ................................................ 39

State of Utah v. Evans, No. 2:01CV0023B (D. Utah April 17, 2001) ................................................ 46

Udall v. Tallman, 380 U.S. 1 (1965) ................................................ 31, 32, 33

Union Electric Co. v. Curie River Electric Coop., Inc.,
    571 S.W.2d 790, 794 (Mo. App. 1978) ................................................ 43, 44

United States House of Representatives v. United States Department of Commerce,
    11 F. Supp. 2d 76 (D.D.C. 1998) ................................................ 46

United States Department of Commerce v. Montana, 503 U.S. 442 (1992) ................................................ 42, 45

United States v. Balsys, 524 U.S. 666 (1998) ................................................ 38

United States v. Calamaro, 354 U.S. 351 (1957) ................................................ 30

United States v. Classic, 313 U.S. 299 (1941) ................................................ 2

United States v. Jackson, 280 U.S. 183 (1930) ................................................ 29

United States v. Johnson, 383 U.S. 169 (1966) ................................................ 39

United States v. Locke, 471 U.S. 84 (1985) ................................................ 33

United States v. Mead Corp., 121 S. Ct. 2164 (2001) ................................................ 30, 32

United States v. Monsanto, 491 U.S. 600 (1998) ................................................ 33

Williams v. Florida, 399 U.S. 78 (1970) ................................................ 39

Wisconsin v. New York, 517 U.S. 1 (1996) ........................................................ passim

Zuber v. Allen, 396 U.S. 168 (1969) ........................................................ 30, 33

## STATUTES, RULES, & ADMINISTRATIVE MATERIALS

5 U.S.C. § 706(2)(A) ........................................................ 46, 47

13 U.S.C. § 141(a) ........................................................ 31, 53

13 U.S.C. § 195 ........................................................ passim

Census Undercount Adjustment: Basis for Decision, 45 Fed. Reg. 69,366
(Oct. 20, 1980) ........................................................ passim

Civil Rule 56.1, Local Rules for the United States District Court
for the District of Utah ........................................................ 4, 5, 6

Federal Rule of Civil Procedure 56 ........................................................ 5, 6

H.R. 1469, Title VIII(b) ........................................................ 47

H.R. Rep. No. 105-207, 105th Cong., 1st Sess. (1997) ........................................................ 49, 50

Pub. L. No. 105-18, Title VIII, 111 Stat. 158 (1997) ........................................................ 46, 47

Pub. L. No. 105-119 (codified at 13 U.S.C. § 141 Note) ........................................................ passim

S. Rep. No. 105-48, 105th Cong., 1st Sess. (1997) ........................................................ 49

U.S. Const. art. I, § 2, cl. 3 ........................................................ 31, 34

## CONGRESSIONAL RECORDS & PUBLICATIONS

Oversight of the 2000 Census: Status of Nonresponse Follow-up and Closeout: Hearing Before
the House Subcomm. on the Census, Comm. on Government Reform, 106th Cong., 2d Sess. at
53-57 (June 22, 2000) (Testimony of Director Prewitt) ........................................................ 22

121 Cong. Rec. H35,171 (daily ed. Oct. 1, 1976) (Statement of Rep. Schroeder) ........................................................ 28

143 Cong. Rec. H7,771 (daily ed. Sept. 24, 1997) (Statement of Rep. Rogers) ........................................................ 49, 50

v

143 Cong. Rec. H8,226 (daily ed. Sept. 30, 1997) (Statement of Rep. Pryce) ........................... 49

143 Cong. Rec. H8,227 (daily ed. Sept. 30, 1997) (Statement of Rep. Rogers) ........................ 50

143 Cong. Rec. S12,666 (daily ed. Nov. 13, 1997) (Statement of Sen. Hollings) ..................... 49

## PUBLICATIONS & OTHERS

33 Weekly Comp. Pres. Doc. 846-48 (June 16, 1997) ................................................................ 47

Charles Warren, The Making of the Constitution (1928) ............................................................. 35

Frank Yates, Sampling Methods for Censuses and Surveys (1981) ........................................... 17

Hyman Alterman, Counting People: The Census in History (1969) ............................... 38, 41, 42

Letter from Thomas Jefferson to Elbridge Gerry (Jan. 26, 1799), in
10 The Writings of Thomas Jefferson 78 (1903) ........................................................................ 42

Records of the Federal Convention of 1787 (Max Farrand ed., 1966) ................................... 35, 41

W. Paul Vogt, Dictionary of Statistics and Methodology: A Nontechnical Guide
for the Social Sciences (1993) ................................................................................................... 17

## INTRODUCTION

In their Reply Memorandum in opposition to the federal defendants' motions to dismiss or for summary judgment, plaintiffs rely on alleged "concessions" by the federal defendants (alternatively, the "Secretary," the "Census Bureau," or the "Bureau"), misstatements of the federal defendants' positions, and generalized, unsupported assertions and language taken out of context regarding "sampling," "imputation," and "mathematical theories." However, as the federal defendants have shown in their opening memorandum, and plaintiffs still have failed to adequately rebut in their Reply, the Census Act was not intended to, and does not, prohibit the Census Bureau's use of imputation in determining the final apportionment counts. Imputation and sampling are two different statistical methodologies. While the Supreme Court has ruled that the Census Act prohibits sampling for apportionment purposes, imputation has been utilized to fill in a small amount of missing or incomplete data without objection by Congress or the plaintiffs in decennial censuses since 1960. Plaintiffs have made no attempt to rebut – either through supplemental declarations or through discussion in their Reply – the three declarations submitted by the federal defendants and North Carolina regarding the differences between imputation and sampling which directly refute statements made in the declarations of Drs. Rubin and Wolfson.

Nor have plaintiffs shown, despite linguistic exercises, that imputation violates the constitutional requirement of an "actual Enumeration." Plaintiffs attempt to define "actual Enumeration" as "an individualized, person-by-person count . . . based on data from those with first-hand knowledge." This attempt fails, as plaintiffs identify no source for their novel definition. In fact, "actual Enumeration" means simply a numbering or counting over of the

population as it exists in fact and contains no implied limitations on how the counting is to be performed (such as that it be based on first-hand knowledge). Plaintiffs' effort to show, by the strained use of obscure British history, that the Framers intended to exclude all forms of "estimation" when they chose the word "enumeration" also must fail. Plaintiffs point to no evidence that the Framers were aware, or plausibly can be assumed to have been aware, of the "history" that they cite. Also unavailing is plaintiffs' argument that, in requiring an "actual Enumeration," the founders of our country, such as Washington and Jefferson, fully intended that censuses would exclude people whose attempts to respond to the census are lost or insufficient, and therefore, by implication, that efforts should not be made to make the census as accurate as possible. On this issue, as on others, the Framers chose language that was general enough and broad enough to carry out "for the indefinite future and in all the vicissitudes of the changing affairs of men" the purposes to which the Constitution was directed. United States v. Classic, 313 U.S. 299, 315-16 (1941).

Further, plaintiffs fail in their attempt to utilize Public Law No. 105-119 to skirt the bar to judicial review of their Administrative Procedure Act claims in Franklin v. Massachusetts, 505 U.S. 788 (1992). The plain language of Pub. L. No. 105-119 (codified at 13 U.S.C. § 141 Note) and its legislative history indicate that Congress intended to create a mechanism for review, before the 2000 Census, of the proposed sampling methods that had never before been used and that represented a dramatic departure from traditional census procedures (which since 1960 have included imputation). Finally, even if APA review were appropriate, plaintiffs have failed to meet their burden to show that the use of imputation – or of imputation used in a particular way,

2

for certain housing units – is arbitrary and capricious. The Census Bureau's long-standing and consistent use of imputation is reasonable and its efficacy has been borne out by extensive analysis by both the Census Bureau and independent statisticians.

This lawsuit should be recognized for what it is – the second after-the-fact attempt by plaintiffs to gain political advantage by questioning census techniques that have been used for decades and were known well in advance of the Census. Accordingly, the federal defendants' motion to dismiss or for summary judgment should be granted.

## FURTHER RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

Rather than addressing or attempting to refute the factual statements made by federal defendants' declarants, plaintiffs continue to rely almost exclusively on the original declaration of Dr. Wolfson to support their statement of facts. And they do so without substantively responding to the federal defendants' objections that this declaration lacks foundation and that it does not meet the requirements for the admissibility of expert evidence. Plaintiffs respond to these objections by stating only that the objections are based on a "mischaracterization" of the declaration. Plaintiffs' Reply Memorandum in Support of Summary Judgment and Memorandum in Opposition to Defendants' Cross-Motions for Judgment and Motions to Dismiss ("Pltfs' Opp.") at 7. In fact, it is plaintiffs themselves who misrepresent the declaration. First, plaintiffs substantially overstate the degree to which Dr. Wolfson reviewed outside materials in forming her opinions. Although Dr. Wolfson claims to have reviewed a large number of documents and other background material, in fact, her review was limited only to the far fewer documents cited in her declaration itself. See Email communication from Mike Lee to Carol Federighi (June 15,

3

2001), attached hereto as Exhibit A. These documents are not sufficient to support a reliable opinion on the issues in this case.

In addition, plaintiffs respond to federal defendants' objections about Dr. Wolfson's qualifications only by pointing to the paragraph in her declaration in which she states, conclusorily, that "[a]n additional portion of my work, both as a scholar and as a consultant, has been in the area of statistical techniques for accounting for missing data; in particular, in the use of statistical imputation methods." Pltfs' Opp. at 7-8 (quoting Wolfson Decl. ¶ 6). Neither Dr. Wolfson nor the plaintiffs support these allegations with a curriculum vitae or a list of publications, talks, or other endeavors in this statistical area. These conclusory allegations are insufficient to support a motion for summary judgment.[1] Nichols v. Hurley, 921 F.2d 1101, 1113 (10th Cir. 1990) (affidavits offering only conclusory allegations without specific supporting facts have no probative value for summary judgment purposes). For both of the foregoing reasons, Dr. Wolfson's claim to be an "expert" in imputation and her opinions in that area should be disregarded.

Similarly, rather than addressing the merits of the disputes raised by the federal defendants to plaintiffs' statement of facts, plaintiffs state only that many of the disputed facts are not "specifically controverted" by the federal defendants and therefore must be deemed admitted under Civil Rule 56.1 of the Local Rules for the United States District Court for the District of Utah ("DUCivR 56.1"). See Pltfs' Opp. at 9-20, ¶¶ 14, 17, 19, 24, 27, 28, 32, 36, 37. In

---

[1] In fact, Dr. Wolfson's C.V., obtained by federal defendants from plaintiffs' counsel, does not show any particular expertise in the area of imputation. See Ex. A, attached hereto.

actuality, plaintiffs are mischaracterizing the federal defendants' responses.  In fact, the facts in

the paragraphs identified *were* "specifically controverted" by federal defendants under Federal

Rule of Civil Procedure ("FRCP") 56 and DUCivR 56.1.  FRCP 56 requires that, in opposing a

motion for summary judgment, the nonmoving party set forth specific facts showing that there is

a genuine dispute.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The nonmovant may set

forth such facts by reference to affidavits or to depositions, answers to interrogatories and

admissions on file.  <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 671 (10th Cir. 1998).

DUCivR 56.1 does not require anything more than this.  <u>See</u> <u>Gullickson v. Southwest Airlines

Pilots' Ass'n</u>, 87 F.3d 1176, 1183 (10th Cir. 1996) (implying that predecessor to DUCivR 56.1

satisfied by compliance with FRCP 56).

    In the paragraphs at issue, the federal defendants have specifically controverted plaintiffs'

statements by referring to specific portions of the Administrative Record and/or specific

paragraphs in the Declaration of Howard Hogan supporting the federal defendants' position.  For

example, plaintiffs state that the federal defendants do not "specifically controvert" any of

plaintiffs' assertions in paragraph 14 regarding the so-called "double-delete" policy.  Pltfs' Opp. at

11.  However, in responding to the assertion that "the Bureau did not classify non-responding

housing units as vacant or 'delete' (*i.e.*, non-existent) unless or until it received information from

two independent sources that the unit in question was vacant or did not exist," Pltfs' Mem. at 9,

the federal defendants stated that the "'double-delete' rule was only one criterion used to assign a

final status of 'delete.'  There are several other criteria that led to the assignment of a 'delete'

status . . . ."  The federal defendants' Consolidated Memorandum in Support of Defendants'

5

Motion to Dismiss or, in the Alternative, their Cross-Motion for Summary Judgment, and in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs' Mem.") at 9. The federal defendants then cited three documents where "delete" criteria were discussed and also referred to paragraph 69 of the declaration of Howard Hogan. Id. This type of response more than satisfies FRCP 56 and DUCivR 56.1.

Plaintiffs also object that many of the federal defendants' disputes with their facts are only with the "phraseology." See Pltfs' Opp. at 11-20, ¶¶ 16, 18, 19, 20, 45, 46, 47. This description of the federal defendants' objections is inaccurate – federal defendants' disputes with plaintiffs' language are not just "quibbles" over word choices but rather are disputes as to the accuracy of the description itself. In any event, in evaluating plaintiffs' motion for summary judgment, the Court must construe all facts and reasonable inferences therefrom in the light most favorable to the federal defendants, the nonmoving parties. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gullickson, 87 F.3d at 1183. Therefore, the Court must accept the federal defendants' choice of language in the paragraphs at issue.

Finally, plaintiffs state that issues regarding the definitions and characterizations of sampling, imputation, and/or hot-deck imputation are issues of law, not of fact. Pltfs' Opp. at 12-16, 19, ¶¶ 19, 21-28, 30-37, 44. By themselves, however, these definitional issues are more properly considered issues of fact. And, for the purposes of plaintiffs' summary judgment motion, for the reasons stated above, the facts should be construed consistent with the federal

6

defendants' views.[2]

Specific comments in addition to those identified above are identified by paragraph number below:

4-12.   The parties agree that the disputes with regard to the facts in these paragraphs are immaterial. However, for the purposes of plaintiffs' summary judgment motion, the facts should be construed consistent with the federal defendants' views.

13 & 15.   The issue of whether imputed numbers may properly be characterized as "estimates generated by statistical methods" is not a legal issue, but rather an issue over the proper characterization of the facts. For the purposes of plaintiffs' summary judgment motion, the facts should be construed consistent with the federal defendants' views. Here, the federal defendants do not agree that the term "estimate generated by statistical methods" can accurately be used to refer to imputation, as the phrase is overly broad, includes many dissimilar statistical methods, and implies that imputation is a form of sampling, which it is not. Plaintiffs also read too much into the cited excerpts from R. Killion, DSSD Briefs, Information, and Topics Memorandum Series #F-1, Sampling and Statistical Methods in Past Censuses (Jan. 13, 1997) (A.R. C01460-65), which refer to imputation as a procedure performed on households that are not enumerated. This discussion, in a short memorandum designed to give a general overview of the use of imputation, does not mean that the Bureau does not consider imputation to be part of

---

[2]Federal defendants agree with plaintiffs that the issue of whether imputation is "sampling" within the meaning of 13 U.S.C. § 195 (see ¶ 37) is a legal issue, which is addressed at length in the parties' briefs, to which the Court is respectfully referred.

its traditional methods of actual enumeration.  Moreover, this memorandum supports the

Bureau's position herein, as it distinguishes sampling from imputation and discusses them in

separate sections.  See A.R. C01461, 1463.  The excerpt from the Bureau of the Census, United

States Dep't of Commerce, Report to Congress – The Plan for Census 2000 (1997) (hereafter

"1997 Report to Congress"), that plaintiffs cite (p. 56, A.R. C00188, cited in Pltfs' Opp. at 11) is

irrelevant here and, in any event, defines imputation consistently with the Bureau's position in

this litigation.

18.    Plaintiffs assert that this paragraph in their original memorandum "intended to

point out that [in 2000] the Bureau used statistical imputation to add numbers to the

apportionment count that represented persons whose existence the Bureau never established."

Pltfs' Opp. at 12.  The original paragraph stated that, in 2000, "the Bureau again imputed persons

living in housing units known to exist, but for which no population count had been reported, . . .

[and] also imputed the presumed occupants of housing units whose existence it had not been able

to verify."  Pltfs' Mem. at 11.  These two statements are different.  The federal defendants dispute

both formulations.  As set forth in Census 2000 Informational Memorandum No. 110, Initial

Research on Count Imputation in Census 2000 (Aug. 10, 2001), attached hereto as Exhibit G

(hereafter "Imputation Research Memo"), the majority of count imputation cases in 2000

represented housing units which the Bureau had reason to believe were valid, nonduplicated

units, and which attempted to participate in the Census.  Imputation was required in these cases

because data was received too late in the process, because data was "lost" through the corruption

of computer files, or because questionnaires had contradictory information.  Id.  Plaintiffs'

statements that the Bureau may not have "established" the existence of these persons or housing

units and that "no population count had been reported," is inaccurate as, in most cases, the

Bureau had reason to believe the persons and units existed and a population count *had* been

reported.

19.     The federal defendants do not "expressly concede[] the essence of Plaintiffs'

assertions in this paragraph." Pltfs' Opp. ¶ 19. In fact, the federal defendants expressly disagree

that the count imputation methodology used in 1970 differed "significantly" from the

methodology used in 1960 and 1980, and expressly disagree with plaintiffs' implication that the

use of count imputation in 1970 constituted sampling. See Defs' Mem. at 11.

21-23, 35, 39. The issues of whether the statistical imputation methodology used in

Census 2000 is "substantively indistinguishable" from the sampling methodology at issue in

House (¶ 21), whether it is part of the Census Bureau's "traditional methods of actual

enumeration" (¶¶ 21, 22, 35, 39), and whether it is or has been described by the Census Bureau as

sampling (¶¶ 22, 23) are issues of fact, not of law, as plaintiffs assert, and are addressed in the

portions of the Hogan Declaration and the documents cited in Defs' Mem. at 12, 15-16. These

paragraphs do not address, as plaintiffs assert (Pltfs' Opp. ¶¶ 21, 22), the definition of "sampling"

under the Census Act. Plaintiffs also read too much into the cited excerpts from R. Killion,

DSSD Briefs, Information, and Topics Memorandum Series #F-1, Sampling and Statistical

Methods in Past Censuses (Jan. 13, 1997) (A.R. C01460-65), which refer to imputation as a

procedure performed on households that are not enumerated. Pltfs' Opp. ¶ 22. This discussion,

in a short memorandum designed to give a general overview of the use of imputation, does not

9

mean that the Bureau does not consider imputation to be part of its traditional methods of actual enumeration. Moreover, this memorandum supports the Bureau's position herein, as it distinguishes sampling from imputation and discusses them in separate sections. See A.R. C01461, 1463. The 1997 Report to Congress excerpt plaintiffs cite (p. 56, A.R. C00188, cited in Pltfs' Opp. ¶ 22) is irrelevant here and, in any event, defines imputation consistently with the Bureau's position in this litigation. Finally, characterizations of documents (Pltfs' Opp. ¶ 23) are issues of fact, not of law.

24.   Plaintiffs' original paragraph did not accurately paraphrase page 23 of the 1997 Report to Congress. Accordingly, the federal defendants merely denied this allegation, as no "distinguishing" of authority or reference to another authority was necessary.

26.   Plaintiffs' original paragraph stated that both sampling and imputation are two-part processes that obtain information about an observed part of the population and use that information to draw inferences about the unobserved part. Pltfs' Mem. at 14. The federal defendants disputed this contention, citing to the declarations of Howard Hogan and Joseph Waksberg, which sharply distinguish sampling from imputation and describe sampling as a method that may be used at the data-collection stage of a survey and imputation as a method used at the data-processing stage of a survey to address missing data or other similar errors. Defs' Mem. at 13. Plaintiffs now assert that the federal defendants' contentions are "unsupported" by the Hogan and Waksberg declarations. Pltfs' Opp. at 14. This statement is incorrect – neither the Hogan nor the Waksberg declarations define sampling or imputation as methods that obtain information from an observed set and use that information to draw inferences about the

unobserved part. Plaintiffs' attempt to define these processes in those terms is therefore inconsistent with those declarations.

34.     Regarding the reliability of the hot-deck method of imputation, the federal defendants cited to Dr. Hogan's declaration, which lists numerous studies that refute plaintiffs' assertions and also describes changes made to Census 2000 that addressed the concerns raised by plaintiffs. Defs' Mem. at 15, citing Hogan Dec. ¶¶ 17, 31, 38.

36.     With regard to assertion (1), the Hogan Declaration explains that, in 2000, imputation was applied to housing units that were recorded on the Bureau's exhaustively updated and validated Decennial Master Address File ("DMAF"), and therefore was not applied to housing units "not known to exist." Hogan Decl. ¶ 9, cited in Defs' Mem. at 15; the procedures used for development of the DMAF are referenced in Hogan Decl. ¶ 15. The federal defendants have therefore "specifically controverted" this assertion. In addressing this assertion, plaintiffs refer to the federal defendants' interrogatory responses at 20-21 and Table 3. Pltfs' Opp. at 15. However, these pages do not state that imputation was applied to housing units "not known to exist." See Ex. E to the North Carolina Defendants' Memorandum in Support of Motion to Dismiss and for Summary Judgement ("NC Memo.").[3] With regard to assertion (2), Dr. Hogan states that imputation improves the accuracy of the census over a census that does not use imputation. Hogan Decl. ¶ 37, cited in Defs' Mem. at 15. Plaintiffs do not controvert this particular assertion, and it is not clear what plaintiffs mean by asserting that imputation results in

_____

[3] The federal defendants have served revised interrogatory responses, which are attached hereto as Exhibit B.

"overestimation." Pltfs' Opp. at 15. The Census Bureau has documented that every census since at least 1940 has produced an undercount. Kenneth Prewitt, Director, U.S. Bureau of the Census, Accuracy and Coverage Evaluation: Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000, at 4 (June 2000) (A.R. C01907).

37.     The issue of whether failing to impute is the equivalent of imputing zero is a question of fact, not of law. In paragraphs 10, 32, and 36 of his declaration, Dr. Hogan explains why failing to impute is the equivalent of imputing zero. Plaintiffs do not offer any controverting evidence, or any alternative way of characterizing a failure to impute. Plaintiffs also do not offer any evidence that imputation worsens the accuracy of the census.

38.     The federal defendants did not "belatedly" add studies to the Administrative Record. Those studies, many of which had previously been served on plaintiffs as part of the discovery in this case, were filed as part of the original Administrative Record. The federal defendants address the relevance of studies of distributive accuracy in paragraphs 34 and 35 of the Hogan Declaration and the need for studies of the impact of <u>House</u> on the Bureau's use of imputation in paragraph 63 of the Hogan Declaration.

39-43.  In these paragraphs in their original statement of facts, plaintiffs included numerous allegations regarding imputation's potential for manipulation of the apportionment count. The only evidence plaintiffs provided in support of these allegations were the unsupported, conclusory, and speculative assertions of Dr. Wolfson. These allegations are immaterial to the resolution of plaintiffs' motion but, in any event, are not sufficiently supported to justify summary judgment.

12

## REPLY TO PLAINTIFFS' RESPONSE TO
## FEDERAL DEFENDANTS' STATEMENT OF FACTS

11.    The documents cited by plaintiffs do not support their assertion that households enumerated through "status imputation" are "fictional or phantom addresses" or even the assertion that the Master Address File ("MAF") and the Decennial Master Address File ("DMAF") contain "fictional or phantom addresses." Rather, the cited documents detail the procedures involved *in the correction and updating* of the MAF and the DMAF. They do not evidence inaccuracies in the addresses that were *finally* used to derive the apportionment count. Thus, plaintiffs quote DSSD Census 2000 Procedures and Operations Memorandum Series #D-11, Specification for Reinstating Addresses Flagged as Deletes on the Hundred Percent Census Unedited File (HCUF) (Nov. 7, 2000) (A.R. C01579-84) to the effect that "[e]vidence from an *early* Master Address File (MAF) extract indicated a potentially larger number of housing units and households may have been duplicated or otherwise included in error" (emphasis supplied). This is the *first* sentence of this memorandum. The memorandum goes on to state that "[t]hese concerns led the Census Bureau to identify and remove housing units . . . from Census 2000. . . . These are the specifications for *reinstating* housing units in Census 2000 when further analysis does not confirm the earlier delete action." Id. Moreover, as explained the Imputation Research Memo, attached hereto as Exhibit C, a recent study has revealed that most of the units for which status imputation was performed were not on the DMAF by the time the census questionnaires were delivered, but were added later by enumerators during field operations. The reasons why the Bureau believes that the Census Bureau did not have data for these units are set forth in more

13

detail in this memorandum.  In any event, these "enumerator adds" reflect valid housing units that were appropriately included in the census, as enumerators would have no reason to add a "fictional" or "phantom" unit.

14.    Plaintiffs' response does not support the conclusion that a dispute exists with regard to the assertion that "a decision not to impute is tantamount to imputing a value of zero." Rather than citing to authorities supporting the opposite proposition, plaintiffs discuss two irrelevant propositions. First, they discuss whether failure to impute implicates 13 U.S.C. § 195, which is an issue of law, not of fact.  Second, they discuss whether failure to impute improves the accuracy of the census, which is not the issue addressed by this paragraph of the federal defendants' statement of facts.  This assertion therefore remains uncontroverted and must be deemed admitted.

24.    The federal defendants agree with plaintiffs that this statement of fact is more properly a legal assertion, and the parties' disagreement as to the proper interpretation of Orr v. Baldrige, No. IP 81-604-C, slip op. (S.D. Ind. July 1, 1985), does not therefore raise a material dispute of fact.

25.    Plaintiffs do not provide sufficient evidence to create a dispute.  In their original memorandum, plaintiffs cited to A.R. C00682 to support their contention that "status" imputation was not used in 1990.  In response, Dr. Hogan explains in his declaration (¶ 56) that A.R. C00682 was not the definitive statement on the processes used in 1990 and that, in fact, status imputation was used in that year.  Plaintiffs provide no evidence to refute these assertions.

31.    The issue of to whom the Census Bureau presented details of the Census 2000

14

Plan is an issue of fact, not of law. Plaintiffs do not address this issue in their Section IC, and therefore federal defendants' assertions in this regard must be deemed admitted. Plaintiffs do not specifically respond to federal defendants' assertion regarding other statistical methodologies. They claim only that the record is "entirely void" of evidence suggesting that the Bureau used other statistical methods to "add" numbers to the apportionment count, but do not address the sources cited by federal defendants.

## ARGUMENT

### I.   THE CENSUS BUREAU'S USE OF IMPUTATION IS NOT PROHIBITED UNDER SECTION 195 OF THE CENSUS ACT

In its opening memorandum, the Census Bureau demonstrated that the Census Act does not prohibit the use of imputation to account for missing, contradictory, or improperly processed data for the following reasons. First, the plain language of section 195 of the Census Act does not refer generally to "statistical methods" or specifically reference "imputation" or "estimation" but prohibits only "the statistical method know as 'sampling.'" 13 U.S.C. § 195. Second, the declarations submitted by the Census Bureau (Dr. Hogan and Mr. Waksberg) and the North Carolina defendants (Dr. Peterson) establish that sampling and imputation are two separate and distinct methodologies fulfilling different functions, and they rebut the efforts of plaintiffs' declarants (Drs. Rubin and Wolfson) to define "sampling" so broadly that not only imputation, but also all decennial censuses, arguably could be included within the prohibition. Third, missing and incomplete data are an inevitable part of any census, and in all such cases, whether it be zero imputation (as proposed by plaintiffs), or hot-deck imputation (the procedure being

15

challenged here), some form of imputation must be used.  The only court to have considered this very issue (<u>Orr v. Baldridge</u>) affirmed the Census Bureau's use of imputation and the distinction between imputation and sampling.

Further, the Secretary consistently has interpreted section 195 to allow imputation and has used imputation for apportionment purposes in every decennial census since 1960; that long-standing interpretation is entitled to deference.  Moreover, the legislative history and subsequent congressional actions, including the House of Representatives' position in <u>Department of Commerce v. U.S. House of Representatives</u>, 525 U.S. 316 (1999), are consistent with the Census Bureau's position that the Census Act's "sampling" prohibition never was intended to bar methodologies other than sampling, such as imputation.

In their Reply, plaintiffs raise numerous disagreements with the Census Bureau's positions, but their arguments are easily rebutted and are noteworthy because of what they do not address.

## A.   Plaintiffs Still Fail To Establish That "Sampling" Includes Imputation

Plaintiffs make no attempt to rebut the three declarations submitted by the Census Bureau and North Carolina, in which Drs. Hogan and Peterson and Mr. Waksberg (1) establish that sampling and imputation are not the same (<u>see</u> Hogan Decl. ¶¶ 7, 18, 19, 23, 24; Waksberg Decl. ¶¶ 5-9, 11; Peterson Decl. ¶¶ 3, 9-11); and (2) refute the opinions of Drs. Rubin and Wolfson in their declarations which define "sampling" so broadly that the entire decennial census could arguably be included and prohibited.  Hogan Decl. ¶¶ 25-28; Waksberg Decl. ¶ 10; Peterson Decl. ¶¶ 3, 22.  Indeed, in their Reply, plaintiffs all but ignore their own declarants and instead

16

make generalized, conclusory, unsupported assertions.[4]

As the unrefuted and unrebutted testimony of Dr. Hogan, Mr. Waksberg, and Dr. Peterson clearly demonstrates, imputation is not sampling. See Hogan Decl. ¶¶ 7, 18, 19, 23, 24; Waksberg Decl. ¶¶ 5-9, 11; Peterson Decl. ¶¶ 3, 9-11. This determination is supported by the decision in Orr v. Baldrige, No. IP 81-604-C, slip op. (S.D. Ind. July 1, 1985), and the affidavit that Donald Rubin, plaintiffs' declarant in this case, submitted on behalf of the plaintiffs in that case. See Affidavit of Donald B. Rubin (hereafter "Rubin Orr Aff.") ¶ 7, attached to Defs' Mem. as Ex. G. Plaintiffs try to avoid altogether the language of the Orr opinion by dismissing it (without explanation) as wrongly decided and its conclusions as "pure dicta." Pltfs' Opp. at 38. Contrary to plaintiffs' assertions, the court did have ample opportunity to review the issue, because the plaintiffs in Orr initially did claim that imputation was a form of sampling prohibited

----

[4]The few sources on which they do rely are either unrelated to the issue presented here or on a full reading fail to support plaintiffs' assertions. For example, plaintiffs refer to two "standard" statistics texts, whose pages they do not attach. Pltfs' Opp. at 36. However, neither text is relevant. Plaintiffs claim that a text by Frank Yates includes a discussion of "substitution" which relates to imputation. The Census Bureau was unable to locate a copy of the 1957 Yates text, but from the pages provided by plaintiffs, it appears that Mr. Yates' discussion of substitution does not relate to imputation. While "substitution" is a term sometimes used by the Census Bureau to refer to a form of imputation, it is not the substitution to which Mr. Yates refers. See Frank Yates, Sampling Methods for Censuses and Surveys 10 (1953). The Census Bureau was able to get a 1981 edition of the text. In a 458-page text on the use of sampling methods in censuses and surveys, imputation is discussed only once. In the chapter entitled "Problems of Execution and Analysis" under the section on "Correction of errors in basic data," imputation is listed as means of correcting erroneous data. See Frank Yates, Sampling Methods for Censuses and Surveys 120 (1981), excerpts attached hereto as Exhibit D. The 1981 text also contains the same discussion of substitution that appeared on page 10 of the 1957 text. The other text merely provides a definition of quota sampling. See W. Paul Vogt, Dictionary of Statistics and Methodology: A Nontechnical Guide for the Social Sciences (1993). As discussed in the declaration of Dr. Hogan, imputation is not quota sampling. See Hogan Decl. ¶ 29.

by the Census Act.  After further review (and presumably after conferring with their expert, Dr.

Rubin) the plaintiffs changed their position.  Consequently, the issue had been presented to the

court.  Of course, the court's rationale lends support to the Secretary's position even if it is

technically *dicta*.

The federal defendants' reading of section 195 as not including imputation within the

meaning of "sampling" is neither "crabbed" nor would it in any way "nullify" section 195 as

construed in House of Representatives, Pltfs' Opp. at 36, particularly since the House and Glavin

plaintiffs in their briefs, and Justice Breyer in his dissenting opinion, all stated that section 195

does not prohibit imputation.  See House, 525 U.S. at 355; Defs' Mem., Ex. I.  Plaintiffs have

failed to explain how the Supreme Court's opinion in House in any way dictates a different result.

Contrary to plaintiffs' representations, the substance and purpose of imputation are

distinguishable from those of the sampling methods struck down in House.  Pltfs' Opp. at 31; see

Hogan Decl. ¶¶ 7, 18-24; Waksberg Decl. ¶¶ 5, 9-11; Peterson Decl. ¶¶ 3, 9-11.  Sampling,

whether it be random sampling, quota sampling or another form of sampling,[5] involves the

---

[5]Plaintiffs mischaracterize the federal defendants' position by claiming that the Census
Bureau has argued that the only form of sampling is random or probability sampling.  Pltfs' Opp.
at 35-36.  The federal defendants in fact argued that what is contemplated by both lay people and
statisticians when using the term "sampling" is ordinarily random or probability sampling.
Hogan Decl. ¶ 30; Peterson Decl. ¶ 7.  Likewise, the type of sampling contemplated by the
Bureau in requesting the passage of section 195, the type of sampling meant by Congress in
passing section 195, and the type of sampling that Congress and the Census Bureau consistently
have interpreted section 195 to encompass since its passage in 1957, is probability or random
sampling.  See Defs' Mem. at 41-47; Peterson Decl. ¶¶ 13-20.  This is because random or
probability sampling, which primarily was developed and pioneered by the Census Bureau, is the
most common, recognized and accepted form of sampling.  Hogan Decl. ¶ 30.  Plaintiffs do not
dispute any of these conclusions.  In fact, their own expert, Dr. Rubin, acknowledged as much in

18

deliberate selection of a subset of the population for the purpose of inferring information about the population as a whole.[6]  Hogan Decl. ¶¶ 26-27, 29-30.  Sampling is a means of collecting data, id. ¶¶ 19, 21, 23, and imputation is not, id. ¶¶ 19, 22-23, 26.  In Census 2000, the Census Bureau did not count only a subset of the population.  Instead, it made an exhaustive effort to collect data from every household in the United States through the mail, the telephone, the internet, personal visits, administrative records, or questionnaires left at houses or made available in public places.  Id. ¶¶ 66-75.  Only if these many forms of data collection failed to gather information from a household, or if information was lost or otherwise missing, did the Census Bureau make use of imputation.  Id. ¶¶ 26, 76.

In their Reply, plaintiffs acknowledge that imputation takes place in the data-processing

---

his affidavit in support of Indiana in the Orr litigation.  See Rubin Orr Aff. ¶ 5, attached to Defs' Mem. as Ex. G.  The federal defendants did not dispute, however, that other forms of sampling exist.  For instance, in his declaration, Dr. Hogan discussed quota sampling and how it bears no likeness to imputation.  Hogan Decl. ¶ 29.

[6]Plaintiffs argue that imputation involves a deliberate or purposeful selection because the imputation program for Census 2000 did not in all instances fill in missing information from the household whose data was input immediately before the household with the missing data.  Pltfs' Opp. at 34.  Instead, the Bureau used the donor within the neighborhood or tract that most closely matched the household with missing data, i.e., the Bureau tried to select donors from households that had their questionnaires completed by an enumerator and from households having the same unit size.  Hogan Decl. ¶¶ 7, 38, 39.  Over the years, the Census Bureau has made these and other improvements to the imputation process in order to enhance homogeneity – the principle on which imputation is based.  Id.  Ironically, on the one hand plaintiffs criticize the efficacy of imputation, and on the other claim that the Census Bureau's attempts to refine imputation somehow convert imputation into sampling.  They do not.  Waksberg Decl. ¶¶ 5-6, 11.

stage and is the second part of a two-step process.[7]  Pltfs' Opp. at 32.  However, plaintiffs then

argue, without any support or explanation, that because the type of imputation at issue is

"nearest-neighbor" or "hot-deck" imputation, the normal use and meaning of imputation does not

apply.[8]  Id. at 32-33.  Imputation is a highly deterministic process, Waksberg Decl. ¶ 6; Peterson

Decl. ¶¶ 9, 11, and nearest-neighbor and hot-deck imputation are more deterministic than most

forms of imputation.  See J. Farber, U.S. Bureau of the Census, A Comparison of Imputation

Methods for Sampling for Non-Response Follow-Up (A.R. C01634-41); Joseph L. Schafer,

Model-Based Imputation of Census Short-Form Items, Bureau of the Census, Proceedings of the

Annual Research Conference 268 (1995) (A.R. C01418).  As Mr. Waksberg explains, by

characterizing sampling to include imputation, plaintiffs have "extended the meaning of

'sampling' both beyond the definition used by almost all statisticians involved in research on

censuses and sample surveys, and in the context of the Census Act."  Waksberg Decl. ¶ 10;

---

[7]Plaintiffs state that it would be "impossible to conceive of a method of 'sampling' relevant to an assessment of the population that would not involve both steps, and accordingly Defendants' linguistic distinction must be rejected." Pltfs' Opp. at 33.  That is untrue.  Just because sampling may require some form of inference or estimation, although not necessarily imputation, for the sampling process to be complete, it does not follow that imputation requires some form of sampling.  In the 1960-2000 decennial censuses, the Census Bureau used imputation, but did not use sampling (except under limited circumstances in 1970).

[8]Plaintiffs state that "the Bureau's own documents show that, although hot-deck imputation is not based on a random sample, it is designed to 'reproduce the random quality of missing items.'" Pltfs' Opp. at 37 n.3 (quoting Y. Thibaudeau, T. Williams and T. Krenke, Multivariate Item Imputation for the 2000 Census Form (A.R. C01716)).  Plaintiffs take that quote completely out of context.  The quoted section does not refer to hot-deck imputation but to the multivariate imputation the study proposes as an alternative to hot-deck imputation precisely because hot-deck does not have a random quality.  See A.R. C01716.

accord Hogan Decl. ¶¶ 25-28; Peterson Decl. ¶¶ 3, 22.

Nevertheless, in an attempt to make imputation appear to be sampling, plaintiffs once again raise the specter of "phantom" housing units and "phantom" people. Pltfs' Opp. at 2, 20, 40. Presumably, plaintiffs are referring to the Census Bureau's use of status imputation. Status imputation occurs when the Census Bureau's records have conflicting or insufficient information about whether an address represents a valid, non-duplicated housing unit. Hogan Decl. ¶¶ 14-15. Of course, the Bureau's use of status imputation is immaterial to the question of whether or not imputation is sampling. At most, plaintiffs' complaints about status imputation amount to a challenge to the manner in which the Bureau conducted its imputation. Such a challenge could be raised only under the Administrative Procedure Act, which, as discussed below, is unavailable to plaintiffs in this case.[9]

In any event, the Census Bureau and the Department of Commerce have not in any way acknowledged that imputation includes "individuals who have never been identified and are not known to exist." Pltfs' Opp. at 2. On the contrary, "[s]tatus imputation was applied to addresses included in the Bureau's DMAF [Decennial Master Address File]. . . . Because the Census Bureau had secured sufficient information to include these addresses in the DMAF, these are not 'phantom' addresses." Hogan Decl. ¶ 15. With their "phantom" theory fading before them,

---

[9]However, given the extraordinarily high deference afforded Congress and, in turn, the Secretary in the conduct of the Census, any attempt to substitute plaintiffs' views on imputation for those of the Bureau would fail even if a claim under the APA were cognizable. See discussion, infra at 49-51.

21

plaintiffs instead focus their attention on the adequacy of the DMAF.[10]  Pltfs' Opp. at 40-41.  In fact, the Census Bureau's preliminary evaluation of the address list praised its overall accuracy and success.  See Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy (hereafter "ESCAP Report") at 10 (March 1, 2001) (A.R. C01046).  Moreover, imputation takes place at the very end of the enumeration process during the data-processing stage, after the addresses on the DMAF have been validated and updated according to specific procedures.  See Hogan Decl. ¶¶ 15, 68.  The two documents to which plaintiffs cite detail some of those procedures, as well as the building and updating process.  See, e.g., DSSD Census 2000 Procedures and Operations Memorandum Series # D-11 ("[e]vidence from an *early* Master Address File (MAF) extract indicated a potentially larger number of housing units and households may have been duplicated or otherwise included in error" (emphasis added)) (A.R. C01579).[11]

However, because the number of imputations was higher in Census 2000 than in the 1990

---

[10]The adequacy of the Census Bureau's DMAF is an entirely unrelated issue that has nothing to do with this litigation and, once again, any challenge to the Bureau's maintenance and development of that DMAF would have to be raised under the APA.

[11]Plaintiffs also quote Dr. Prewitt, Director of the Bureau of the Census, completely out of context in an attempt to make it appear as though the Census Bureau inappropriately included invalid housing units in the Census.  Pltfs' Opp. at 40.  In fact, Director Prewitt was explaining why it was necessary for the Census Bureau to send letters demanding that management companies allow census enumerators access to apartment buildings to verify addresses – a congressman had received a complaint from one such management company.  See Oversight of the 2000 Census:  Status of Nonresponse Follow-up and Closeout:  Hearing Before the House Subcomm. on the Census, Comm. on Government Reform, 106th Cong., 2d Sess. at 53-57 (June 22, 2000) (Testimony of Director Prewitt), excerpts attached hereto as Exhibit E.

Census – but still only a fraction of one percent of the total apportionment count – the Census Bureau convened an interdivisional team to conduct an extensive study of the origins of the imputations for Census 2000. Hogan Decl. ¶ 77; see ESCAP Report at 26. The results of the Census team study were presented to the ESCAP on July 26, 2001. See Census 2000 Informational Memorandum No. 110, Initial Research on Count Imputation in Census 2000 (Aug. 10, 2001) (hereafter "Imputation Research Memo"), Ex. C, attached hereto.

With respect to status imputation, the Bureau's research reveals that most of the units in that category were not on the DMAF by the time the census questionnaires were delivered, but were added later by enumerators during field operations. The research team believes that there are two possible reasons why the Census Bureau does not have data for these units – the Non-Identification ("Non-ID") process and the constraints on the data processing schedule. The Non-ID process was a method by which new addresses were added to the census address file. A unique identifier, the MAF Identification ("MAF ID"), is preprinted on questionnaire forms mailed or delivered to addresses for mail back and preprinted on questionnaires given to enumerators for addresses they are assigned to visit during follow-up. However, addresses added by enumerators in the field or through the Be Counted or telephone questionnaire assistance ("TQA") programs would result in respondent data without a MAF ID. These cases were assigned a temporary processing ID which later was matched to the MAF or assigned a MAF ID. For some cases, the temporary processing IDs were corrupted, thus preventing the Census Bureau from linking them back to their corresponding data. The data corruption appears to be the primary reason for the imputed cases in the status imputation category. Constraints on the data

23

processing compounded this problem.  Some MAF IDs were entered in the DMAF late in the census process and were not included in the merge process, whereby data captured records were merged with corresponding MAF IDs.  This late addition prevented the data for this record from being a part of the final census files.  See generally Imputation Research Memo.

Overall, 75% of the total number of housing units imputed in the status imputation category were added during the enumeration process by the enumerators in the field or through other Census programs.  These adds reflect valid housing units that appropriately were included in the Census 2000.  See Imputation Research Memo.

**B.    The Secretary Has Consistently Interpreted Section 195 As Not Precluding Imputation**

Plaintiffs argue that the Secretary and the Census Bureau have been inconsistent in their interpretation of section 195, and in support refer to various documents which on review flatly fail to support their contention.[12]

Plaintiffs' rely primarily on page 23 of the Bureau of the Census, United States Dep't of Commerce, Report to Congress – The Plan for Census 2000 (hereafter the "1997 Report to Congress"), for their theory that the Census Bureau previously has stated that sampling and imputation are the same.[13]  See Pltfs' Opp. at 5, 13, 23, 29, 30, 36.  On page 23, the Census

---

[12]On page 49 n.8 of their Reply brief, plaintiffs provide what they claim to be other examples of the Bureau's "inconsistencies" in its position with respect to section 195's prohibition against sampling, but these examples relate solely to sampling and have nothing to do with imputation.

[13]Plaintiffs also cite to the explanation of imputation in the glossary of terms on page 56 of the 1997 Report to Congress.  Pltfs' Opp. at 11, 13.  Noticeably, that explanation does not say

24

Bureau specifically states:

> Census 2000 will not be the first time that Census Bureau has used *statistical methods* to correct for problems in physical enumeration and to provide a more accurate final result. Since at least 1940, statistical imputation has been used when an enumerator knew that a housing unit was occupied, but could not obtain information on the number of people living in that unit. In 1980, statistical imputation raised the physical enumeration total by 761,000 people. The number and rate of people imputed in the 1990 Census was only 53,590. Automated data control systems and field procedures discouraged enumerators from turning in incomplete questionnaires. In 1970, the Census Bureau used *sampling* to impute people to addresses that had initially been assumed vacant. The *sample* of 13,546 housing units initially presumed "vacant" found that 11.4 percent of them should be reclassified as "occupied." The National Vacancy check added 1,068,882 people, or 0.5 percent of the total, to the 1970 Census.

Id. (emphasis added) (A.R. C00155). Plaintiffs argue that the Court should ignore the plain meaning of section 195, its legislative history, the Bureau's long-standing interpretation of the statute, and the three expert declarations submitted by defendants in this case, and find that imputation is a form of sampling prohibited under section 195 because, although the Bureau refers to imputation as a *statistical method* on that page (as opposed to sampling which it also discusses), the brief discussion of imputation falls under the heading of "Reliance on Sampling in Previous Censuses." Pltfs' Opp. at 29. The fact that imputation may be a *statistical method* in no way means that it constitutes statistical sampling.

---

that imputation involves sampling or that imputation occurs "whenever the information on a portion of a population is used to infer information on the population as a whole" – the definition of sampling provided on page 23 of the 1997 Report to Congress. Rather, it states that "[w]hen information is missing or inconsistent, the Census Bureau uses a method called imputation to assign values. Imputation relies on the statistical principle of 'homogeneity,' or the tendency of households within a small geographic to be similar in most characteristics. In past censuses, when the occupancy status or the number of residents was not known for a housing unit, this information was imputed." Id. at 56.

25

In addition, plaintiffs point to a memorandum from the Census Bureau, James Farber and Richard Griffin, A Comparison of Alternative Estimation Methodologies for Census 2000 (A.R. C01642), as support for their "imputation is sampling" theory. Pltfs' Opp. at 28-29. However, this memorandum discusses the sampling procedure struck down by the Supreme Court in House of Representatives. The purpose of the memorandum was to evaluate what methodology the Bureau should use to "account for the population residing at nonrespondent and UAA vacant addresses not in either the NRFU or UAA vacant samples." See A.R. C01642. The "nonsampled addresses" referred to in the memorandum are those addresses that would not have been included in the original sample taken under the Bureau's proposed sampling plan – they do not relate to imputation. Id. Plaintiffs further point to DSSD Briefs, Information, and Topics Memorandum Series #F-1, Sampling and Statistical Methods in Past Censuses (Jan. 13, 1997). Pltfs' Opp. at 11, 13. In fact, that memorandum, which specifically addresses the use of statistical methods in past censuses, draws a clear distinction between sampling and imputation. See A.R. C01461, 1463.

Plaintiffs also claim that a statement published by the Census Bureau in the Federal Register demonstrates that the Census Bureau does not really consider imputation to be part of the traditional enumeration process. Pltfs' Opp. at 23, 25, 49, 50, 52, 77. It, in fact, demonstrates the opposite. In that statement announcing the Secretary's decision not to statistically adjust the 1980 Census, the Bureau explained that the "1980 census data covering the vast majority of Americans will result from a *pure count in the full tradition and practice of enumeration*." Census Undercount Adjustment: Basis for Decision, 45 Fed. Reg. 69,366, 69,373 (Oct. 20,

1980) (emphasis added) (A.R. C01220).  The Bureau then proceeded to describe its

implementation of the 1980 enumeration process, including its use of count imputations, in the

section called "Operational Facets of '*Actual Enumeration*.'"  Id. (emphasis added).  Under the

subheading "Substitution for Enumerations and Processing Reasons, Close-out," the Bureau

explained that after several visits to a housing unit, "[i]f the number of occupants is unknown, an

entire set of characteristics for a neighboring house is substituted."  Id.  The Bureau proceeds to

explain that "[o]ccasionally during shipment or the processing of data, census forms are lost,

destroyed or damaged so as to be unreadable by the machine."  Id.  In such cases, "[b]oth the

number and characteristics are substituted."  Id.

 Finally, plaintiffs make the illogical leap that imputation "is indistinguishable from the

random sampling stuck down in the House of Representatives case."  Pltfs' Opp. at 4, 31, 39, 53,

75.  That conclusion does not follow.  The Census Bureau has never argued that the prohibition

against sampling in section 195 of the Census Act in any way extends to imputation or that

imputation and sampling are the same under the Act.  The federal defendants took the position in

the House of Representatives litigation that sampling is constitutional and House did not find

otherwise.  In House, the Supreme Court held only that the use of sampling for apportionment

violated section 195 of the Census Act.  That ruling does not in any way pertain to imputation,

which is an entirely different method with a completely different purpose.

**C. The Legislative History Is Consistent With The Secretary's Interpretation**

 Plaintiffs do not offer any legislative history in support of their novel argument that

Congress meant to include other statistical methodologies when it specifically limited the

prohibitions in section 195 to "the statistical method known as 'sampling,'" or any substantive

evidence of congressional intent contrary to the Secretary's interpretation. Plaintiffs merely argue

that the Court should ignore forty years of congressional knowledge and acquiescence in the use

of imputation, which clearly support the plain language of the statute. See Defs' Mem. at 41-48;

Peterson Decl. ¶¶ 13-20. The plain language of the statute, of course, makes clear that Congress

understood that sampling is a subset of statistical methods, as section 195 is limited to the

"statistical method known as 'sampling.'" If Congress had intended to prohibit the use of

statistical methods in general, it could have done so; clearly it instead chose to limit the use of

only one certain statistical method – sampling.

Plaintiffs' sole offerings of legislative history or intent for the 1957 enactment of section

195 and its 1976 amendment are two quotes that simply reiterate the purpose of the section – to

authorize the Secretary to use sampling, instead of a complete or actual enumeration, but not for

purposes of apportionment. Pltfs' Opp. at 44; see Census Undercount Adjustment: Basis for

Decision, 45 Fed. Reg. 69,366, 69,372 (Oct. 20, 1980) (A.R. C01219); 121 Cong. Rec. H35,171

(daily ed. Oct. 1, 1976) (Statement of Rep. Schroeder).[14]

---

[14]In their introduction, plaintiffs argue, without any support, that in "1957, for example, in response to a proposal by the Bureau to use *a form of random sampling* to remedy the 'undercount' of traditionally undercounted groups, Congress gave the Bureau permission to use sampling methods for purposes other than the apportionment count." Pltfs' Opp. at 3 (emphasis added). It is true that section 195 was passed at the Bureau's request, and, as plaintiffs concede, to authorize "*a form of random sampling*," but the undercount had nothing to do with the Bureau's request to use sampling in 1957. The Bureau sought the authority to use sampling for purposes of collecting non-apportionment-related information to conserve time and resources and to reduce the burden on respondents. See Defs' Mem. at 43.

28

Plaintiffs have not provided any evidence to contradict the fact that although Congress has been fully aware and kept completely apprised of the Bureau's use of imputation, it has never suggested that the Bureau's use of imputation violated the Census Act. Moreover, Congress has amended the Census Act many times since 1957, including section 195 itself, but never to prohibit imputation. This congressional acceptance of the Census Bureau's construction of section 195 of the Census Act lends weight to the deference due the Bureau's interpretation and implementation of the Act. "In addition to the importance of legislative history, a court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change." National Labor Relations Board v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 274-75 (1974) (footnotes omitted); see also United States v. Jackson, 280 U.S. 183, 196-97 (1930); Lorillard v. Pons, 434 U.S. 575, 580 (1978).

Plaintiffs argue that this position is contrary to the "applicable legal standard." Pltfs' Opp. at 46. However none of the cases which plaintiffs cite are in conflict with the Bureau's position. For example, in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164 (1994), the Court stated "[w]hen Congress reenacts statutory language that has been given a consistent and judicial construction, we often adhere to that construction in interpreting the reenacted statutory language. Congress has not reenacted the language of § 10(b) since 1934, however." Id. at 185 (citations omitted). Likewise, in Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650 (1990), the Court stated that "[d]espite Congress' awareness of the [the agency's position], Congress did not amend [the statute] to restrict [the agency's] discretion. The

29

conclusion that Congress thought the [agency] was properly exercising its authority is at least as plausible as any other." Finally, the Court in <u>Zuber v. Allen</u>, 396 U.S. 168, 185 n. 21 (1969), did not stop at the sentence quoted by plaintiffs, but continued on to explain that "[Congressional silence's] significance is greatest when the area is one of traditional . . . supervision . . . where watchdog committees are considering and revising the statutory scheme."[15]

### D.   Plaintiffs' Assertions That The Secretary's Interpretation Is Not Entitled To Deference Must Be Rejected

Plaintiffs base their argument that the Secretary's interpretation is not entitled to deference on the recent Supreme Court opinions in <u>Christensen v. Harris County</u>, 529 U.S. 576 (2000), and <u>United States v. Mead Corp.</u>, 121 S. Ct. 2164 (2001). Not only do they incorrectly read the limitations on <u>Chevron</u> deference found in those cases to apply to the congressional delegation of authority to the Secretary here to carry out the actual enumeration of the population, they trivialize the Secretary's role in the conduct of the census and completely fail to address, discuss, or even cite to the general and considerable body of census law which establishes the "virtually unlimited discretion" accorded the Secretary in conducting the census and the great deference which the courts have accorded the Secretary's actions.

---

[15]Plaintiffs also cite to three cases in support of the position that when Congress reenacts a statute without changes, it does not thereby automatically adopt the agency's interpretation. Those cases are inapposite. In <u>Brown v. Gardner</u>, 513 U.S. 115, 121 (1994), the Court held that the subsequent action doctrine was not applicable because in that case the law was clear. <u>See also</u> <u>United States v. Calamaro</u>, 354 U.S. 351, 358 (1957). The agency in <u>Investment Co. Inst. v. Camp</u>, 401 U.S. 617, 627 (1971) never adopted a position. Here, the law clearly supports the Bureau's position, a position that it has held and communicated to Congress for the last sixty years.

In the phrase, "in such manner as they shall by Law direct," the Constitution grants to Congress the authority to determine the manner, and hence, methods by which the census shall be taken. The Congress, through enactment of Title 13, has legislatively delegated the determination of the manner and methods of conducting the census to the Secretary of the Commerce and the Director of the Bureau of the Census.

Census Undercount Adjustment: Basis for Decision, 45 Fed. Reg. 69,372 (Oct. 20, 1980) (A.R. C01220). Thus, not only is the Secretary entitled to deference under Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), but also under the substantial body of census jurisprudence,[16] as well as by virtue of his long-standing and consistent interpretation of section 195 of the Census Act.[17]

This case, which involves "an executive department's construction of a statutory scheme it is entrusted to administer" falls squarely under Chevron. 467 U.S. at 844 (the issue in Chevron, as here, was whether the agency had adopted a reasonable interpretation of a term in a statute that the agency had been directed by Congress to administer). Because the decennial census is such a highly complex undertaking, the Census Bureau's experience and expertise in the

---

[16]See, e.g., Wisconsin v. New York, 517 U.S. 1, 23 (1996) (noting that courts must grant Census Bureau's policy decision "deference" because of "the wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary"); see also U.S. Const. art. I, § 2, Cl. 3; 13 U.S.C. § 141(a); City of Detroit v. Franklin, 4 F.3d 1367, 1377-78 (6th Cir. 1993) (rejecting challenge to Census Bureau decision regarding alleged undercount of minorities); District of Columbia v. United States Dep't of Commerce, 789 F. Supp. 1179, 1189 (D.D.C. 1992) (upholding as "rational" a Census Bureau decision to count prisoners in District of Columbia prison located in Virginia as Virginia residents); Cuomo v. Baldrige, 674 F. Supp. 1089, 1105-08 (S.D.N.Y. 1987) (finding Census Bureau's decision not to statistically adjust count to be reasonable).

[17]See, e.g., Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 31-32 (1981); Bell Aerospace, 416 U.S. at 275; Udall v. Tallman, 380 U.S. 1, 16 (1965).

31

conduct of the census should be afforded great weight. "Indeed, the judgments about the way the real world works that have gone into the [agency's policy] are precisely the kind that agencies are better equipped to make than are courts. This practical agency expertise is one of the principal justifications behind <u>Chevron</u> deference." <u>Pension Benefit Guar. Corp.</u>, 496 U.S. at 651-52.

Plaintiffs nevertheless argue that even the lesser deference provided under <u>Mead</u> would be inappropriate here because of alleged "inconsistencies" in the Secretary's treatment of imputation.[18]  As the discussion above demonstrates, there have been no such inconsistencies. Indeed, the opposite is true and the highest level of deference should be accorded given the Secretary's long-standing and consistent interpretation of section 195 as not prohibiting the Bureau's use of imputation. "[T]he practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years will not be disturbed except for cogent reasons." <u>Udall</u>, 380 U.S. at 18; <u>see also</u> <u>Bell Aerospace</u>, 416 U.S. at 275.  Since 1940, the Census Bureau has used imputation to account for missing, contradictory, or improperly processed data.  Hogan Decl. ¶ 39.  In 1957, while it was preparing for the 1960 Census, the Census Bureau asked Congress to amend the Census Act to add section 195.[19]  The Census

---

[18]As plaintiffs concede, even under <u>Christensen</u> and <u>Mead</u>, agency interpretations "are entitled to respect" although they are "not controlling upon the courts by reason of their authority."  Pltfs' Opp. at 48 (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)).  In this case, the Census Bureau's interpretation of section 195 is entitled to the maximum deference under the factors outlined in <u>Skidmore</u>, 323 U.S. at 140.

[19]An agency's interpretation of a statute "carries most weight when the administrators participated in drafting and directly made known their views to Congress in Committee hearings.

Bureau used count imputation in every census since as part of its data-processing procedures. Hogan Decl. ¶ 7. Throughout all of this time, the Census Bureau has considered imputation as part of the traditional enumeration process. Hogan Decl. ¶¶ 7, 11.

In light of the Census Bureau's long-standing and consistent interpretation of the Census Act, and Congress' acceptance of that interpretation, the Census Bureau's interpretation clearly is reasonable, not in conflict with congressional intent, and therefore entitled to substantial deference.[20] Chevron, 467 U.S. at 844; Federal Election Comm'n, 454 U.S. at 31-32; Bell Aerospace, 416 U.S. at 275; Udall, 380 U.S. at 16.

## II.    THE CENSUS BUREAU'S USE OF IMPUTATION IS CONSTITUTIONAL

Plaintiffs again attempt to establish that the Bureau's use of imputation is unconstitutional by reading limitations into the constitutional language that are not there. The constitutional language simply does not sustain the weight of meaning that plaintiffs seek to impart to it.

---

In such circumstances, absent any indication that Congress differed with the responsible department, a court should resolve any ambiguity in favor of the administrative construction." Zuber, 396 U.S. at 192 (citations omitted); Udall, 380 U.S. at 16.

[20]Plaintiffs also attempt to invoke the statutory construction of "constitutional doubt." Pltfs' Opp. at 51 n.12. Courts apply the constitutional doubt theory to avoid rendering a statute unconstitutional. See Rust v. Sullivan, 500 U.S. 173, 190 (1991). Those who invoke this doctrine must believe that the alternative is a serious likelihood that the statute will be held unconstitutional. See Almendarez-Torres v. United States, 523 U.S. 224, 238-39 (1998); United States v. Monsanto, 491 U.S. 600, 611 (1998); United States v. Locke, 471 U.S. 84, 95 (1985). That rule has no application to this case. None of the parties have asked the Court to declare the Census Act unconstitutional. Plaintiffs simply have raised a constitutional claim in addition to their claim under the Census Act. This does not mean that the Court should find a statutory violation in order to avoid consideration of plaintiffs' constitutional claim. Accordingly, plaintiffs' claims are not cognizable under the constitutional doubt theory.

Today, as in 1787, the constitutional phrase "actual Enumeration" means simply a numbering or counting over of the population as it exists in fact, and does not purport to define the methods by which this counting is to be performed.  Moreover, when read in the context of the rest of the Census Clause, which plaintiffs refuse to do, the absence of any intent on the Framers' part to dictate the methods by which this "actual Enumeration" or counting is be taken becomes even clearer.  The Census Clause grants Congress (and, hence, the Secretary) "virtually unlimited discretion" to decide the "Manner" in which the enumeration is to be taken.  U.S. Const. art. I, § 2, cl. 3; Wisconsin, 517 U.S. at 19.  This broad grant of authority confirms that the phrase "actual Enumeration" is merely a direction to take a census, not an instruction booklet as to how to do so.

Such a conclusion is consistent with general principles of constitutional construction, which direct courts to construe the provisions as liberally as possible.  "'As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require . . . .'" Nixon v. United States, 506 U.S. 224, 230 (1993) (quoting Dillon v. Gloss, 256 U.S. 368, 376 (1921)) (holding that the word "try" in the Impeachment Trial Clause "does not provide an identifiable textual limit on the authority which is committed to the Senate"); see also Bush v. Gore, 531 U.S. 98, 126 (2000) (Stevens, J., dissenting) ("[A]s a general matter, '[t]he interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints.'") (quoting Bain Peanut Co. v. Pinson, 282 U.S. 499, 501 (1931) (Holmes, J.)).  The limitations that plaintiffs seek to read into the Census Clause

34

without any textual support violate these precepts of constitutional construction and hence must be rejected.

In fact, defendant North Carolina's brief demonstrates that any detailed analysis of the phrase "actual Enumeration" is ultimately beside the point. As set forth by North Carolina, in the drafting of the Constitution, the phrase "actual Enumeration" did not appear until it was added by the Committee of Style very late in the proceedings. NC Mem. at 48-56. The function of the Committee of Style was only "to revise the stile of and arrange the articles which had been agreed to . . ." by the Convention. Powell v. McCormack, 395 U.S. 486, 538 (1969) (quoting 2 Records of the Federal Convention of 1787, at 553 (Max Farrand ed., 1966) (hereafter "Farrand")). "[T]he Committee . . . had no authority from the Convention to make alterations of substance in the Constitution as voted by the Convention, nor did it purport to do so." Id. at 539 (quoting Charles Warren, The Making of the Constitution 422 n.1 (1928)). Accordingly, the phrase "actual Enumeration" must be considered synonymous with the phrases that the Framers had used in earlier drafts. Nixon, 506 U.S. at 231 ("we must presume that the Committee's reorganization or rephrasing accurately captured what the Framers meant in their unadorned language"). Those earlier drafts directed only the taking of a "census" or of "the number of inhabitants," see, e.g., 1 Farrand 591, 598-603 ("Census"); 2 Farrand 183 ("which number shall . . . be taken"). Even plaintiffs do not claim that this "unadorned" language prescribes a particular method for taking the count.

Instead of adhering to the literal and common meaning of the words, plaintiffs create out of whole cloth their own definition for the phrase "actual Enumeration." They define it as "an

35

individualized, person-by-person count of the population based on data from those with first-hand knowledge of the matters reported." Pltfs' Opp. at 55 & n.14. Plaintiffs cite no source for this definition. Certainly, no such meaning appears in the records of the Constitutional Convention. Nor do any of the census acts passed during the history of this country contain such restrictions. Plaintiffs completely unsupported definition therefore must be rejected.

Adoption of plaintiffs' restrictive definition of "actual Enumeration" would put into question not only imputation, but also a host of other methodologies that have been routinely used in census taking for most of the twentieth century. As set forth by Dr. Hogan in his declaration, "[s]tatistical methods underlie every aspect of a modern nonsampling census, from address building to unduplication to quality assurance." Hogan Decl. ¶ 64. For example, other statistical processes used in Census 2000 included the primary selection algorithm, many of the quality assurance programs, disclosure avoidance, the duplicate housing unit operation, and characteristic imputation. Id. Plaintiffs' novel interpretation of "actual Enumeration" would imperil these and other stalwarts of the census-taking process, and the courts would likely be called upon to sort through the technical details of myriad census methods to determine which fall within plaintiffs' crabbed requirements.[21]

_____

[21]Furthermore, while the federal defendants heartily dispute plaintiffs' novel definition of "actual Enumeration," the Court should recognize that the vast majority of count imputation cases in Census 2000 would fall within plaintiffs' very definition. The Imputation Research Memo makes clear that the majority of count imputation cases were added precisely because the Census Bureau did not wish to nullify "first-hand knowledge" received in the enumeration process. These cases were imputed because data was received too late in the process, because data was "lost" through the corruption of computer files, or because questionnaires had contradictory information. See Ex. C, attached hereto.

36

Plaintiffs argue that the federal defendants are taking the position that they are entitled to this Court's deference to their "interpretation" of the constitutional phrase "actual Enumeration." Pltfs' Opp. at 54. Plaintiffs misconstrue the federal defendants' position. The federal defendants are not arguing that the constitutional provisions at issue are ambiguous and that they are therefore entitled to deference with regard to their interpretation of those provisions. Rather, the federal defendants maintain that the Constitution unambiguously grants the Secretary broad discretion in how to implement its terms. The positions are distinct. Thus, "deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of" the judiciary, Baker v. Carr, 369 U.S. 186, 211, 217 (1962), regardless of how ambiguous the constitutional language may be. However, as in this case, "once the Court determines that the Constitution requires no particular result, selection between the constitutional options is left to the judgment of the administrator." Plato v. Roudebush, 397 F. Supp. 1295, 1306 (D. Md. 1975); see also Baker v. Carr, 369 U.S. at 217 (cases that involve a "textually demonstrable constitutional commitment of the issue to a coordinate political department" are nonjusticiable).

Plaintiffs also return to the argument that an enumeration and an "estimate" are "mutually exclusive concepts" and that the Framers so understood them to be. Pltfs' Opp. at 56-63. Indeed, they continue to assert that, in choosing the phrase "actual Enumeration," the Framers "*expressly* rejected any enumeration based in whole or in part on 'estimates.'" Id. at 3 (emphasis added). This line of reasoning is based on a strained, and ultimately irrelevant, analysis of American

37

colonial history and 18th-century British history, and on an inaccurate reading of the debates in the Constitutional Convention. It has no validity and should be rejected.

First, plaintiffs attempt to show that Americans in the constitutional era "drew a clear distinction" between an "estimate" and "a census based on an 'enumeration.'" Pltfs' Opp. at 57. To do so, they cite several scattered discussions concerning counting populations that appeared in certain American colonial and 18th-century British sources. Id. at 57-63. This historical disquisition does not prove anything about what collective views the Framers held and should be disregarded by the Court. First, there is absolutely no evidence in the reports of the Constitutional Convention that the cited discussions had any influence on the drafting of the Census Clause, or even that the Framers were aware of them. Second, plaintiffs do not establish that these discussions were prominent enough at the time so that the Court could safely *presume* that the Framers were aware of them. Certainly, events occurring or documents published *after* the Constitutional Convention (such as Plaintiffs' Exhibits J, L, M, N, R) could not have played any role and can be disregarded on the basis of date alone.[22] See United States v. Balsys, 524 U.S. 666, 687 (1998) ("The presumed influence of English law on the intentions of the Framers hardly invests the Framers with clairvoyance, and subsequent English developments are not attributable to the Framers by some rule of renvoi."). Finally, no argument can be made that the

---

[22]Indeed, rather than concluding that English law influenced American law in this regard, some commentators believe that the first American census was instead the impetus for the passage of Britain's first census act in 1800 (Pltfs' Ex. M). See Hyman Alterman, Counting People: The Census in History 41-42, 164 (1969) (hereafter Counting People), attached hereto as Exhibit F.

notions appearing in the cited excerpts formed part of the English common law, the precepts of which the Supreme Court has often assumed the Framers to have been aware. See South Carolina v. United States, 199 U.S. 437, 450 (1905) (the Constitution "'. . . must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution'") (citations omitted).

In cases in which the Supreme Court has relied on history to aid in interpreting constitutional clauses, there is inevitably *some* evidence that this history played a role or plausibly can be assumed to have been known to the Framers, or credible evidence that the Framers were influenced by similar principles from English common law. Compare United States v. Johnson, 383 U.S. 169, 177 (1966) (using English law and history to construe Speech and Debate Clause, where the framers used language "almost identical to the English Bill of Rights in 1689"), and Cramer v. United States, 325 U.S. 1, 23 (1945) (relying on Framers' experience of treason prosecutions where Framer observed "prosecutions for treason were generally virulent"), with Williams v. Florida, 399 U.S. 78, 99 (1970) (declining to apply common law to the trial by jury requirement where "there is absolutely no indication in the 'intent of the Framers' of an explicit decision to equate the constitutional and common-law characteristics of the jury"). As in Williams, no such connection appears here.

In any event, the discussions to which plaintiffs refer do not prove the proposition that the Framers or their contemporaries believed that an "actual Enumeration" would not include a method such as imputation. The sources cited do establish that the Framers' contemporaries differentiated between a census in which an attempt was made actually to count people and other,

39

more indirect methods of determining the population (such as using data about the consumption, use, or sales of certain commodities).  However, aside from a few references to "counting" people, the cited sources do not discuss the nuts and bolts of what is involved in an actual enumeration, such as how the "counting" is to be performed and what is to be done about the inevitable problems such as lost or illegible forms, apparently occupied houses from which no response can be obtained, contradictory information.[23]  As plaintiffs acknowledge, the population "controversy" to which the sources refer was over the true size of the population of Britain and whether to have a census at all, *not* over counting methods.  Therefore, counting methods are never mentioned in the cited documents, and the documents accordingly shed no light on the issue at bar here.[24]

Similarly, plaintiffs' attempt to show that the Framers expressly rejected an enumeration based on any form of "estimates" goes too far.  As set out by North Carolina, an examination of the records from the Constitutional Convention reveals that the Framers' concern with

_____

[23]Thus, to the extent that plaintiffs are relying on the cited history to provide a contemporary definition of "actual enumeration," the history does not add anything beyond what is in the dictionaries.

[24]Plaintiffs assert that the statistical methods used by Richard Price (Pltfs' Ex. H) are similar to the Bureau's imputation method in that they "assigned a population to households that were reasonably believed to exist."  Pltfs' Opp. at 59 n.17.  Plaintiffs mischaracterize Price's methods.  In fact, Price used several methods to estimate the population.  One of these methods involved determining the number of houses from tax records and then multiplying that number by the estimated average number of inhabitants per house.  See, e.g., Pltfs' Ex. H, at 1-8.  This method is completely different from the Bureau's census methods, in that the Bureau does not use averages and relies only on data collected through an actual effort to list and count each individual household inhabitant.

"estimation" arose only in the context of discussing whether apportionment should be based on wealth. See NC Mem. at 56 & n. 20. The Framers rightly concluded that wealth was too subjective and vague a measure to be the basis for representation and (perhaps to justify this decision) concluded that numbers could serve as a proxy for wealth in any event. See 1 Farrand 542, 561, 582-83, 587, 593, 605-06. Moreover, the Framers' experience under the Articles of Confederation confirmed that wealth was too imprecise a measure to be used. See Counting People, at 182-83 ("'The value of all land'" was determined by the states themselves and freely manipulated by them. . . . [I]t was clear that land value was not a basis upon which to share taxes."). However, nowhere in the Constitutional Convention proceedings do the Framers discuss estimation *in conjunction with taking a census* or reject the use of any form of estimation in an enumeration. NC Mem. at 56 & n.20. As plaintiffs acknowledge, in determining population, the Framers did reject the type of "conjecture" that formed the basis for the original apportionment of representatives, but this type of conjecture (based on very general speculation as to population, wealth, and expected growth in population, see Defs' Mem. at 51-52; Counting People, at 188-89) is very different from the Bureau's use of imputation in a census that is attempting to list every address and enumerate the people in each such address.

Plaintiffs also assert that evidence from the first census in 1790 shows that the Framers understood *and accepted* that the censuses would fall short of the true number and that they expressly intended that people who could not or would not be counted would be excluded from the census. Pltfs' Opp. at 63-66, 68-69. These conclusions are based on a misreading of the history. Plaintiffs are correct that both Washington and Jefferson "lamented" the fact that the

41

1790 census returns fell short of previous estimates of the population and their beliefs as to the "*real* numbers." Pltfs' Exs. P, Q. However, it is likely that their expectations (which were not grounded in census records or in information collected by a census) were actually much too high, that the census returns were closer to the truth than they admitted in their letters, and that Washington's and Jefferson's "lamenting" was no different than the perennial discussions today about the census undercount. Counting People, at 205. In any event, Washington's and Jefferson's disappointment as to the result of the first census does not equate to an "acceptance" of any errors or a "resignation" to supposed limitations of an "actual enumeration" for all future censuses. There is no evidence that either Washington or Jefferson (or any of the other early founders) "accepted" the exclusion of people from the census or were less offended by the exclusion of people than they would have been by imputation.[25]

Plaintiffs do not disagree that imputation improves the accuracy of the census. Instead, they argue that considerations of accuracy should not factor into a determination of whether the method is constitutional. Pltfs' Opp. at 69-71. This argument ignores Supreme Court precedent, which clearly holds that one factor to be considered in evaluating decisions about the census is whether that decision furthers the goal of equal representation. See United States Dep't of

---

[25]Moreover, it cannot be assumed that either man, and in particular, Jefferson, would think that an "actual enumeration" was an unvariable process and would not insist upon improvements to census methods so as to reduce the errors in the next census. See, e.g., Letter from Thomas Jefferson to Elbridge Gerry (Jan. 26, 1799), in 10 The Writings of Thomas Jefferson 78 (1903) (stating, in declaring his political philosophy, that "I am for encouraging the progress of science in all its branches; and not for . . . [believing] that nothing can ever be devised more perfect than what was established by our forefathers"), attached hereto as Exhibit G.

Commerce v. Montana, 503 U.S. 442, 465 (1992); Franklin v. Massachusetts, 505 U.S. 788, 806

(1992). Plaintiffs do not even acknowledge this case law, much less address it, and limit

themselves to mischaracterizing the federal defendants' position as arguing that "the

constitutional requirement of an actual enumeration cannot apply to modern estimates." Pltfs'

Opp. at 69. The federal defendants' position is, however, exactly the *opposite* – that the

constitutional requirement of an "actual Enumeration" must be read to *include* modern methods

of counting people. See Defs' Mem. at 50-51 (describing "long line of census techniques"

instituted to further "efficiency or accuracy of the census").[26]

It is also not true that, until recently, the Bureau has "firmly adhered to" the view that the

phrase "actual Enumeration" precludes the use of "estimates" such as imputation. Pltfs' Opp. at

52-53. The Bureau has never taken the position that the phrase "actual Enumeration" precludes

the use of imputation. In attempting to prove the opposite, plaintiffs misquote a 1980 Federal

Register notice. In that notice, the Bureau quoted Union Electric Co. v. Curie River Electric

Coop., Inc., 671 S.W.2d 790, 794 (Mo. App. 1978), only for the proposition that a "'census' has

been judicially defined as 'an official enumeration of the inhabitants with details of sex, age,

---

[26]Plaintiffs also mischaracterize the federal defendants' argument on page 52 of their
opening memorandum. See Pltfs' Opp. at 71-72. The federal defendants are not arguing that the
constitutionality of a census method turns on "the extent of its use." Id. at 71. Rather, the federal
defendants are arguing that the constitutionality of a census method turns on whether it is
consistent with the requirement of an "actual Enumeration" and with the goal of equal
representation. Defs' Mem. at 49. In evaluating the former issue, the role and use of any census
method, and its relation to other census methods and to the goal of an "actual Enumeration," *is* a
relevant factor in determining its constitutionality. Imputation is part of an "actual Enumeration"
because it is used to address the unavoidable problem of a limited amount of missing data arising
from attempts to count every individual inhabitant, *not* because it is used only "at the margins."

family, etc., and the public record thereof * * *  A 'census' is not an estimate of the population.'"
Census Undercount Adjustment: Basis for Decision, 45 Fed. Reg. 69,366, 69,371 (Oct. 20, 1980)
(A.R. C01218).  The Bureau did not quote or reference the part of Union Electric's definition
requiring "an official list containing the names of all the inhabitants," as plaintiffs imply (Pltfs'
Opp. at 52).  In addition, in stating that the Bureau has "firmly rejected" estimates based on, e.g.,
imputation, plaintiffs read the statement on page 69,372 of this Notice out of context.  That
statement, which distinguishes "actual Enumeration" for apportionment purposes from "estimates
based on sampling or other statistical procedures," A.R. C01219, cannot be interpreted to include
imputation in the phrase "other statistical methods," given that the 1980 Census, which the
Notice was addressing, made extensive and open use of imputation in the "actual Enumeration"
conducted for apportionment purposes.  See A.R. C01220.

     Plaintiffs' attempt to equate imputation to sampling through the use of legal positions that
the Bureau took in the House case also merits little consideration.  See Pltfs' Opp. at 52-53.
First, plaintiffs ignore the fact that Congress, in the person of the House of Representatives, was
one of the plaintiffs in that case and that the position it took was that imputation was
constitutional.  See Defs' Mem., Ex. I.  Second, plaintiffs read too much into the government's
prior statement, in its House brief, that "no constitutional difference exists between sampling and
the imputation methodology."  That statement appeared in a footnote in which the Bureau was
addressing the House's claim that the phrase "actual Enumeration" required "physical, headcount
evidence."  Pltfs' Ex. A, at 26 n.20.  The Bureau was merely stating that, if one took the view that
the Constitution required such "evidence," both sampling and imputation would be excluded, and

therefore that the House's position (which believed the former but not the latter to be unconstitutional) was inconsistent with its own particular definition. See Pltfs' Ex. A, at 20.[27]

When faced with a "complex" constitutional problem "with many hard questions and few easy answers," the Supreme Court has instructed courts to "pay careful attention to how the other branches of Government have addressed the same problem." Columbia Broadcasting Sys., Inc. v. Democratic National Comm., 412 U.S. 94, 103 (1973). The Court must afford "great weight to the decisions of Congress and the experience of the" administrative agency. Id. at 102. In addition, the Supreme Court has repeatedly recognized Congress' broad authority with regard to the census. Wisconsin, 517 U.S. at 19-20. In the present case, imputation has been used by the Census Bureau in one form or another since 1940, and its use over this extended period of time has been accepted by Congress without a single objection. Taken together with the other principles of constitutional construction outlined above, this history compels a finding of constitutionality here. See Montana, 503 U.S. at 465-66 (stating that "[f]or a half century the results of that [apportionment] method have been accepted by the States and the Nation" and that this history "supports our conclusion that Congress had ample power to enact the statutory procedure"); see also Ray v. Blair, 343 U.S. 214, 229-30 (1952) ("long-continued practical interpretation . . . weighs heavily in considering the constitutionality" of an elector's pledge of his or her electoral vote).

---

[27]Plaintiffs' arguments that the Framers "selected an 'enumeration' over an 'estimate'" "to minimize the risk of 'partisan manipulation' by the federal government," Pltfs' Opp. at 66-67, have already been adequately addressed in the federal defendants' opening memorandum (pp. 55-58).

## III.   THE CENSUS BUREAU'S USE OF IMPUTATION IN CENSUS 2000 IS NOT REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT

Plaintiffs do not and cannot deny that Franklin v. Massachusetts and State of Utah v. Evans ("Utah I"), No. 2:01CV0023B, slip op. (D. Utah April 17, 2001), foreclose their claims for summary judgment under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Plaintiffs therefore, in their Reply, make a backdoor attempt to keep their APA claims alive through Pub. L. No. 105-119. However, 105-119 does not create a basis for plaintiffs to bring their arbitrary and capricious claims.[28]

Section 209(b) of Public Law No. 105-119 (codified at 13 U.S.C. § 141 Note) was passed for a specific purpose – Congress wanted the opportunity to challenge the Census Bureau's proposed plan to use sampling in Census 2000 prior to its implementation. For that reason, Congress designated both the report ordered by Title VIII of Public Law 105-18, the 1997 Report

---

[28]Section 209(b) of Public Law No. 105-119 states that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act) . . . may in a civil action obtain declaratory, injunctive and any other appropriate relief against the use of such method" (emphasis added). Even if section 209 were to apply to this case, on its face, it authorizes only plaintiffs' substantive constitutional and Census Act claims, but not their procedural arbitrary and capricious claim. Use of an arbitrary and capricious imputation method does not constitute use of a statistical method "in violation of the Constitution or any provision of law." Indeed, neither the plaintiffs in United States House of Representatives v. United States Dep't of Commerce, 11 F. Supp. 2d 76 (D.D.C. 1998), aff'd, 525 U.S. 316 (1999), nor those in Glavin v. Clinton, 19 F. Supp. 2d 543 (E.D. Va. 1998), aff'd, 525 U.S. 316 (1999), raised an arbitrary and capricious challenge. However, as explained below, plaintiffs have brought their constitutional and statutory claims too late to use section 209 as a jurisdictional basis for their suit. Arguably then, plaintiffs are without jurisdiction to bring their Census Act claims at all, because the only challenges to apportionment that remain available under Franklin are constitutional ones.

46

to Congress,[29] and the 1997 Census 2000 Operational Plan (hereafter the "1997 Plan") as "final

agency action" for the purpose of providing judicial review under section 209(b), so that review

could be had prior to the Census. See Sec. 209(c)(2).  The 1997 Report to Congress as well as

the 1997 Plan were issued in July 1997, and both were invalidated by the Supreme Court in

House.  In 1999, the Census Bureau issued a new plan, the Census 2000 Operational Plan Using

Traditional Census-Taking Methods (Jan. 1999) (hereafter the "Traditional Plan").  The Census

Bureau's use of imputation changed dramatically from the 1997 Plan to the Traditional Plan.  In

the 1997 Plan, the Census Bureau planned to use imputation only as the final stage of the NRFU

and UAA vacancy programs.  In the Traditional Plan, the Census Bureau returned to using

imputation in essentially the same way it did in the 1960 through 1990 Censuses.  The

Traditional Plan has not been designated a final agency action by 105-119, or by any subsequent

legislation.

     In 105-119, Congress specifically defined an "aggrieved person" for purposes of bringing

---

[29]Public Law No. 105-18 was passed for similar reasons.  Congress was aware that the
Census Bureau planned to use sampling in Census 2000.  Congress first attempted to pass a law
prohibiting the Census Bureau from using sampling, but the President vetoed it.  See H.R. 1469,
Title VIII(b), at 65; 33 Weekly Comp. Pres. Doc. 846-48 (June 16, 1997).  Congress then passed
legislation requiring the Census Bureau to provide a report to Congress outlining the Census
Bureau's plan for Census 2000.  See Pub. L. No. 105-18, Title VIII, 111 Stat. 158, 217 (1997).
Once it received the Report, Congress passed Public Law No. 105-119 which made the 1997
Report to Congress and the 1997 Plan proposing to use sampling for Census 2000 "final agency
action," so that the Bureau's plan to use sampling could be challenged in court under the
Administrative Procedure Act.  Cf. Franklin v. Massachusetts, 505 U.S. at 788 (1992) (ordinarily
precluding judicial review of Census Bureau decisions regarding the form and manner of the
Census because they do not constitute "final agency action" under the Administrative Procedure
Act, 5 U.S.C. § 706(2)(A)).

47

the action allowed by section 209(b) as "any resident of a State whose congressional representation or district *could be changed* as a result of the use of a statistical method challenged in the civil action," sec. 209(d)(1) (emphasis added), thus evidencing congressional intent to facilitate a prospective remedy for any constitutional or statutory infirmity in a Census Bureau procedure *before* it was actually used.  Indeed, the remedy provided for in section 209(b) specifically contemplates only a prospective remedy, i.e., "declaratory, injunctive, and any other appropriate relief *against the use* of such method" (emphasis added).  The provisions of section 209, when read together, make it clear that the cause of action created therein was intended to provide a vehicle for expedited review of the methods chosen by the Census Bureau for use in Census 2000 prior to the actual undertaking and completion of the Census.

In fact, Congress, in the findings accompanying section 209, explicitly recognized that the cause of action it was creating was intended to provide judicial review prior to the actual conduct of the Census: "[t]he decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the Constitution and laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide meaningful relief *after* such enumeration has been conducted." Sec. 209(a)(8) (emphasis added).  Moreover, Congress recognized that its desire to have challenges to the Census Bureau's procedures resolved prior to the actual conduct of the census was essential in order to fulfill its "commit[ment] to providing the level of funding that is required to perform the entire range of constitutional census activities." Sec. 209(a)(9).

The legislative history of Section 209 similarly evidences that expedited review was

48

intended to allow for the fashioning of appropriate prospective relief before the Census was actually taken.[30] The legislative history also makes it clear that the animating force behind the enactment of section 209 was the Census Bureau's proposal to use a never-before-used statistical procedure, i.e., the particular statistical sampling techniques that were challenged and found constitutionally infirm in House:

> The Committee is aware that the Administration has proposed the *unprecedented use of a series of complex and controversial statistical sampling procedures* as an alternative to traditional methods that rely primarily upon the physical counting of persons. This proposed methodology has *never before been used* to determine the official population count for the purposes of apportionment, and represents a *dramatic departure from the manner in which all previous censuses have been conducted.* As a result, significant concerns and questions have been raised regarding the reliability, legality and constitutionality of the proposed methodology. In order to protect both the integrity of the decennial census and the multi-billion dollar investment necessary to conduct the census, the Committee believes that these serious questions and concerns must be resolved . . . *prior to* the expenditure of significant additional resources.

H.R. Rep. No. 105-207, 105th Cong., 1st Sess. at 65 (1997) (emphasis added), excerpts attached hereto as Exhibit H. This sentiment was echoed in the Senate Report. S. Rep. No. 105-48, 105th Cong., 1st Sess. at 63 (1997), excerpts also attached hereto as Ex. H. It also is evident

---

[30]See, e.g. 143 Cong. Rec. S12,666 (daily ed. Nov. 13, 1997) (Statement of Sen. Hollings) ("The agreement seeks to ensure that the Federal Courts will rule on the constitutionality of using statistical sampling prior to the next census by creating expedited judicial review proceedings"); 143 Cong. Rec. H8,226 (daily ed. Sept. 30, 1997) (Statement of Rep. Pryce) ("[I]t protects the taxpayer by getting a court decision on the legality of sampling and statistical adjustment before billions of taxpayer dollars are spent and potentially wasted"); 143 Cong. Rec. H7,771 (daily ed. Sept. 24, 1997) (Statement of Rep. Rogers) ("Before millions of dollars of taxpayers' monies are put at risk for the first time in a sampling process that we think is unconstitutional, the Congress, the Administration and most importantly, the public deserve to have the dispute resolved beforehand, and that is what we do in the bill").

throughout the debate leading up to 105-119's passage.[31]

     The plain language of section 209, its supporting findings, and its legislative history all indicate that Congress intended to create a mechanism for expedited review of Census Bureau activities that fell within the terms of the cause of action created therein so that the challenges could be resolved before substantial funds were committed to procedures that "had never before been used," H. Rep. No. 105-207 at 65, and so that a court might fashion effective and meaningful prospective relief before the Census was actually taken. Plaintiffs here instead challenge a practice that already has been used in Census 2000, and thus, the relief contemplated by section 209 – declaratory or injunctive relief against its use – is meaningless. Further, plaintiffs challenge a practice that has been used consistently by the Census Bureau since 1960, and thus certainly cannot be classified as the "dramatic departure from the manner in which all other previous censuses have been conducted" at which the judicial review provisions of Section 209 were aimed. See id. Plaintiffs' reliance on that section to seek summary judgment under the APA, therefore, is wholly misplaced.

---

[31]See, e.g., 143 Cong. Rec. H8,227 (daily ed. Sept. 30, 1997) (Statement of Rep. Rogers) ("The administration's plan for the 2000 census represents the most radical departure from the manner in which the census has been conducted for the past 200 years"); 143 Cong. Rec. H7,771 (daily ed. Sept. 24, 1997) (Statement of Rep. Rogers) ("The Administration wants us to abandon our history and take off on a new, untested, and many of us think, illegal, or unlawful, and unconstitutional process").

IV.   **THE CENSUS BUREAU'S USE OF IMPUTATION IN CENSUS 2000 DOES NOT VIOLATE THE ADMINISTRATIVE PROCEDURE ACT**[32]

Plaintiffs claim that the Census Bureau's long-standing and accepted use of imputation is arbitrary and capricious because the Bureau has not attempted (at the administrative level) to explain "whether it believes that imputation 'furthers the constitutional goal of equal representation'"[33] nor has it "examined whether imputation is consistent with the Census Act or the Census Clause, much less explained how that procedure can be reconciled with the majority and concurring opinions in *House of Representatives*."[34]  Pltfs' Opp. at 73.  This, however, is not

---

[32]If the Court determines, as the Census Bureau has argued, that the Bureau's use of imputation does not violate the Census Act or the Census Clause, then the Census Bureau's decision to use imputation in Census 2000 is committed to agency discretion by law for all the reasons discussed in the federal defendants' opening memorandum.  See Defs' Mem. at 59-61.

[33]Plaintiffs state that the Bureau has violated the APA because it has not provided sufficient evidence and explanation of how imputation furthers the constitutional goal of equal representation, which plaintiffs assert is the same thing as distributive accuracy.  However, this explanation is not a requirement under the APA.  Pltfs' Opp. at 75.  Although, as Dr. Hogan states in his declaration, the Bureau believes that imputation does further distributive accuracy, see Hogan Decl. ¶¶ 31-36, a census program is not arbitrary and capricious or contrary to law if it does not.  See also Peterson Decl. ¶ 11.  Morever, the Supreme Court has held that, although "a preference for distributive accuracy . . . would seem to follow from the constitutional purpose of the census," there is nevertheless no constitutional ground "for preferring numerical accuracy to distributive accuracy, or for preferring gross accuracy to some particular measure of accuracy."  Wisconsin, 517 U.S. at 18, 20.

[34]Plaintiffs argue that the Bureau should have reviewed its use of imputation in light of the House decision.  However, the plaintiffs in that case, the House of Representatives, were fully aware of the Bureau's use of imputation and specifically stated in their briefs that imputation neither violated the Census Act or the Census Clause.  See Defs' Mem., Ex. I.  Likewise, the Supreme Court knew of the Census Bureau's use of imputation, but the Supreme Court in no way indicated that imputation is unconstitutional or contrary to the Census Act.  Rather, Justice Breyer in his dissent stated that: "Section 195 of the Census Act, at least in my view, could not have been intended as a prohibition so absolute as to stop the Census Bureau

the standard under the Administrative Procedure Act.  See Citizens to Preserve Overton Park,

Inc. v. Volpe, 401 U.S. 402, 414-16 (1971); Northwest Pipeline Corp. v. Federal Energy

Regulatory Comm'n, 61 F.3d 1479, 1486 (10th Cir. 1995).  Plaintiffs misunderstand the process

here and attempt to shift their burden to show that there was no rational basis for the Secretary's

actions to the federal defendants.  The Census Bureau makes thousands of decisions regarding

hundreds of programs in the course of preparing for the decennial census.  The APA does not

require the Census Bureau to formally evaluate how each of these programs and/or decisions

furthers constitutional goals, nor does the APA require that every agency decision or action be

accompanied by a formal memorandum.  The APA only requires the Bureau's decisions to be

rational and not arbitrary and capricious or contrary to law – and agency actions are accorded a

"presumption of regularity."  Citizens to Preserve Overton Park, 401 U.S. at 414.  Therefore, if

the agency's decision was "based on a consideration of the relevant factors,"[35] and there has been

no "clear error of judgment," the agency's decision must be upheld.  Id. at 416; see also Motor

Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Maier v. United

---

from imputing the existence of a living family behind the closed doors of an apparently occupied
house."  525 U.S. at 355.

    [35]Under the APA, an agency is required only to consider those factors that are "relevant,"
not all possible factors.  See Foust v. Lujan, 942 F.2d 712, 714 (10th Cir. 1991) ("the agency's
decision is based on 'such relevant evidence as a reasonable mind might accept as adequate to
accept a conclusion'"); Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir.
1994) (agency action will be set aside if the agency "entirely failed to consider an important
aspect of the problem, offered an explanation for its decisions that runs counter to the evidence
before the agency, or is so implausible that it could not be ascribed to a difference in view or the
product of agency expertise") (emphasis added) (quoting Motor Vehicles Manufacturers Assn.,
463 U.S. at 43).

States EPA, 114 F.3d 1032, 1039 (10th Cir. 1997); Grynberg v. Watt, 717 F.2d 1316, 1318 (10th

Cir. 1983).

Despite plaintiffs' representations, the Census Bureau has carefully considered and

revisited the issue of imputation before and after every decennial census since 1940.[36]  In his

declaration, Dr. Hogan cites to over twenty representative examples of studies and analyses of

the effectiveness and validity of imputation performed by the Census Bureau since 1940.  Hogan

Decl. ¶ 51.  Moreover, plaintiffs completely ignore the fact that many independent statisticians,

including plaintiffs' own declarant, Dr. Rubin, have endorsed imputation and its use.  See Defs'

Mem. at 21-22, 64.  Plaintiffs have not disputed or rebutted those conclusions in any way.

Congress and, in turn, the Secretary of Commerce and the Director of the Bureau of the

Census to whom the Secretary has delegated his authority, have been granted enormous

discretion in the conduct of the Census.  See Wisconsin, 517 U.S. at 19; see also 13 U.S.C. §

141(a) ("The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial

census of population as of the first day of April of such year, which date shall be known as the

'decennial census date,' *in such form and content as he may determine* . . . .") (emphasis added).

---

[36]Plaintiffs imply that the Census Bureau has suddenly reversed its course on imputation,
although they do not provide any basis for this allegation. Pltfs' Opp. at 77 n.28. The Census
Bureau's position on imputation has remained consistent since 1940. Hogan Decl. ¶¶ 7, 11, 39.
The Bureau has maintained throughout that time period that imputation is constitutional and
permissible under section 195 of the Census Act. Plaintiffs cite to 45 Fed. Reg. at 69371-72 in
the paragraph proceeding this footnote, so presumably that is the sudden change to which
plaintiffs refer. However, in that notice, the Census Bureau specifically references imputation in
its description of the traditional enumeration process. See Census Undercount Adjustment:
Basis for Decision, 45 Fed. Reg. 69,366, 69,372 (Oct. 20, 1980) (A.R. C01220).

Plaintiffs have completely failed to address this "virtually unlimited discretion," Wisconsin, 517

U.S. at 19, granted by the Constitution to Congress and delegated to the Secretary, or the long

line of census cases challenging Census Bureau's policies and decisions which uniformly have

found in the Bureau's favor because of the Census Bureau's broad grant of discretion and superior

knowledge and experience in these matters.[37]

## V. THE DELAY IN BRINGING PLAINTIFFS' CLAIMS AND THE ALLEGED RESULTING PREJUDICE IS ATTRIBUTABLE SOLELY TO PLAINTIFFS' LACK OF DUE DILIGENCE

Remarkably, plaintiffs attempt to blame their delay in bringing this lawsuit primarily on

the Census Bureau and the Department of Commerce.  First, they point to the Census Bureau's

failure to make the count imputation numbers publically available under Pub. L. No. 105-119,

Title II, § 209(j).  However, as the Bureau previously explained, there was no such requirement.

See Defs' Mem. at 47 n.25.  Next, despite plaintiffs' failure to exercise due diligence in

developing and bringing their claim, they blame the Census Bureau and North Carolina for any

resultant prejudice because the defendants objected to plaintiffs' motion for an expedited

Scheduling Order in this action.

Plaintiffs first sought to file a third amended complaint in Utah I.  The Court denied that

---

[37]Even if the Court were to find that the Census Bureau's decision to use imputation were arbitrary and capricious, plaintiffs concede that the only available remedy would be for the Court to remand the decision to the Bureau for further consideration.  Pltfs' Opp. at 80.  Of course, plaintiffs fail to address the Bureau's further argument that even if the Bureau were to reverse its decision to use imputation, it could and would have no impact on Census 2000, because the President has certified the apportionment results and transmitted them to the Clerk of the House of Representatives as required by law.  See Defs' Mem. at 64-65.

54

motion on April 17, 2001.  See Order Denying Plaintiffs' Motion for Leave to File a Third

Amended Complaint, dated April 17, 2001 (hereafter "Order"), attached to NC Mem. as Ex. B.

As the Court in Utah I stated, "[t]here is no doubt that at that time [January 30, 2001– the date

plaintiffs filed their motion for summary judgment], and from the commencement of this action,

plaintiffs were aware of the Census Bureau's practice of 'imputing' certain figures for purposes of

*actually enumerating* the resident population of the United States." Id. at 3-4 (emphasis added).[38]

Moreover, as the court noted, it was plaintiffs who "pressed so urgently to have an immediate

decision . . . rather than allowing a brief period of additional time to go by to allow them to

obtain the necessary data in question." Id. at 5-6.

 Shortly after filing their complaint in Utah I, plaintiffs served their initial requests for

discovery on January 16, 2000, and filed a motion to compel supplemental responses on February

28, 2001.  The federal defendants responded to plaintiffs' requests in full.  Plaintiffs did not ask

---

[38]Paragraph 11 of the plaintiffs' Memorandum in Support of Summary Judgment filed on
January 30, 2001, states as follows:

 11. Since at least 1940, the Census Bureau has used a counting process known as
 "imputation" to fill in gaps in its enumeration.  When a enumerator believes that a
 particular residence is occupied, but is unable to obtain information about its
 occupants, the Census Bureau "imputes" that information based upon the
 demographics of nearby households.  In the 1980 Census, the Census Bureau
 added approximately 761,000 individuals to the total nationwide population
 through imputation.  Department of Commerce, Bureau of the Census, Report to
 Congress: The Plan for Census 2000, at 23 (Aug. 1997) (available at
 www.Census.gov/main/plans/plan2000.pdf).

Id.  That same paragraph appeared in plaintiffs' proposed stipulations of material facts provided
to the federal defendants on January 25, 2001, attached hereto as Exhibit I.

55

for any information regarding imputation in any of their written discovery requests.

On January 31, 2001, plaintiffs' declarant, Dr. Wolfson, made a Freedom of Information Act ("FOIA") request to the Census Bureau. The Census Bureau provided Dr. Wolfson with all of the information she requested. However, Dr. Wolfson did not ask for any materials or information regarding imputation in that request. Jeff Bosh of Sidley & Austin made FOIA requests for imputation-related information on April 19, 2001, and May 1, 2001. Again, the Census Bureau responded to those requests in full. <u>See</u> FOIA requests, attached hereto as Exhibit J.

Because imputation is used "for purposes of actually enumerating the resident population of the United States," Order at 4, the count imputation numbers were available in December as part of the final apportionment numbers.[39] At any time, plaintiffs could have attempted to obtain those numbers through a FOIA request, discovery, or through calling the Census Bureau. Plaintiffs failed to pursue any of those options. Moreover, DSSD 2000 Procedures and Operations Memorandum Series B-17, Census 2000: Missing Housing Unit Status and Population Data (Feb. 28, 2001) (A.R. C01010-28) (hereafter "B-17"), one of the documents on

---

[39]Dr. Wolfson states that the Census Bureau Webpage containing the apportionment data did not allow her to determine whether the Bureau's use of imputation had affected Utah's representation in Congress because those numbers were not separately broken out. Wolfson Supp. Decl. ¶ 14. She adds that a footnote at the bottom of the Webpage suggested that imputation had not been used because it stated that "[a]s required by the January 1999 U.S. Supreme Court ruling . . . , the apportionment population counts do not reflect the use of statistical sampling to correct for overcounting or undercounting." <u>Id.</u> ¶ 15. As the Bureau has explained several times, imputation is not statistical sampling, and imputation is not used to correct the overcount or undercount, so there was nothing misleading about that footnote, as implied by Dr. Wolfson.

which Dr. Wolfson relies in her declaration filed in support of plaintiffs' motion for leave to file a third amended complaint, was finalized on February 28, 2001, and made public on the Census Bureau's Website on March 1, 2001. See Third Declaration of Lara J. Wolfson, Ph.D. ¶ 17, attached hereto as Exhibit K. Dr. Wolfson clearly was familiar with the Census Bureau Website because she cites to it in her declaration. Id.

Despite the fact that the imputation information has been available since December 2000 and B-17 was made publically available on March 1, 2001, when "plaintiffs' counsel was asked directly by the [Utah I] court whether there were any further amendments to the complaint, . . . counsel represented to the court that the Second Amended Complaint covered and represented plaintiffs' position." Order at 5. Plaintiffs made this representation to the Utah I court even though, according to their own account, they were aware of the count imputation numbers on March 13, 2001, two weeks before the March 28 oral arguments in Utah I. Pltfs' Opp. at 83; Wolfson Supp. Decl. ¶¶ 11, 12. The Press Release dated March 13, 2001, which plaintiffs and Dr. Wolfson allege first informed them that Utah had standing to bring this challenge, contains the actual count imputation numbers for both Utah and North Carolina. See Press Release attached as Ex. 1 to Wolfson Supp. Decl.

Once again, in their Reply, "[p]laintiffs do not explain or outline any attempt made prior to that date [April 9, 2001 – the date plaintiffs claim to have learned they had standing] to obtain the figures in question, to extrapolate such figures from prior Census data, or give a reason why the cause of action was not previously included and discovery sought on the issue." Order at 5. Instead, plaintiffs and Dr. Wolfson engage in a lengthy account of their attempts to obtain

57

information about count imputation from everyone and anyone but the Census Bureau. Dr. Wolfson claims to have spent "dozens of hours during March and early April examining thousands of pages of the Census Bureau's publically released documents." Wolfson Supp. Decl. ¶ 13.[40] Dr. Wolfson also claims to have spent similar time making inquiries with the Census Monitoring Board,[41] which is an independent board established by Congress under 105-119, and members of the House Subcommittee on the Census. [42] Somehow, it apparently never occurred to plaintiffs or to Dr. Wolfson to seek the information through the Census Bureau.

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, alternatively, defendants are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. Plaintiffs' Motion for Summary Judgment should be denied.

---

[40]Dr. Wolfson fails to identify those documents, or explain how she managed to overlook B-17.

[41]In her declaration, Dr. Wolfson states that on or about March 16, 2001, members of the Monitoring Board were unable to provide her with information regarding imputation because of a Memorandum of Agreement ("MOU") with the Census Bureau that required them to maintain the confidentiality of certain data. Wolfson Supp. Decl. ¶ 17. That MOU governed the disclosure of information regarding the undercount; it ended "on the day of the official release of a written report to the Director of the Census prepared by the Census Bureau's ESCAP." See MOU, attached hereto as Exhibit L. That report was officially released on March 1, 2001. See A.R. C01029.

[42]Even though Dr. Wolfson claims that the Monitoring Board did not have information, or sufficiently detailed information, regarding imputation, that representation is belied by the very March 13 Press Release on which she and plaintiffs rely. That press release provides the imputation numbers for both North Carolina and Utah and cites to the U.S. Census Monitoring Board as the source for that information.

58

Respectfully submitted,

STUART E. SCHIFFER
Acting Assistant Attorney General

SANDRA M. SCHRAIBMAN
CAROL FEDERIGHI
AMY M. ALLEN
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, 901 E Street, N.W.
Washington, D.C.  20044
Telephone:  (202) 514-4523
Facsimile:  (202) 616-8202

Counsel for Defendants

Dated:  August 14, 2001

## LIST OF EXHIBITS

Exhibit A      Email communication from Mike Lee to Carol Federighi (June 15, 2001), and
                Curriculum Vitae of Lara J. Wolfson, Ph.D.

Exhibit B      Defendants' Supplemental Objections and Responses to Plaintiffs' Revised First
                Set of Interrogatories and Requests for Production of Documents.

Exhibit C      Census 2000 Informational Memorandum No. 110, Initial Research on Count
                Imputation in Census 2000 (Aug. 10, 2001).

Exhibit D      Excerpts from Frank Yates, Sampling Methods for Censuses and Surveys (1981).

Exhibit E      Excerpts from Oversight of the 2000 Census:  Status of Nonresponse Follow-up
                and Closeout:  Hearing Before the House Subcomm. on the Census, Comm. on
                Government Reform, 106th Cong., 2d Sess. at 53-57 (June 22, 2000) (Testimony
                of Director Prewitt).

Exhibit F      Excerpts from Hyman Alterman, Counting People: The Census in History (1969).

Exhibit G      Letter from Thomas Jefferson to Elbridge Gerry (Jan. 26, 1799), in 10 The
                Writings of Thomas Jefferson 78 (1903)

Exhibit H      Excerpts from H.R. Rep. No. 105-207, 105th Cong., 1st Sess. (1997), and from
                S. Rep. No. 105-48, 105th Cong., 1st Sess. (1997).

Exhibit I      Plaintiffs' proposed stipulations of material facts dated January 25, 2001.

Exhibit J      FOIA requests of Dr. Wolfson and Sidley & Austin.

Exhibit K      Third Declaration of Lara J. Wolfson, Ph.D.

Exhibit L      Memorandum of Understanding.

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.