

**PUBLISH**

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF UTAH, CENTRAL DIVISION**

STATE OF UTAH; MICHAEL O.
LEAVITT, Governor; OLENE S.
WALKER, Lieutenant Governor;
MARK L. SHURTLEFF, Utah
Attorney General; L. ALMA
MANSELL, President of the Utah
Senate; MARTIN R. STEPHENS,
Speaker of the Utah House; MIKE
DMITRICH, Utah Senate Minority
Leader; RALPH BECKER, Utah
House Minority Leader; ORRIN G.
HATCH, United States Senator;
ROBERT F. BENNETT, United States
Senator; JAMES V. HANSEN,
Member of Congress; CHRISTOPHER
B. CANNON, Member of Congress;
JAMES MATHESON, Member of
Congress; BLAKE J. RUSSON;
MICHAEL WAYNE ANDERSON;
BRENT McGHIE; JEAN McGHIE,

       Plaintiffs,

v.

DONALD L. EVANS, Secretary of
Commerce; WILLIAM G. BARRON,
Director, United States Census Bureau,

       Defendants,

No. 2:01CV292G



STATE OF NORTH CAROLINA;
MICHAEL F. EASLEY, Governor;
BEVERLY PERDUE, Lieutenant
Governor; ROY COOPER, North
Carolina Attorney General; MARC
BASNIGHT, President Pro Tempore of
the North Carolina Senate; JAMES
BLACK, Speaker of the North
Carolina House; PATRICK
BALLENTINE, North Carolina Senate
Minority Leader; LEO DAUGHTRY,
North Carolina House Minority
Leader; JESSE HELMS, United States
Senator; JOHN EDWARDS, United
States Senator; EVA M. CLAYTON,
Member of Congress; BOB
ETHERIDGE, Member of Congress;
WALTER B. JONES, Member of
Congress; DAVID PRICE, Member of
Congress; RICHARD BURR, Member
of Congress; J. HOWARD COBLE,
Member of Congress; MIKE
McINTYRE, Member of Congress;
ROBIN HAYES, Member of Congress;
SUE MYRICK, Member of Congress;
T. CASS BALLENGER, Member of
Congress; CHARLES H. TAYLOR,
Member of Congress; MELVIN L.
WATT, Member of Congress,

       Intervenors.

## MEMORANDUM OPINION

Thomas R. Lee, Lindon, Utah; Mark L. Shurtleff, Utah Attorney General, Raymond A. Hintze, Chief Civil Deputy Attorney General, J. Mark Ward, Assistant Attorney General, Utah Attorney General's Office, Salt Lake City, Utah; Gene C. Schaerr, Michael S. Lee, Jay T. Jorgensen, Sidley & Austin, Washington, D.C., for plaintiffs.

Amy M. Allen, Attorney, Stuart E. Schiffer, Acting Assistant Attorney General, Sandra M. Schraibman, Attorney, Carol Federighi, Attorney, United States Department of Justice, Civil Division, Federal Programs Branch, Washington, D.C., for defendants.

Tiare B. Smiley, Special Deputy Attorney General, Roy Cooper, North Carolina Attorney General, Edwin M. Speas, Jr., Chief Deputy Attorney General, James Peeler Smith, Special Deputy Attorney General, North Carolina Attorney General's Office, Raleigh, North Carolina; Jathan W. Janove, Janove Baar Associates, L.C., Salt Lake City, Utah, for intervenors.

Before **MICHAEL R. MURPHY**, Circuit Judge, **DALE A. KIMBALL**, United States District Judge, and **J. THOMAS GREENE**, Senior United States District Judge.

**MURPHY**, Circuit Judge.

The State of Utah and numerous elected Utah officials ("Plaintiffs") bring this suit against the Secretary of Commerce and the Acting Director of the Census Bureau ("Defendants") seeking injunctive and declaratory relief.  Plaintiffs contend that Defendants' use of a statistical method known as "hot deck

-3-

imputation" during the 2000 decennial census violated various statutory
provisions and the Constitution.  Furthermore, Plaintiffs allege that had the
Census Bureau not supplemented the apportionment count by hot deck imputation,
"Utah would have been entitled to 4 seats in the United States House of
Representatives beginning in 2003, North Carolina would have been entitled to 12
seats, and no other state's apportionment would have been affected."  The State of
North Carolina and several of its elected officials ("Intervenors") have intervened
as party defendants in this action.

This three-judge panel of the United States District Court for the District of
Utah was convened pursuant to Plaintiffs' request under 28 U.S.C. § 2284.
Plaintiffs have filed a motion for summary judgment.  Defendants and Intervenors
have each filed a motion designated as a motion to dismiss or, in the alternative,
cross-motion for summary judgment.  All parties have filed responses to the
competing motions for summary judgment and/or dismissal and Defendants have
filed the administrative record.

This court may grant summary judgment "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).
For the reasons set out below, this court grants Defendants' and Intervenors'

-4-

cross-motions for summary judgment, and denies Plaintiffs' motion for summary

judgment.


## I.   BACKGROUND[1]

This is the second complaint filed by Plaintiffs challenging the methods

employed by Defendants in conducting the 2000 decennial census.  In a prior

complaint, Plaintiffs alleged that Defendants violated numerous statutory

provisions and the Constitution when they refused to count in the 2000 census

LDS missionaries serving missions abroad, while, at the same time, enumerating

federal employees working abroad.  *See Utah v. Evans*, 143 F. Supp. 2d 1290,

1293 (D. Utah 2001) (*Evans I*).[2]  A three-judge panel of this court granted

summary judgment in favor of Defendants and Intervenors on the claims raised in

the earlier complaint, concluding as follows: (1) Plaintiffs lacked statutory

---

[1]The facts recited in this portion of the court's opinion are undisputed by
the parties.

[2]Plaintiffs attempted to raise the claims which are the subject of the instant
complaint before the three-judge court in *Evans I* by filing a Motion for Leave to
File a Third Amended Complaint.  In denying Plaintiffs' motion, the *Evans I* court
noted that Plaintiffs were aware on January 10, 2001, the time of the filing of
their original complaint, of the Census Bureau's practice of imputing certain
figures for purposes of actually enumerating the population of the states.  The
court further noted that Plaintiffs had "continually represented . . . that an
expedited decision was imperative" and that "the Second Amended Complaint
covered and represented plaintiffs' position."  Accordingly, the *Evans I* court
concluded that Plaintiffs' motion to file their Third Amended Complaint should
be denied on the basis of undue delay.

standing to bring their challenge under the Administrative Procedures Act

("APA"); (2) Plaintiffs failed to come forward with any evidence that the decision

not to enumerate missionaries serving outside of the country burdened the

missionaries' religious beliefs or practices; (3) the decision to enumerate federal

employees working outside of the country, in combination with the failure to

enumerate missionaries serving outside of the country, did not violate either the

Census Act or the Constitution. *See id.* at 1296, 1297, 1299, 1301. In so ruling,

the prior three-judge panel set forth the following useful synopsis of the workings

of the decennial census:

> The decennial Census is conducted pursuant to the requirement
> imposed by Article I of the United States Constitution and the
> Fourteenth Amendment that seats in the United States House of
> Representatives be "apportioned among the several States according
> to their respective numbers, counting the whole number of persons in
> each State." U.S. Const. amend. XIV, § 2; U.S. Const. art. I, § 2, cl.
> 3. The "counting" of the "number of persons in each State" is
> accomplished by "actual Enumeration," conducted every ten years,
> "in such Manner as [Congress] shall by Law direct." U.S. Const. art.
> I, § 2, cl. 3; *Franklin v. Massachusetts*, 505 U.S. 788, 791, 112 S. Ct.
> 2767, 120 L. Ed.2d 636 (1992).
> Congress, by means of the Census Act, 13 U.S.C. §§ 1-196,
> has delegated to the Secretary of the Department of Commerce the
> responsibility to "take a decennial census of population . . . in such
> form and content as he may determine." 13 U.S.C. § 141(a). The
> Secretary is assisted in that endeavor by the Director of the Census
> Bureau who "shall perform such duties as may be imposed upon him
> by law, regulations, or orders of the Secretary." 13 U.S.C. § 21. The
> Supreme Court has acknowledged that "the text of the Constitution
> vests Congress with *virtually unlimited discretion* in conducting the
> decennial" Census and such wide discretion commands extraordinary
> deference. *Wisconsin v. City of New York*, 517 U.S. 1, 19, 116 S. Ct.

1091, 134 L. Ed.2d 167 (1996) (emphasis added). Thus, the Secretary's conduct of the Census must "bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." *Id.* at 20, 116 S. Ct. 1091; *see also United States Dep't of Commerce v. Montana*, 503 U.S. 442, 464, 112 S. Ct. 1415, 118 L. Ed.2d 87 (1992) (noting that Congress's "apparently good-faith choice of a method of apportionment of Representatives among the several States 'according to their respective Numbers' commands far more deference" than state districting decisions).

Under the Census Act, "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress . . . shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States." 13 U.S.C. § 141(b). Upon receipt of the Secretary's report, the President:

> shall transmit to the Congress a statement showing the
> whole number of persons in each State . . . as
> ascertained under the . . . decennial census of the
> population, and the number of Representatives to which
> each State would be entitled under an apportionment of
> the then existing number of Representatives by the
> method known as the method of equal proportions.

2 U.S.C. § 2a(a). The Clerk of the House of Representatives then sends to "the executive of each State a certificate of the number of Representatives to which such State is entitled." 2 U.S.C. § 2a(b). With respect to Census 2000, the Secretary of Commerce delivered the Census 2000 data to the President on December 28, 2000, and the President, in turn, transmitted the counts to the Clerk of the House of Representatives on January 4, 2001. The Clerk notified Utah of its number of representatives on January 16, 2001.

*Id.* at 1293-94.

In an attempt to obtain a completed census questionnaire from every housing unit for the 2000 census, the Census Bureau developed a Decennial Master Address File ("DMAF") which contained the mailing address, street

address, and census block location of every housing unit in the United States.

The DMAF contains both "city-style addresses" and "non-city-style addresses."

A primary source of city-style addresses was the United States Postal Service. A

second primary source of city-style addresses was the address list compiled during

the 1990 census. Units of local and tribal governments also assisted by reviewing

the addresses in the DMAF to confirm the existence of the units and to provide

additional addresses that might have been missing from the address list. The non-

city-style addresses were obtained through a systematic field operation in which

Census Bureau staff visited each living quarters in an assigned area to obtain the

occupant's name and mailing address. The areas were revisited twice and a

Census 2000 questionnaire was left at each living quarters.

For the 2000 census, there were three basic data collection methods: (1)

mailout/mailback (Postal Service delivered questionnaires to the vast majority of

housing units with city-style addresses); (2) update/leave (in areas with

predominantly non-city-style addresses, enumerators left addressed census

questionnaires at each housing unit); and (3) list/enumerate (in very remote areas,

enumerators visited each housing unit and completed a short or long census

questionnaire).[3] The Census Bureau made numerous attempts to obtain census

---

[3]Several additional data collection methods were employed to improve coverage in difficult-to-enumerate areas and to enumerate "special populations," such as military personnel, persons living in a group home, and homeless persons

information from non-responding housing units.  For the non-responding housing units that ultimately could not be contacted, imputation was used.

In the 2000 census, imputation was used to complete the population count when the following situations were presented: (1) occupied units with no population count ("household size imputation"); (2) existing units whose occupied or vacant status was unknown ("occupancy imputation"); and (3) unclassified units for which nothing was known—occupied, vacant, or nonexistent status ("status imputation").  The third category included units which at some point in time were reported to exist and therefore appeared in the DMAF.  With status imputation, the process resulted in units either being deleted from the DMAF, imputed as vacant, or imputed as occupied.  If imputed as occupied, the number of inhabitants also was imputed.

The national percentage of imputed individuals in the 2000 census amounted to 0.4% of the total population.  The distribution of the housing units for which imputation was used is as follows: 56.2% of the units were imputed as occupied, 34.2% imputed as vacant, and 9.6% imputed as nonexistent and

_____

or persons otherwise without a fixed residence.

-9-

therefore deleted from the DMAF.[4]  In North Carolina and Utah, 0.4% and 0.2%

of the populations were imputed respectively.

The Census Bureau used an imputation process called a hot deck method.[5]

Hot decks are distributions of values that are constantly altered as questionnaires

are processed.  Using this method, imputation of a missing entry was made from

the last value (the last person or housing unit) stored in the matrix that fit other

known characteristics of the person or housing unit.  Typically, the records from a

nearby, fully-enumerated household of the same size were duplicated.  Donor

households supplying the characteristics or counts imputed were restricted to

those requiring field follow-up.  If possible, both the donor and the donee, the

address to which the characteristics and counts were imputed, shared the

characteristic of a single-unit structure or multi-unit structure.

Although imputation was used in the 1940 and 1950 censuses to determine

characteristics of the population, it was not used to determine the actual

population count for apportionment purposes until 1960.  In 1980, the Census

---

[4]This compares to the following distribution for housing units where
imputation was not necessary: 87.3% were occupied, 8.4% were vacant, and 4.3%
were nonexistent.

[5]The parties' memoranda refer to both "characteristic imputation" and
"count imputation."  Characteristic imputation involves the imputation of
characteristics, such as age, gender, etc., which do not affect apportionment.
Count imputation refers solely to the imputation of the population numbers, which
directly affect the apportionment count.

Bureau's use of count imputation shifted one congressional seat from Indiana to Florida. *See Orr v. Baldrige*, No. IP-81-604-C, slip. op. (D. Ind. July 1, 1985). Indiana challenged the outcome, but the district court ruled in favor of Florida. Notably, both parties agreed that imputation was not a form of sampling.  No appeal was taken from the decision in *Orr*.

The parties in this case agree that without the use of imputation in the 2000 census, Utah would have been entitled to a fourth congressional seat.  Further, the parties agree that without the use of status imputation, Utah would have been entitled to the seat.  In its filings before this court, Plaintiffs challenge both the use of imputation in general and the use of status imputation in particular.

## II.  JURISDICTION/JUSTICIABILITY

Plaintiffs' complaint sets forth the following three separate causes of action: (1) Defendants' use of imputation violates the APA because Defendants have failed to provide a rational basis for the use of imputation instead of "traditional methods" of enumeration, have failed to reconcile the use of imputation with 13 U.S.C. § 195, and have failed to reconcile the use of imputation with the constitutional requirement of an "actual enumeration"; (2) Defendants' utilization of imputation violates the prohibition against the use of statistical sampling for reapportionment purposes set out in section 195 of the

Census Act; and (3) the use of imputation violates the constitutional requirement of an "actual enumeration." Before addressing the merits of these claims, however, this court must address potential jurisdictional deficiencies in Plaintiffs' claims whether or not posed by Defendants or Intervenors. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-95 (1998) (holding that federal courts must address jurisdictional issues before reaching merits).

   *A. Census Act and Census Clause Claims*

   In their reply memorandum, Intervenors assert that although this court can enter declaratory and injunctive relief prohibiting the use of imputation in the next decennial census in 2010, this court cannot affect the apportionment tallies flowing from the 2000 census because the President has already transmitted to Congress the statement required by 2 U.S.C. § 2a(a) and the Clerk of the House of Representatives has already sent to the states a certificate of the number of Representatives to which each state is entitled as required by 2 U.S.C. § 2a(b). To the extent Intervenors are attempting to question this court's jurisdiction, we conclude the Supreme Court's decision in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), establishes that Plaintiffs' Census Act and constitutional claims are justiciable.

   In *Franklin*, Massachusetts brought suit against the President, Secretary of Commerce, Census Bureau officials, and the Clerk of the House of

-12-

Representatives challenging the enumeration and attribution of overseas military personnel to the state designated in the personnel files as their "home of record." *See id.* at 790-91. Massachusetts contended that the inclusion of overseas military personnel altered the relative state populations enough to shift a congressional seat from Massachusetts to Washington. *See id.* at 791. A three-judge district court concluded that the enumeration of military personnel serving abroad was arbitrary and capricious under the APA. As a remedy, the district court directed the Secretary of Commerce to eliminate the overseas military personnel from the apportionment count, directed the President to recalculate the appropriate number of representatives to which each state was entitled and to transmit those new calculations to Congress, and directed the Clerk of the House of Representatives to inform the states of the change. *See id.* The federal defendants appealed. *See id.*

Before addressing the merits of Massachusetts' constitutional claims, the Court noted that the suit raised a "thorn[y] standing question." *Id.* at 802. According to the Court, there was serious doubt whether jurisdiction existed to enter an injunction directing the President to recalculate and retransmit reapportionment figures to Congress. Absent such an injunction, a question existed whether Massachusetts' injury was redressable. *See id.* at 802-03.

-13-

Nevertheless, a plurality of the Court concluded that the case was justiciable, stating:

> For purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone. The Secretary certainly has an interest in defending her policy determinations concerning the census; even though she cannot herself change the reapportionment, she has an interest in litigating its accuracy. And, as the Solicitor General has not contended to the contrary, we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination.

*Id.* at 803 (citations omitted). Although only four Justices joined this portion of *Franklin*, a separate group of four Justices also concluded that Massachusetts' constitutional claims failed on the merits, albeit with no discussion of the question of justiciability. *See id.* at 820 (Stevens, J., concurring in part and concurring in the judgment) ("For the reasons stated in Part IV of the Court's opinion, I agree that the inclusion of overseas employees in state census totals does not violate the Constitution."). This led Justice Scalia to note in his separate opinion that the Court had concluded the case was justiciable. *See id.* at 824 n.1 (Scalia, J., concurring in part and concurring in the judgment) ("Although only a plurality of the Court joins that portion of Justice O'CONNOR's opinion which finds standing (Part III), I must conclude that the *Court* finds standing since eight

-14-

Justices join Part IV of the Court's opinion discussing the merits of appellees' constitutional claims.").

This case stands in the identical posture as *Franklin*. This court clearly has jurisdiction to enter injunctive and declaratory relief against Defendants. *See id.* at 802. Furthermore, this court can assume that the President, who is not a party as he was in *Franklin*, would abide by an authoritative interpretation of the Constitution and Census Act. *See id.* at 803. Finally, this court can assume that if the President transmits revised reapportionment calculations to Congress, the Clerk of the House of Representatives would submit a new certificate to the states pursuant to 2 U.S.C. § 2a(b). *See id.*; *see also id.* at 824 (Scalia, J., concurring in part and concurring in the judgment) ("[I]n light of the Clerk's purely ministerial role, we can properly assume that insofar as *his* participation is concerned, the sequence of events [envisioned by the majority] will occur."). Accordingly, Plaintiffs' Census Act and constitutional claims are justiciable.

### B. APA Claim

This court reaches a different jurisdictional conclusion with regard to Plaintiffs' APA claim. Plaintiffs can advance their APA claim only if they can satisfy the statutory standing requirements set out in the APA. In particular, Plaintiffs must demonstrate that Defendants undertook "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also*

*Colo. Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173

(10th Cir. 2000). Defendants assert that the Supreme Court's decision in *Franklin*

forecloses APA review. Plaintiffs, on the other hand, claim they have statutory

standing under section 209 of Public Law Number 105-119. *See* Pub. L. No. 105-

119, Title II, § 209, 111 Stat. 2440, 2480-83 (1997) (reproduced in the notes to 13

U.S.C. § 141). Upon review of the parties' submissions and the pertinent

authorities, this court concludes that *Franklin* controls and Plaintiffs lack

statutory standing to bring their APA claim.

The three-judge panel in *Evans I* summarized the holding in *Franklin* as

follows:

> In *Franklin*, Massachusetts challenged the apportionment
> determination following the 1990 Census, in which federal overseas
> employees were counted, and which resulted in Massachusetts' loss
> of a Congressional seat. A three-judge panel of the district court
> held that the inclusion of such federal overseas employees was
> arbitrary and capricious under the APA. On appeal, the Supreme
> Court reversed, holding, with respect to Massachusetts' APA claim,
> "[b]ecause it is the President's personal transmittal of the report to
> Congress that settles the apportionment, until he acts there is no
> determinate agency action to challenge." *Franklin*, 505 U.S. at 799,
> 112 S. Ct. 2767. Because the President is not an agency, there was
> no statutory standing to challenge the apportionment under the APA.

143 F. Supp. 2d at 1295-96. Based on *Franklin*, the court in *Evans I* held that

Plaintiffs lacked statutory standing to bring an APA challenge to Defendants'

failure to enumerate overseas missionaries, while enumerating federal employees

serving overseas. *See id.* at 1296.

-16-

Plaintiffs contend, however, that they have APA standing to challenge

Defendants' use of imputation during the 2000 census based on section 209 of

Public Law Number 105-119.  Section 209(b) provides as follows:

> Any person aggrieved by the use of any statistical method in
> violation of the Constitution or any provision of law . . . in
> connection with the 2000 or any later decennial census, to determine
> the population for the purposes of the apportionment or redistricting
> of Members in Congress, may in a civil action obtain declaratory,
> injunctive, and any other appropriate relief against the use of such
> method.

§ 209(b), 111 Stat. at 2481.  Plaintiffs' contentions notwithstanding, this court

concludes that section 209 does not create statutory standing to bring the type of

APA challenge at issue here.  We are well aware the Supreme Court has indicated

that section 209 eliminates the prudential standing concerns addressed in

*Franklin*.  *See Dep't of Commerce v. United States House of Representatives*, 525

U.S. 316, 328-29 (1999).  In this case, however, unlike *House of Representatives*,

Plaintiffs' challenge comes after the 2000 census has been completed, the

President has transmitted reapportionment figures to Congress, and the Clerk of

the House of Representatives has issued a certificate to each state indicating the

number of representatives to which that state is entitled.  We conclude that this

differing procedural posture disposes of Plaintiffs' claim that section 209 creates

statutory standing for their APA claim.

-17-

In section 209(d), Congress defined an "aggrieved person" for purposes of bringing the action allowed under section 209 as, *inter alia*, "any resident of a State whose congressional representation or district *could be changed* as a result of the use of a statistical method challenged in the civil action." § 209(d)(1), 111 Stat. at 2482 (emphasis added). This language evidences congressional intent to facilitate a prospective remedy for any constitutional or statutory infirmity in a procedure Defendants propose to use in a decennial census before the procedure is actually used. Indeed, the remedy set out in section 209(b) specifically contemplates only a prospective relief: "declaratory, injunctive, and any other appropriate relief *against the use* of" any statistical method that violates the Constitution or any other provision of law. § 209(b), 111 Stat. at 2481 (emphasis added).

Congress clearly intended section 209 to provide a vehicle for expedited review of the methods chosen by Defendants for use in the 2000 census prior to the actual undertaking and completion of the census. This conclusion is borne out by the congressional findings accompanying Section 209, which explicitly recognize that

> the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief *after* such enumeration has been conducted.

-18-

§ 209(a)(8), 111 Stat. at 2481 (emphasis added).  Moreover, Congress recognized that its desire to have these types of challenges resolved prior to the actual conduct of the census was essential in order to fulfill its "commit[ment] to providing the level of funding that is required to perform the entire range of constitutional census activities." § 209(a)(9), 111 Stat. at 2481.  In furtherance of this goal, Congress specifically deemed "sufficiently concrete and final" several precursor acts undertaken by Defendants in the years leading up to the 2000 census.[6]

------------------------------------------------

[6]In this regard, section 209(c) provides as follows:
> (c) For purposes of this section—
> > (1) the use of any statistical method as part of a dress rehearsal or other simulation of a census in preparation for the use of such method, in a decennial census, to determine the population for purposes of the apportionment or redistricting of Members of Congress shall be considered the use of such method in connection with that census; and
> > (2) the report ordered by title VIII of Public Law 105-18 and the Census 2000 Operational Plan shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census, thus making the question of their use in such census sufficiently concrete and final to now be reviewable in a judicial proceeding.

Pub. L. No. 105-119, Title II, § 209(c), 111 Stat. 2440, 2481-83 (1997).  In light of this provision we can summarily reject Plaintiffs' assertion that section 209 must apply even after the completion of a census because "no plaintiff has standing to bring an APA claim until they have suffered a concrete injury."  The Supreme Court recognized as much in *Dep't of Commerce v. United States House of Representatives*, 525 U.S. 316, 328-30 (1999).

## III. DISCUSSION

### A. Census Act

The Census Clause of the Constitution requires that an "actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3. The Fourteenth Amendment requires that the House of Representatives be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."[7] U.S. Const. amend. XIV, § 2.

In *Wisconsin v. City of New York*, the Supreme Court acknowledged that "the text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" 517 U.S. 1, 19 (1996). Through the Census Act, Congress delegated to the Secretary of the Department of Commerce the responsibility to take a decennial census of the population "in such form and content as he may determine." 13 U.S.C. § 141(a). The Supreme Court

---

[7]To the extent that Plaintiffs' filings could be read to suggest that the reference to "whole number of persons" in the Fourteenth Amendment supports their belief that each individual person must be actually counted in the census, this court summarily rejects the contention. This section of the Fourteenth Amendment amended Article I so that African-Americans are counted as "whole persons" instead of as three-fifths of a person as it was at the time the Constitution was adopted. *Compare* U.S. Const. art. I, § 2, cl. 3 *with* U.S. Const. amend. XIV, § 2.

held in *Wisconsin* that "so long as the Secretary's conduct of the census is consistent with the constitutional language and the constitutional goal of equal representation, it is within the limits of the Constitution." *Id.* at 19-20 (quotation and citation omitted). The Secretary's decisions "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." *Id.* at 20.

Plaintiffs contend, however, that 13 U.S.C. § 195, as interpreted by the Supreme Court in *House of Representatives*, precludes Defendants from using figures derived from imputation for the purpose of reapportioning the House of Representatives. Section 195 provides as follows: "Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title." 13 U.S.C. § 195. In *House of Representatives*, the plaintiffs challenged the following two sampling programs that the Census Bureau proposed to use during the 2000 census: the Nonresponse Followup Program ("NFP") and the Integrated Coverage Measurement ("ICM"). *See* 525 U.S. at 324-25. Under the NFP, enumerators would have visited a randomly selected sample of nonresponding housing units, which would be statistically representative of all housing units in a nonresponding tract, and would use this

-21-

information to estimate the characteristics of the remaining 100 nonresponding units for which the Census Bureau had no information. *See id.* Under the ICM, stratified sampling would have been used by the Bureau. *See id.* at 325. Each of the country's seven million census blocks were classified into strata, defined by the characteristics of each block. *See id.* The Census Bureau would select blocks at random from each stratum to conduct interviews and estimate characteristics of the whole based on these results. *See id.* The Supreme Court held that § 195 of the Census Act "directly prohibits the use of sampling in the determination of population for purposes of apportionment." *Id.* at 338. The Court indicated that whether sampling was used as a supplement or as a substitute its use to determine the population is impermissible. *See id.* at 342.

With this authority as a backdrop, Plaintiffs assert that hot deck imputation is sampling and that its use by Defendants in the 2000 census violated section 195. In particular, Plaintiffs claim that through the use of hot deck imputation, Defendants sought to estimate by means of a sample or statistical model people who were not actually counted by traditional methods of enumeration. Accordingly, the essence of Plaintiffs' argument is that sampling and imputation are indistinguishable because in both processes, a portion of the population is used to infer information about the population as a whole.

-22-

Whether hot deck imputation is sampling and thus forbidden by section 195

is a question of law for this court to decide. *See Walker v. United Parcel Serv.,*

*Inc.*, 240 F.3d 1268, 1277 (10th Cir. 2001) (holding that the proper interpretation

of a federal statute is a question of law). For this reason, the divergent views of

the parties' experts as to whether imputation is sampling does not create a

question of fact precluding summary judgment. This court has considered the

views of those experts, however, and finds them helpful in resolving Plaintiffs'

claims.

We begin by noting that section 195 does not preclude the Census Bureau

from the use of every type of statistical methodology in arriving at apportionment

figures during a decennial census. Instead, it prohibits only "the use of the

statistical method known as 'sampling.'" 13 U.S.C. § 195. The parties'

submissions lead us to conclude that statistical sampling and imputation are

separate statistical methodologies and that they were viewed as such at the time of

the enactment of § 195. In this regard, we agree with the following passage in

*Orr v. Baldridge*:

> The first procedure for collecting data for the 1980 decennial
> census was the mailout-mailback method, whereby questionnaires
> where mailed to [almost every housing unit in the United States].
> Although the recipients were instructed to mail the questionnaires
> back to the Census Bureau ("the Bureau"), some questionnaires were
> not returned. All housing units for which questionnaires were not
> returned were scheduled for follow-up enumeration, which included
> visits by at least two different enumerators. If information was not

obtained in this process, enumerators sought information from knowledgeable outside sources, such as landlords or neighbors. Even after this procedure, the occupancy status (vacant or occupied) and/or the number of people in the unit could not be determined for some units ("unclassified units").

The Bureau then had the task of selecting a method for dealing with the problem of unclassified units so as to minimize distortion in the population counts. The alternative suggested by the State of Indiana and its Governor, ignoring the units or tabulating them as "not reported," is the equivalent of imputing zero or no persons in the unclassified units. This would result in an undercount of the population because some of the classified units were known to be occupied.

. . . .

The plaintiffs concede, and the Court agrees, that hot deck imputation is not sampling. Sampling is the selection of a subset of units from a larger population in such a way that each unit of the population has a known chance of selection. Sampling is used where a scientifically selected set of units can be used to represent the entire population from which they are drawn. Inferences about the entire population can be based on sample results. Imputation, on the other hand, is a procedure for determining a plausible value for missing data. Imputation is used in both sample surveys and censuses with the goal of achieving as complete as possible an enumeration of the sampled or population units. In short, sampling is one of a variety of techniques which *may* be used in an attempt to improve the accuracy of a count (unless, as here, it is prohibited by law), while imputation, in some form, *must* be performed once the census taker determines that data from known and identified housing units is missing. Thus hot deck imputation does not violate § 195's specific ban on sampling.

. . . [T]he Bureau had to use some form of imputation. Some action had to be taken with regard to the small number of identified housing units from which either no information or incomplete information was obtained. Every option available to the Bureau encompassed some form of imputation, either implicitly or explicitly.

Slip. op. at 3-4, 5-7.

Although Plaintiffs struggle mightily to convince the court that sampling and imputation are two aspects of the same methodology, their arguments are not borne out by the record. Sampling is the technique of determining the traits of the entire population by collecting and analyzing data from a representative segment of that population. In hot deck imputation, on the other hand, there is no representative sample from which to infer the characteristics of the larger population. Instead, a single, fully enumerated housing unit is used to draw conclusions about a neighboring housing unit for which data is missing. That is, imputation is used to fill in missing data on the assumption that similar types of dwellings in the same geographic area will have similar characteristics.

The administrative record and the parties' filings furthermore make clear that sampling is a statistical methodology utilized at the data collection stage, while imputation is a distinct statistical methodology utilized at the data processing stage. That is, with a census or survey based on sampling, a sample design is created identifying a particular portion of the population that will be surveyed. Only those pre-identified persons or housing units are contacted for the purpose of data collection. That data is then processed and used to make conclusions about a larger population. Imputation, on the other hand, is used only at the data processing stage. It is only employed to account for discrete incomplete or inconsistent data. For instance, imputation is used to assign a value

to an empty field on an otherwise completed questionnaire or to complete a blank questionnaire, thereby forming a complete record for a given respondent. Imputation is also used when two responses on a questionnaire are inconsistent, rendering one of the responses implausible, *e.g.*, a response could indicate that a person is two-years old and also the spouse of the householder.

The administrative record and the parties' filings demonstrate that, if utilized, sampling and imputation operate at completely different levels and entirely independent of each other. Accordingly, although both methodologies could conceivably improve the accuracy of a given survey or census, they are not the same statistical method. Because imputation is not "the statistical method known as 'sampling,'" section 195 does not prohibit its use in the 2000 census. 13 U.S.C. § 195. For that same reason, the Supreme Court's decision in *House of Representatives*, a case clearly dealing with proposed sampling methodologies, does not foreclose the use of imputation in the 2000 census.

In concluding that imputation is "the statistical method known as 'sampling,'" Judge Greene quite correctly notes in his dissent that the Census Bureau did seem to blur the distinction between sampling and imputation in its 1997 report to Congress. *See* Dissenting Op. at 3; *see also* United States Department of Commerce Bureau of the Census, Report to Congress—The Plan for Census 2000, at 23 (Revised and Reissued August 1997) (noting the historic

use of "statistical methods" such as imputation in a section of the report with the following heading: "Reliance on Sampling in Previous Censuses"). Because this court found it unnecessary to reach the question of whether the Census Bureau's interpretation of § 195 is entitled to *Chevron* deference,[8] we have not relied on reports produced by the Census Bureau in determining the meaning of § 195. Nevertheless, it must be noted that the 1997 report to Congress was produced at a time when the Census Bureau was seeking to assuage concerns by many members of Congress over the proposed use of sampling in Census 2000. It apparently chose to do so by tying imputation, a statistical methodology utilized by the Census Bureau since 1960, to the sampling programs at issue in *House of Representatives*. Under these circumstances, we think that the 1997 report to Congress has very little to say with regard to whether imputation is "the statistical method known as 'sampling.'" 13 U.S.C. § 195.

Furthermore, we do not see how the dissent takes any comfort from the comments by Census Bureau officials set forth in *Young v. Klutznick*, 652 F.2d 617, 621 (1981). *See* Dissenting Op. at 3-4. The parties do not contest that count imputation has been used in each decennial census since 1960. Furthermore, as *Orr v. Baldridge* makes clear, the use of imputation shifted one seat in the House of Representatives from Indiana to Florida in the 1980 decennial census. With

—————————————

[8]*Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

-27-

this backdrop, the comments of the Census Bureau officials in *Young* regarding the 1980 decennial census clearly demonstrates that the Census Bureau did not think that imputation was prohibited by § 195. Instead, what was at issue in *Young*, was the question of whether gross estimates would be used to attribute a possible undercount of five million people to various states and localities without adequate statistical methodologies. *See Young*, 653 F.2d at 621 ("[Census Bureau officials] explained that survey techniques and demographic analysis were not sufficiently advanced as sciences to permit distribution or allocation of the estimated undercount to states and localities on anything other than a pro rata basis using population figures from the census.").

Finally, we do not think that Justice Breyer's dissenting opinion in *House of Representatives* can be read for the proposition that imputation is the "statistical method known as sampling." Instead, we read Justice Breyer's dissent as asserting that § 195 does not preclude the use of any statistical methodology in the census, as long as that methodology is only used to supplement, as opposed to establish, the apportionment count. *See House of Representatives*, 525 U.S. at 350 (Breyer, J., dissenting) ("The language of § 195 permits a distinction between sampling used as a substitute and sampling used as a supplement."). In that vein, Justice Breyer noted that imputation was simply one such method used by the Census Bureau and expressly recognized that it was distinct from sampling.

-28-

*Compare id.* at 352 (Breyer, J., dissenting) ("Census Bureau practice also helps to support this limited interpretation of the [§ 195's] scope.  Both before and after § 195 was enacted in 1957, the census has used sampling techniques in one capacity or another in connection with its determination of population, most often as a quality check on the headcount itself."), *with id.* (Breyer, J., dissenting) ("The Census Bureau *has also used a form of statistical estimation to adjust or correct the actual headcount.*  Since at least 1940, the Census Bureau has used an estimation process called 'imputation' to fill in gaps in its headcount."  (emphasis added)).

For the reasons set out above, this court concludes that hot deck imputation is not "the statistical method known as 'sampling.'"  13 U.S.C. § 195.  Thus its use by Defendants during Census 2000 did not violate the Census Act.

*B.  Census Clause*

As noted above, taken together, Article I of the Constitution and the Fourteenth Amendment require an "actual Enumeration" of the "whole number of persons in each State" every ten years.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  Relying on what they contend is the plain meaning of the phrase "actual enumeration," discussions during the Constitutional Convention demonstrating that the Founders understood the difference between a head count and an estimation of the population, and Justice Scalia's separate opinion in

-29-

*House of Representatives*, Plaintiffs contend that the Constitution forbids the use of any statistical estimations in the conducting of a decennial census. Upon review of the record and pertinent authorities, these arguments are unconvincing.

As noted above, the Constitution provides that the decennial censuses shall take place "in such Manner as [Congress] shall by Law direct." *Id.* art. I, § 2, cl. 3. This text vests Congress with virtually unlimited discretion in conducting the decennial actual Enumeration. *See Wisconsin*, 517 U.S. at 19. Congress has delegated its broad authority to the Secretary of Commerce. *See* 13 U.S.C. § 141(a). In light thereof, the Supreme Court has held that so long as the Secretary of Commerce's conduct of the census is "consistent with the . . . constitutional goal of equal representation, it is within the limits of the Constitution." *Wisconsin*, 517 U.S. at 19-20 (quotation omitted); *see also id.* at 20 (holding that decisions of the Secretary of Commerce "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census").

In view of the record, this court concludes that Defendants' use of imputation during the 2000 census was reasonably consistent with the accomplishment of an actual enumeration of the population. In the 2000 census, the Census Bureau processed data for over 120 million households, including over 147 million paper questionnaires and 1.5 billion pages of printed material. The

-30-

workload during peak operations was approximately 3.3 million forms per day. In light of the enormity and complexity of this undertaking, it is inconceivable that the Constitution prohibits the use of statistical methodologies to account for missing and incomplete data. As noted by the court in *Orr*, some type of imputation must take place by practical necessity, whether it is the imputation of statistically plausible values for the missing data or the imputation of a zero. The latter approach appears clearly inconsistent with the constitutional imperative of an actual enumeration. In fact, a study conducted by the Census Bureau after the completion of the 2000 census demonstrates that the vast majority of the unclassified housing units for which a status was imputed, roughly seventy-five percent, were added by census enumerators in the field or other census programs. The study reveals that these units were clearly valid residences that were simply not captured because of errors at the data-processing stage. Forcing Defendants to ignore these residences hardly seems consistent with an actual enumeration of the population.[9]

The court further concludes that Plaintiffs' effort to ascribe some exalted meaning to "actual enumeration" fails when that term is considered in the context of the entire text of Article I and the history of the Census Clause. It is clear

---

[9]For this reason, in addition to rejecting Plaintiffs' objections to imputation generally, we also reject Plaintiffs' objections to status imputation in particular.

-31-

from the text of Article I, when read in conjunction with the proceedings of the Constitutional Convention, that the first apportionment of the House of Representatives was necessarily based on the grossest of estimates. *See* U.S. Const. art. I, § 2; 1 Max Farrand, Records of the Federal Convention of 1787, at 578-79 (1927) (explaining that delegates to the Constitutional Convention recognized that the first apportionment would be based on a "conjectural ratio"). The constitutional requirement of an enumerative census was simply to distinguish that process from the conjectural apportionment of the first Congress. Furthermore, the phrase "actual enumeration," so heavily relied on by Plaintiffs, was added by the Committee of Style and Arrangement, a committee which did not operate to alter the substance of any of the resolutions passed by the Constitutional Convention. *Cf. Nixon v. United States*, 506 U.S. 224, 231 (1993). This court is simply unwilling to adopt the draconian interpretation Plaintiffs would have us ascribe to "actual enumeration."

As a final matter, we note that Plaintiffs' reliance on Justice Scalia's separate opinion in *House of Representatives* is unavailing. It is true that Justice Scalia and the three Justices joining his separate opinion in *House of Representatives* seemed to opine that the use of "estimation techniques" in conducting the decennial censuses would violate the Census Clause. 525 U.S. at 347-48 (Scalia, J., concurring in part). Nevertheless, Justice Stevens and the

three Justices that joined his dissenting opinion clearly indicated that statistical methodologies used to improve the accuracy of the census count, including statistical sampling, were consonant with the Constitutional requirement of an "actual enumeration." *Id.* at 362-64 (Stevens, J., dissenting). Justice O'Connor did not offer an opinion on the constitutionality of statistical sampling, noting that it was unnecessary to do so in light of the conclusion that the proposed sampling programs violated § 195. *See id.* at 343-44. Faced with this split, and in light of the analysis set out above, this court concludes that the Constitution does not prohibit the use of narrowly tailored statistical methodologies, such as hot deck imputation, for the purpose of improving the accuracy of the decennial census and furthering "the constitutional goal of equal representation." *Franklin*, 505 U.S. at 804.

## IV. CONCLUSION

For those reasons set out above, this court **GRANTS** Defendants' and Intervenors' motions for summary judgment and **DENIES** Plaintiffs' motion for summary judgment. The clerk is directed to enter judgment accordingly.

DATED this 1st day of November, 2001.

Michael R. Murphy
United States Circuit Judge

Dale A. Kimball
United States District Judge

-34-

**No. 2:01CV0023B,** *State of Utah v. Evans*

**GREENE,** United States District Judge, concurring in part and dissenting in part.

I concur with the majority that the plaintiffs' Census Act claim is justiciable. I disagree, however, with the majority's conclusion that the use of imputation to arrive at apportionment numbers in the 2000 Census was not prohibited under 13 U.S.C. § 195, as interpreted by the Supreme Court in *Dep't of Commerce v. House of Representatives*, 525 U.S. 316 (1999). For that reason I would rule that § 195 of the Census Act was violated and that the injunctive and declaratory relief sought by plaintiffs should be granted. My analysis is limited to a consideration of the statute, so I do not reach or discuss the APA or constitutional claims asserted by plaintiffs, and I would abstain from acting thereupon. The issue of disagreement presented by this dissent is whether the use of "imputation" in arriving at the final 2000 Census apportionment count constitutes "sampling" which is prohibited under § 195 of the Census Act. If so, the statute was violated. If not so, no violation occurred.

Judge Michael Murphy, in a very well written opinion for the majority in this case, has ruled that the use of imputation is not prohibited by the statute for the following reasons:

> Sampling is the technique of determining the traits of the entire population by collecting and analyzing data from a representative segment of that population. In hot deck imputation, on the other hand, there is no representative sample from which to infer the characteristics of the larger population. Instead, a single, fully enumerated housing unit is used to draw conclusions about a neighboring housing unit for which *data is missing.* That is, *imputation is used to fill in missing data on*

> *the assumption that similar types of dwellings in the same geographic area will have similar characteristics.* Because imputation is not "the statistical method known as 'sampling,'" section 195 does not prohibit its use in the 2000 census.

Majority Opinion at 25 (emphasis added).[1]

The statute in question, as amended in 1976, provides:

> *Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States,* the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.

13 U.S.C. § 195 (emphasis added).

The Supreme Court in *House of Representatives* ruled that "the Section maintains its prohibition on the use of statistical sampling in calculating population for purposes of apportionment" and that a plain reading of the "text of the statute" demonstrates that "the use of sampling for apportionment purposes" is prohibited. 525 U.S. at 339, 343. The court went on to conclude that "the Census Act prohibits the proposed uses of statistical sampling in calculating the population for purposes of apportionment." *Id.* at 343.

---

[1]In coming to its conclusion, the majority relies in part on dicta in *Orr v. Baldrige*, Slip. Op. (D. Ind. July 1, 1985), an unappealed district court case in which imputation, apparently for tactical reasons, was stipulated not to constitute sampling. Since that matter did not involve any dispute concerning imputation as related to sampling, the court's dicta was based on a non-issue that was neither briefed nor argued. In this regard, Justice Souter enunciated this admonition in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 113 S. Ct. 2217, 2247 (1993), as to such undisputed issues: "Sound judicial decisionmaking requires 'both a vigorous prosecution and a vigorous defense' of the issues in dispute. . . ."

Since the use of imputation was not directly before the court in *House of Representatives*, of course there was no ruling as to whether or not it is prohibited by § 195. However, as will be seen, the essence of the use of imputation in Census counting is that it is a form of sampling. As such, it ought to be struck down for the same reasons the proposed uses of statistical sampling were struck down in *House of Representatives*. No definition of sampling was set forth in *House of Representatives*, but for many years the Census Bureau has defined sampling broadly, and its basic meaning has been and is common knowledge. Hence, the "statistical method known as sampling" is no secret and it was aptly described by the Bureau in its 1997 report to Congress thusly:

> In our common experience, "sampling" occurs whenever the information on a portion of a population is used to infer information on the population as a whole.... In laymen's terms, a "sample" is taken whenever the whole is represented by less than the whole.

United States Department of Commerce Bureau of the Census, Report to Congress—The Plan for Census 2000, p. 23 (Revised and Reissued August 1997).

Prior to 1994, the Bureau studiously avoided the use of estimates to arrive at a population count for purposes of apportionment. That prior history, including reference to testimony given by the Bureau in court proceedings and to Congress, was noted in the majority opinion written by Justice O'Connor in *House of Representatives*. *See* 525 U.S. at 340. The consistent past opposition by the Census Bureau concerning use of estimates in determining the apportionment count was explained by a Bureau representative in a

court proceeding in 1981:

> [S]ince 1790 the census enumeration has never been adjusted to reflect an *estimated* undercount and that in their opinion Congress by statute had prohibited such an adjustment in the figures used for purposes of Congressional apportionment.

*Young v. Klutznick*, 652 F.2d 617, 621 (1981) (emphasis added).

By the mid-1990s, as set forth in its 1997 Census Report to Congress, the Bureau's position had changed and was in full support of the use of sampling, including the use of imputation. In that Report, under a general section entitled "Reliance on Sampling in Previous Censuses" and also under a subheading entitled "Use of Scientific Sampling to Increase Accuracy," imputation and other forms of sampling were discussed. *See* United States Department of Commerce Bureau of the Census, Report to Congress—The Plan for Census 2000, p. 23.[2] The Bureau's reasoning for the use of imputation in Census apportionment counting was articulated by Kenneth Prewitt, then Director of the Bureau. He stated that "the apportionment number includes imputed Census records, that is people we have not talked to, but [which] we impute into the Census file." *Oversight of the 2000 Census: Hearing of the Census Subcommittee of the House of Government Reform Committee,* at 2 (June 22, 2000).  Mr. Prewitt further explained:

> [I]n the apportionment number there will be a certain number of Census records which are put there through an imputed process. Those are not people with names.  They are not people who filled out a form.  They are people who our statistical processes

---

[2]The Bureau's "Plan for Census 2000" states:  "The Census Bureau also has used a form of statistical estimation to adjust or correct its actual headcount. . . ."

lead us to believe by putting that Census record in there we have
given the country a more accurate number.  That's an *adjusted*
number.

*Id.* at 3 (emphasis added).

In his dissenting opinion in *House of Representatives*, Justice Breyer argued that
statistical sampling should be allowed as a *supplement* in arriving at final population
figures for purposes of apportionment.  *See* 525 U.S. at 353.  Justice Breyer then
discussed imputation as an appropriate statistical procedure in use by the Census Bureau
to "fill in gaps" in arriving at the final population count.  *Id.* at 352.

Justice Breyer's description of the way imputation is used to enhance the
population count fits well within the definition of sampling used by the Bureau now and
historically.  Justice Breyer said:

> When an enumerator believes a residence is occupied but is
> unable to obtain any information about how many people live
> there, the Census Bureau "imputes" that information based upon
> the demographics of nearby households.  Imputation was
> responsible, for example, for adding 761,000 people to the
> Nation's total population in 1980 and 53,590 people in 1990.

*Id.*

The majority in *House of Representatives* rejected Justice Breyer's position that
sampling could properly be used as a supplement in population counting.  The same
reasoning should apply to the use of imputation as above described.

From the foregoing discussion, imputation is revealed as a form of sampling to
establish and enhance a portion of the total population by imputing to nonresponding

-5-

households and housing units the same number of occupants who live in certain occupied households.

Whether by the use of imputation apportionment numbers are enhanced by the use of a "statistical process" in order to arrive at "adjusted" numbers, as described by the Census Bureau; or whether the number is adjusted by a "statistical estimate" as described by Justice Breyer in order to "fill in gaps;" or whether "estimation techniques" are utilized to enhance population figures in the manner suggested by Justice Scalia in *House of Representatives;*[3] or whether the number is enhanced so as to "*fill in missing data* on the *assumption* that similar types of dwellings in the same geographic area will have similar characteristics" as is described by the majority in this case;—the result is the same. All of

---

[3]Justice Scalia, joined by three other justices in *House of Representatives,* warned of the use of "estimation techniques" in arriving at population/apportionment counts:

> To give Congress the power, under the guise of regulating the "Manner" by which the census is taken, to select among various estimation techniques having credible (or even incredible) "expert" support is to give the party controlling Congress the power to distort representation in its favor. In other words, genuine enumeration may not be the most accurate way of determining population, but it may be the most accurate way of determining population with minimal possibility of partisan manipulation. The prospect of this Court's reviewing estimation techniques in the future, to determine which of them so obviously creates a distortion that it cannot be allowed, is not a happy one.

525 U.S. at 348-49. Justice Scalia's comments were not directed specifically to § 195 of the Census Act, but they are instructive because the very mischief he seeks to avoid in eschewing "estimation techniques" could constitute violation of the statute.

these examples describe a form of sampling known as imputation in which statistical estimates are used to arrive at population apportionment.  This crosses the line and violates § 195 of the Census Act.  Accordingly, the use of imputation should be struck down as a prohibited form or subset of sampling under the reasoning of *House of Representatives*.

Manifestly, "sampling" and "imputation" in substance and effect are indistinguishable because both use a portion of the population to infer information concerning segments of the population in order to arrive at final figures concerning the population as a whole.

For the reasons aforesaid, I respectfully dissent.

DATED this 30th day of October, 2001.


J. Thomas Greene
Senior United States District Judge

alp

United States District Court
for the
District of Utah
November 1, 2001


* * CERTIFICATE OF SERVICE OF CLERK * *


Re:  2:01-cv-00292


True and correct copies of the attached were either mailed or faxed by the clerk to the following:


Mr. J. Mark Ward, Esq.
UTAH ATTORNEY GENERAL'S OFFICE
LITIGATION UNIT
160 E 300 S 6TH FL
PO BOX 140856
SALT LAKE CITY, UT  84114-0856
JFAX 9,3660101

Thomas R. Lee, Esq.
1395 E CANBERRA DR
LINDON, UT  84042

Michael S. Lee, Esq.
SIDLEY AUSTIN BROWN & WOOD
1501 K ST NW
WASHINGTON, DC  20005

Gene Schaerr, Esq.
SIDLEY AUSTIN BROWN & WOOD
1501 K ST NW
WASHINGTON, DC  20005

Daniel D. Price, Esq.
US ATTORNEY'S OFFICE
,
JFAX 9,5245985

Carol Federighi, Esq.
UNITED STATES DEPT OF JUSTICE
CIVIL DIVISION
901 E ST NW RM 862
WASHINGTON, DC  20530

Amy M. Allen, Esq.
US DEPT OF JUSTICE
CIVIL DIVISION
901 E ST NW
PO BOX 883
WASHINGTON, DC  20044
JFAX 8,202,6168202

Jathan W. Janove, Esq.
JANOVE BAAR ASSOC
9 EXCHANGE PLACE STE 900
SALT LAKE CITY, UT  84111
JFAX 9,5300428

Tiare B. Smiley, Esq.
NORTH CAROLINA ATTORNEY GENERAL'S OFFICE
PO BOX 629
RALEIGH, NC  27602
JFAX 8,919,7166763

Edwin M. Speas Jr, Esq.
NORTH CAROLINA ATTORNEY GENERAL'S OFFICE
PO BOX 629
RALEIGH, NC  27602

Judge Dale A. Kimball
DISTRICT OF UTAH
,

J. Thomas Greene
DISTRICT OF UTAH
,

Michael The Honorable Michael Murphy
125 S STATE RM 5438
SALT LAKE CITY, UT  84138